FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**WICHITA DIVISION**

'08  MAY 29  P 2 :05

CLERK, U.S. DISTRICT COURT
~~ *PMoody* DEPUTY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| MICHAEL J. MCNAUL, II, ET AL, | : |
| Defendants, | : |
| And | : |
| CONSOLIDATED MANAGEMENT GROUP, LLC, ET AL, | : |
| Relief Defendants. | : |

Civil Action No.08-
1159-JTM

08mc0371

## ORDER APPOINTING RECEIVER AS TO
## DEFENDANT RAYMOND L. LEONARD, JR. AND
## RELIEF DEFENDANT CONSUMER INFORMATION NETWORK, INC.

This matter came on before me, the undersigned United States District Judge, this

*29th* day of May 2008, on the motion of Plaintiff Securities and Exchange Commission

("Commission") for the appointment of a Receiver in the above-referenced matter. It

appears that this *Order Appointing Receiver as to Defendant Raymond L. Leonard, Jr. and*

*Relief Defendant Consumer Information Network, Inc. ("Order")* is both necessary and

appropriate in order to prevent waste and dissipation of assets to the detriment of investors in

the securities offered and sold by Defendant.

3.    All persons, including but not limited to the Defendant and Relief Defendant and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of this *Order* by personal service or otherwise, are enjoined from in any way interfering with the operation of the Receivership or in any way disturbing the Receivership Assets and from filing or prosecuting any actions or proceedings which involve the Receiver or which affect the Receivership Assets, specifically including any proceeding initiated pursuant to the United States Bankruptcy Code, except with the prior permission of this Court. Any actions so authorized to determine disputes relating to Receivership Assets shall be filed in this Court. No person holding or claiming any position of any sort with the Receivership Estate shall possess any authority to act by or on behalf of any of the Receivership Estate, except as authorized by the Receiver.

4.    The Receiver shall have and possess all powers and rights to administer and manage the Receivership Estate, including, but not limited to the power and authority to:

(a)    to take custody, control and possession of  all records, assets, funds, property premises and other materials of any kind in the possession of or under the direct or indirect control of the  Receivership Estate and, until further order of this Court;

(b)    to manage, control, operate and maintain the Receivership Estate, to use income, earnings, rents and profits of the Receivership Estate, with full power to sue for, collect, recover, receive and take into possession all goods,

chattels, rights, credits, monies, effects, lands, books and records of accounts and other documents, data and materials;

      (c)     to conduct the business operations of the Receivership Parties named in the first paragraph of this *Order*, above, and the entities they control, including the collection of rents or continuation and termination or any employment arrangement and all other aspects of any active business operation;

      (d)     to make such ordinary and necessary payments, distributions, and disbursements as he deems advisable or proper for the marshaling, maintenance or preservation of the Receivership Assets;

      (e)     to sell, rent, lease or otherwise hypothecate or dispose of the assets of the Receivership Estate;

      (f)     to contact and negotiate with any creditors of the named Defendants for the purpose of compromising or settling any claim, including the surrender of assets to secured creditors;

      (g)     to receive and collect any and all sums of money due or owing to the Receivership Parties whether the same are now due or shall hereafter become due and payable, and is authorized to incur such expenses and make such disbursements as are necessary and proper for the collection, preservation, maintenance, administration and operation of the Receivership Estate;

      (h)     to renew, cancel, terminate, or otherwise adjust any pending lease agreements to which any of the Receivership Parties is a party;

      (i)     to institute, defend, compromise or adjust such actions or proceedings in state or federal courts now pending and hereafter instituted, as

may in his discretion be advisable or proper for the protection of the Receivership

Estate or proceeds there from, and to institute, prosecute, compromise or adjust

such actions or proceedings in state or federal court as may in his judgment be

necessary or proper for the administration, preservation and maintenance of the

Receivership Estate;

(j)    to institute such actions or proceedings to impose a constructive

trust, obtain possession and/or recover judgment with respect to persons or

entities who received assets or funds traceable to investor monies, with all such

actions filed in this Court;

(k)    to open bank accounts or other depository accounts, in the name of

the Receiver on behalf of the Receivership Estate;

(l)    to prepare any and all tax returns and related documents regarding

the assets and operation of the Receivership Estate;

(m)    to take any action which could be taken by the officers, directors,

managers, members, partners, trustees or other principals of the Receivership

Estate;

(n)    to take such other action as may be approved by this Court.

5.    The Receiver shall perform an accounting of the offering and sale of

securities that is outlined in the Commission's Complaint including, but not limited to, the

named Defendants' and the Relief Defendants' solicitation, receipt, disposition and use of

the proceeds from such offering.

6.    The Receiver shall be empowered, but is not required, to file a voluntary

petition for relief under Title 11 of the United States Code (the Bankruptcy Code) for the

Receivership Estate or any portion thereof. If a bankruptcy petition is filed, the Receiver shall become, and shall be empowered to operate the Receivership Estate as a debtor in possession, with all powers and duties provided to a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Without leave or further order of this Court, no person other than the Receiver is authorized to seek relief for any person or entity included within the Receivership Estate.

7.      In the event an asset freeze order is issued, the Receiver shall be authorized, but not required, to administer, manage, and direct the marshaling, disbursement an/or transfer of monies or other assets held by third parties that are subject to the freeze. The Receiver may, in the reasonable exercise of his discretion, authorize the release, use or segregation of proceeds held by third parties.

8.      The Receivership Parties and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of this *Order*, shall cooperate with the Receiver and the other professionals working with him in the administration of the Receivership Estate, including, but not limited to, the immediate delivery to the Receiver of the following:

(a)      all assets and other materials of the Receivership Estate in the possession or under their control, as well as the name and contact information of any person who has knowledge of the nature or location of assets or other materials belonging to the Receivership Estate;

(b)      business records of any kind, whether in hard copy or electronic format, including e-mail files and accounts, customer files, accounting and financial records, bank records and brokerage or other depository records;

(c)     insurance policies regarding any assets or persons that are in any way affiliated with the Receivership Estate, along as other information regarding insurance coverage or the absence thereof;

(d)     computers and computer files, including e-mail files, along with all passwords for such files, that belong to or are under the control of any of the Receivership Parties or that in any way relate to the assets or the operation of the Receivership Estate;

(e)     passwords and other identifying information regarding all computer or on-line files, banking or brokerage accounts and/or any other assets of any of the Receivership Parties or under their direct or indirect control, specifically including but not limited to, passwords for internet or electronic access banking, brokerage and other on-line accounts;

(f)     keys, security cards, parking cards and other access codes for premises, vehicles, safety deposit boxes or accounts or assets under the direct or indirect control of any of the Receivership Parties; and,

(g)     such other information related to the Receivership Estate as the Receiver and those working with him reasonably request.

9.     Any bank, brokerage firm, mutual fund or other financial institution or any other person, partnership, corporation or other entity maintaining of having custody or control of: any brokerage or depository accounts or other assets of the Receivership Estate; or, accounts into which proceeds of the subject investment offering(s) have been deposited; or, accounts or assets under the direct or indirect control of the Receivership Parties who receives actual notice of this *Order*, shall:

(a)     freeze such accounts, funds or assets;

(b)     within five (5) business days of receipt of such notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other assets, the balance in the account or the description of the assets as of the close of business on the date of the receipt of the notice;

(c)     promptly cooperate with the Receiver to determine whether and to what extent any accounts, funds or other assets are actually assets or proceeds of assets of the Receivership Estate;

(d)     provide to the Receiver records of such funds, accounts and assets and tender said funds and/or the assets to the Receiver.

To the extent that there are assets about which a determination of ownership cannot be made, they shall be turned over to the Receiver to be held in escrow pending a determination of the ownership of such assets.

10.     The Receiver is authorized to provide notice of the entry of this *Order* to any governmental agency, person or other entity he deems appropriate. Actual notice may be accomplished by delivery of a copy of this *Order* by hand, U.S. mail, courier service, facsimile, by e-mail or by any other reasonable means of delivery.

11.     The Receiver is hereby authorized to make appropriate notification to the United States Postal Service to forward delivery of any mail addressed to any of the Receivership Parties named in the first paragraph of this *Order*, above, or any company or entity under the direction or control of the Receivership Parties, to any Post Office box or other mail depository, to himself. Further, the Receiver is hereby authorized to open

and inspect all such mail, to determine the location or identity of assets or the existence and amount of claims.

12.     The Receiver may investigate any matters he deems appropriate in connection with discovering additional information as it relates to the activities of the Receivership Estate.    In connection with any such investigation, the Receiver is authorized to:

(a)     compel, including by subpoena, the appearance and testimony of all persons, including the Receivership Parties (prior to and/or after the filing of responsive pleadings in this  action) and the production of the originals of any records and materials, of any sort whatsoever, within the possession, custody or control of any person, though the Receiver's authority under this  paragraph shall not be construed to require the waiver by any person of any validly asserted privilege; and,

(b)     order consumer and credit reports that the he deems necessary and appropriate as a part of his investigation.

13.     The Receiver is hereby directed to file with this Court and serve upon the parties, within 45 days after entry of this *Order*, a preliminary report setting out the identity, location and value of the Receivership Assets, and any liabilities pertaining thereto.

14.     Absent express permission and leave by this Court, all creditors and other persons seeking money damages or other relief from the Receivership Estate and all others acting on behalf of any such creditors and other persons, including sheriffs, marshals, and all officers and deputies, and their respective attorneys, servants, agents

and employees, are, until further order of this Court, hereby stayed. Further, all persons

having notice of this Order, including creditors and others seeking money damages or

other relief from the Receivership Estate, and all others acting on behalf of any such

creditors and other persons, including sheriffs, marshals, and all officers and deputies,

and their respective attorneys, servants, agents and employees, are restrained from doing

anything to interfere with the Receiver performance of his duties and the administration

of the Receivership Estate.

15.    The Receiver is authorized to communicate with all such persons as he

deems appropriate to inform them of the status of this matter and the financial condition

of the Receivership Estate.

16.    The Receiver is hereby authorized to employ such employees,

accountants, consultants, attorneys and other professionals, including employees of his

own professional firm, as are necessary and proper for the administration of the

Receivership Estate and the performance of his duties as set forth herein.    The Receiver

shall seek and obtain the approval of this Court prior to disbursement of professional fees

and expenses to himself, his firm or his counsel, by presentation of a written application

therefore, and after consultation with the Commission.    All costs incurred by the

Receiver shall be paid from the Receivership Assets.    Upon notice to all parties in this

case, the Receiver may submit a proposed order regarding an administrative process for

the approval and payment of professional fees and expenses consistent with this

provision.

17.    Upon the request of the Receiver, the United States Marshal's Office, in

any judicial district, or any other law enforcement agency is hereby ordered to assist the

Receiver in carrying out his duties to take possession, custody or control of, or identify the location of, any Receivership Assets or Receivership Records. The Receiver is authorized to remove any person from any premises or real estate that is owned or controlled by any of the Receivership Parties, or that is otherwise part of the Receivership Estate. The Receiver is further authorized to enter any premises, safety deposit boxes, vehicles or other property of the Receivership Parties, and to change any locks or other security mechanisms, and to recover and assets and records located thereon or therein, and, in cases of doubt, to secure assets and, in the case of any contest, to seek a judicial determination by this Court with respect to ownership.

18.    The Receiver shall keep the Commission and the Court apprised at reasonable intervals of developments concerning the operation of the receivership, and shall provide to the Commission upon request any documents under the control of the Receiver. The Receiver shall promptly notify the Court and counsel for the Commission of any failure or apparent failure of any of the Receivership Parties to comply in any way with the terms of this Order.

19.    Except for an act of gross negligence or intentional misconduct, the Receiver and all persons engaged or employed by him shall not be liable for any loss or damage incurred by any person or entity by reason of any act performed or omitted to be performed by the Receiver or those engaged or employed by him in connection with the discharge of their duties and responsibilities in connection with the receivership.

**II.**

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this action for all purposes. The Receiver is hereby authorized, empowered and directed to

apply to this Court, with notice to the Commission and the Receivership Parties named in the first paragraph of this *Order*, above, for issuance of such other orders as may be necessary and appropriate in order to carry out the mandate of this Court.

### III.

IT IS FURTHER ORDERED that this *Order* will remain in effect until modified by further order of this Court.

EXECUTED AND ENTERED at 2:00 o'clock, __. M. this 29th day of May 2008.

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

'08  JUN -5  A 8 :56

CLERK U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| Plaintiff, | : | |
| vs. | : | Civil Action No. |
| | : | 08-1159 JTM |
| MICHAEL J. MCNAUL, II, | : | |
| ET AL, | : | |
| Defendants, | : | |
| And | : | |
| CONSOLIDATED MANAGEMENT GROUP, LLC, | : | |
| ET AL, | : | |
| Relief Defendants. | : | |

## AGREED ORDER APPOINTING RECEIVER NUNC PRO TUNC

This matter came on before me, the undersigned United States District Judge, this 28th day

of May 2008, on the motion of Plaintiff Securities and Exchange Commission ("Commission") for

the appointment of a Receiver in the above matter.  It appears that this *Order Appointing Receiver*

*("Order")* is both necessary and appropriate in order to prevent waste and dissipation of assets to the

detriment of investors in the securities offered and sold by Defendants.

## I.

**IT IS THEREFORE ORDERED:**

1.    This Court hereby takes exclusive jurisdiction and possession of the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever situated, of Defendants Michael J. McNaul, II, Dale C. Lucas and Russell W. Kilgariff ("Defendants") and of Relief Defendants Alliance Leasing, LLC, Consolidated Management Group, LLC, Golden Belt Transportation, LLC, Garner Management, LLC, Forrest Energy, LLC, Warren Drilling, LLC, Warrick Drilling, LLC, Pawnee Iron Works, LLC, Mid Kan Operating, LLC and T&D Oil Service, LLC ("Relief Defendants"), including all such assets of purported ventures and partnerships identified in Plaintiff's Complaint (including any amendments thereto) ("Ventures") for which Defendants or Relief Defendants purport or have purported to serve as general partners or managing venturers (references to the Defendants and Relief Defendants collectively will be "The Receivership Parties" or to a "Receivership Party"), any investor funds raised in connection with such purported Ventures and any assets acquired with or attributable to such investor funds, **including the assets of Warren Energy, Inc.,** (collectively, these assets may be referred to herein as "Receivership Assets" or a "Receivership Asset"); and the books and records of any Receivership Party or the books and records under the actual or beneficial control of any Receivership Party or any persons acting in concert with or under the direction of any Receivership Party.

2.    Edward Nazar, located at Redmond & Nazar, L.L.P., 245 North Waco, Suite 402, Wichita, Kansas 67202-1117, with the phone number of (316) 262-8361, facsimile number (316) 263-0610, is appointed Receiver for each Receivership Party identified above, as well as of any investor funds raised in connection with the Ventures and any assets acquired with or attributable to such

investor funds; and the books and records of any Receivership Party or the books and records under the actual or beneficial control of any Receivership Party or any persons acting in concert with or under the direction of any Receivership Party ("the Receivership Estate"). The Receiver shall file with the Clerk of this Court a bond in the sum of $10,000, without need for sureties approved by the Court, to assure his conscientious performance of the duties and responsibilities imposed by this *Order*.

3. All persons, including but not limited to the Receivership Parties and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of this *Order* by personal service or otherwise, are enjoined from in any way interfering with the operation of the Receivership or in any way disturbing the Receivership Assets and from filing or prosecuting any actions or proceedings which involve the Receiver or which affect the Receivership Assets, specifically including any proceeding initiated pursuant to the United States Bankruptcy Code, except with the prior permission of this Court. Any actions so authorized to determine disputes relating to Receivership Assets shall be filed in this Court. No person holding or claiming any position of any sort with the Receivership Estate shall possess any authority to act by or on behalf of any of the Receivership Estate, except as authorized by the Receiver.

4. The Receiver shall have and possess all powers and rights to administer and manage the Receivership Estate, including, but not limited to the power and authority to:

(a) to take custody, control and possession of all records, assets, funds, property premises and other materials of any kind in the possession of or under the direct or indirect control of the Receivership Estate and, until further order of this Court;

-3-

(b)    to manage, control, operate and maintain the Receivership Estate, to use income, earnings, rents and profits of the Receivership Estate, with full power to sue for, collect, recover, receive and take into possession all goods, chattels, rights, credits, monies, effects, lands, books and records of accounts and other documents, data and materials;

(c)    to conduct the business operations of the Receivership Parties named in the first paragraph of this *Order*, above, and the entities they control, including the collection of rents or continuation and termination or any employment arrangement and all other aspects of any active business operation;

(d)    to make such ordinary and necessary payments, distributions, and disbursements as he deems advisable or proper for the marshaling, maintenance or preservation of the Receivership Assets;

(e)    to sell, rent, lease or otherwise hypothecate or dispose of the assets of the Receivership Estate;

(f)    to contact and negotiate with any creditors of the named Defendants for the purpose of compromising or settling any claim, including the surrender of assets to secured creditors;

(g)    to receive and collect any and all sums of money due or owing to the Receivership Parties whether the same are now due or shall hereafter become due and payable, and is authorized to incur such expenses and make such disbursements as are necessary and proper for the collection, preservation, maintenance, administration and operation of the Receivership Estate;

-4-

(h)    to renew, cancel, terminate, or otherwise adjust any pending lease agreements to which any of the Receivership Parties is a party;

(i)    to institute, defend, compromise or adjust such actions or proceedings in state or federal courts now pending and hereafter instituted, as may in his discretion be advisable or proper for the protection of the Receivership Estate or proceeds there from, and to institute, prosecute, compromise or adjust such actions or proceedings in state or federal court as may in his judgment be necessary or proper for the administration, preservation and maintenance of the Receivership Estate;

(j)    to institute such actions or proceedings to impose a constructive trust, obtain possession and/or recover judgment with respect to persons or entities who received assets or funds traceable to investor monies, with all such actions filed in this Court;

(k)    to open bank accounts or other depository accounts, in the name of the Receiver on behalf of the Receivership Estate;

(l)    to prepare any and all tax returns and related documents regarding the assets and operation of the Receivership Estate;

(m)    to take any action which could be taken by the officers, directors, managers, members, partners, trustees or other principals of the Receivership Estate;

(n)    to take such other action as may be approved by this Court.

5.    **Notwithstanding the powers and rights set forth above in Paragraph 4, the Receiver, prior to recommending any disposition of Receivership Asset to the Court, shall use reasonable efforts to evaluate the viability of a proposed capital infusion by the firm East West Energy, Inc. ("East West"), referenced generally in paragraphs 58-62 of the Declaration of Steve**

-5-

**Webster, filed with the Court as part of Plaintiff's Appendix in Support of its Motion for Emergency Relief.**

6.      The Receiver shall perform an accounting of the offering and sale of securities that is outlined in the Commission's Complaint including, but not limited to, the named Defendants' and the Relief Defendants' solicitation, receipt, disposition and use of the proceeds from such offering.

7.      The Receiver shall be empowered, but is not required, to file a voluntary petition for relief under Title 11 of the United States Code (the Bankruptcy Code) for the Receivership Estate or any portion thereof.  If a bankruptcy petition is filed, the Receiver shall become, and shall be empowered to operate the Receivership Estate as a debtor in possession, with all powers and duties provided to a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity.  Without leave or further order of this Court, no person other than the Receiver is authorized to seek relief for any person or entity included within the Receivership Estate.

8.      In the event an asset freeze order is issued, the Receiver shall be authorized, but not required, to administer, manage, and direct the marshaling, disbursement an/or transfer of monies or other assets held by third parties that are subject to the freeze.  The Receiver may, in the reasonable exercise of his discretion, authorize the release, use or segregation of proceeds held by third parties.

9.      The Receivership Parties and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of this *Order,* shall cooperate with the Receiver and the other professionals working with him in the administration of the Receivership Estate, including, but not limited to, the immediate delivery to the Receiver of the following:

(a)    all assets and other materials of the Receivership Estate in the possession or under their control, as well as the name and contact information of any person who has knowledge of the nature or location of assets or other materials belonging to the Receivership Estate;

(b)    business records of any kind, whether in hard copy or electronic format, including e-mail files and accounts, customer files, accounting and financial records, bank records and brokerage or other depository records;

(c)    insurance policies regarding any assets or persons that are in any way affiliated with the Receivership Estate, along as other information regarding insurance coverage or the absence thereof;

(d)    computers and computer files, including e-mail files, along with all passwords for such files, that belong to or are under the control of any of the Receivership Parties or that in any way relate to the assets or the operation of the Receivership Estate;

(e)    passwords and other identifying information regarding all computer or on-line files, banking or brokerage accounts and/or any other assets of any of the Receivership Parties or under their direct or indirect control, specifically including but not limited to, passwords for internet or electronic access banking, brokerage and other on-line accounts;

(f)    keys, security cards, parking cards and other access codes for premises, vehicles, safety deposit boxes or accounts or assets under the direct or indirect control of any of the Receivership Parties; and,

(g)    such other information related to the Receivership Estate as the Receiver and those working with him reasonably request.

-7-

10.    Any bank, brokerage firm, mutual fund or other financial institution or any other person, partnership, corporation or other entity maintaining of having custody or control of: any brokerage or depository accounts or other assets of the Receivership Estate; or, accounts into which proceeds of the subject investment offering(s) have been deposited; or, accounts or assets under the direct or indirect control of the Receivership Parties who receives actual notice of this *Order*, shall:

      (a)    freeze such accounts, funds or assets;

      (b)    within five (5) business days of receipt of such notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other assets, the balance in the account or the description of the assets as of the close of business on the date of the receipt of the notice;

      (b)    promptly cooperate with the Receiver to determine whether and to what extent any accounts, funds or other assets are actually assets or proceeds of assets of the Receivership Estate;

      (c)    provide to the Receiver records of such funds, accounts and assets and tender said funds and/or the assets to the Receiver.

To the extent that there are assets about which a determination of ownership cannot be made, they shall be turned over to the Receiver to be held in escrow pending a determination of the ownership of such assets.

11.    The Receiver is authorized to provide notice of the entry of this *Order* to any governmental agency, person or other entity he deems appropriate.    Actual notice may be accomplished by delivery of a copy of this *Order* by hand, U.S. mail, courier service, facsimile, by e-mail or by any other reasonable means of delivery.

12.    The Receiver is hereby authorized to make appropriate notification to the United States Postal Service to forward delivery of any mail addressed to any of the Receivership Parties named in the first paragraph of this *Order*, above, or any company or entity under the direction or control of the Receivership Parties, to any Post Office box or other mail depository, to himself. Further, the Receiver is hereby authorized to open and inspect all such mail, to determine the location or identity of assets or the existence and amount of claims.

13.    The Receiver may investigate any matters he deems appropriate in connection with discovering additional information as it relates to the activities of the Receivership Estate. In connection with any such investigation, the Receiver is authorized to:

(a)    compel, including by subpoena, the appearance and testimony of all persons, including the Receivership Parties (prior to and/or after the filing of responsive pleadings in this action) and the production of the originals of any records and materials, of any sort whatsoever, within the possession, custody or control of any person, though the Receiver's authority under this paragraph shall not be construed to require the waiver by any person of any validly asserted privilege; and,

(b)    order consumer and credit reports that the he deems necessary and appropriate as a part of his investigation.

14.    The Receiver is hereby directed to file with this Court and serve upon the parties, within 45 days after entry of this *Order*, a preliminary report setting out the identity, location and value of the Receivership Assets, and any liabilities pertaining thereto.

15.    Absent express permission and leave by this Court, all creditors and other persons seeking money damages or other relief from the Receivership Estate and all others acting on behalf

-9-

of any such creditors and other persons, including sheriffs, marshals, and all officers and deputies,

and their respective attorneys, servants, agents and employees, are, until further order of this Court,

hereby stayed.  Further, all persons having notice of this Order, including creditors and others

seeking money damages or other relief from the Receivership Estate, and all others acting on behalf

of any such creditors and other persons, including sheriffs, marshals, and all officers and deputies,

and their respective attorneys, servants, agents and employees, are restrained from doing anything

to interfere with the Receiver performance of his duties and the administration of the Receivership

Estate.

16.    The Receiver is authorized to communicate with all such persons as he deems

appropriate to inform them of the status of this matter and the financial condition of the Receivership

Estate.

17.    The Receiver is hereby authorized to employ such employees, accountants,

consultants, attorneys and other professionals, including employees of his own professional firm, as

are necessary and proper for the administration of the Receivership Estate and the performance of

his duties as set forth herein.   The Receiver shall seek and obtain the approval of this Court prior

to disbursement of professional fees and expenses to himself, his firm or his counsel, by presentation

of a written application therefore, and after consultation with the Commission.  All costs incurred

by the Receiver shall be paid from the Receivership Assets.  Upon notice to all parties in this case,

the Receiver may submit a proposed order regarding an administrative process for the approval and

payment of professional fees and expenses consistent with this provision.

18.    Upon the request of the Receiver, the United States Marshal's Office, in any judicial

district, or any other law enforcement agency is hereby ordered to assist the Receiver in carrying out

his duties to take possession, custody or control of, or identify the location of, any Receivership
Assets or Receivership Records. The Receiver is authorized to remove any person from any
premises or real estate that is owned or controlled by any of the Receivership Parties, or that is
otherwise part of the Receivership Estate. The Receiver is further authorized to enter any premises,
safety deposit boxes, vehicles or other property of the Receivership Parties, and to change any locks
or other security mechanisms, and to recover and assets and records located thereon or therein, and,
in cases of doubt, to secure assets and, in the case of any contest, to seek a judicial determination by
this Court with respect to ownership.

19.    The Receiver shall keep the Commission and the Court apprised at reasonable
intervals of developments concerning the operation of the receivership, and shall provide to the
Commission upon request any documents under the control of the Receiver. The Receiver shall
promptly notify the Court and counsel for the Commission of any failure or apparent failure of any
of the Receivership Parties to comply in any way with the terms of this Order.

20.    Except for an act of gross negligence or intentional misconduct, the Receiver and all
persons engaged or employed by him shall not be liable for any loss or damage incurred by any
person or entity by reason of any act performed or omitted to be performed by the Receiver or those
engaged or employed by him in connection with the discharge of their duties and responsibilities in
connection with the receivership.

**II.**

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this action for all
purposes. The Receiver is hereby authorized, empowered and directed to apply to this Court, with
notice to the Commission and the Receivership Parties named in the first paragraph of this *Order*,

-11-

above, for issuance of such other orders as may be necessary and appropriate in order to carry out

the mandate of this Court.

### III.

**IT IS FURTHER ORDERED** that this *Order* will remain in effect until modified by further

order of this Court.

EXECUTED AND ENTERED at ___9___ o'clock, _A_. M. this ___5___ day of June

2008.

J. Thomas Marten
UNITED STATES DISTRICT JUDGE

APPROVED BY:

ERIC F. MELGREN
United States Attorney

S/Laurie K. Kahrs
LAURIE K. KAHRS, #17249
Assistant United States Attorney
1200 Epic Center, 301 N. Main
Wichita, KS 67202
Telephone: (316) 269-6481
Fax: (316) 269-6484
E-mail: laurie.kahrs@usdoj.gov

TOBY M. GALLOWAY
Texas Bar No. 00790733
DAVID B. REECE
Texas Bar No. 24002810
SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
801 Cherry Street
19th Floor
Fort Worth, TX 76102
(817) 978-6447
(817) 978-4927
E-mail: gallowayt@sec.gov

AGREED TO BY:


_s/ Mark Ayesh_
Mark Ayesh
Ray Simmons
Ayesh Law Offices
Building 2300, Suite 2
8100 East 22nd Street
Wichita, KS  67226
Counsel for Defendants McNaul and Lucas,
and Relief Defendants Alliance, Consolidated, Forrest, Warren, Warrick, PIW, Mid Kan, T&D
and Warren Energy, Inc.



_s/ Bob Arnett_
Bob Arnett
Munck Carter P.C.
12770 Coit Road, Suite 600
Dallas, Texas 75251
Counsel for Defendant Kilgariff and Relief Defendants
Garner Management, LLC and Golden Belt
Transportation, LLC.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action No.: |
| | : | 08-1159-JTM-DWB |
| | : | |
| MICHAEL J. MCNAUL, II, DALE C. LUCAS, | : | FIRST AMENDED |
| GREGG KRAUSE, LLOYD F. NUNNS, | : | COMPLAINT |
| RUSSELL W. KILGARIFF, STEVEN L. TALLMAN, | : | |
| FREDDIE J. HEMBREE, | : | |
| RAYMOND L. LEONARD, JR., MID WESTERN | : | |
| NATURAL GAS, INC., and MARK DuBOISE | : | |
| | : | |
| Defendants, | : | |
| | : | |
| And | : | |
| | : | |
| ALLIANCE LEASING, LLC, | : | |
| CONSOLIDATED MANAGEMENT GROUP, LLC, | : | |
| GOLDEN BELT TRANSPORTATION, LLC, | : | |
| GARNER MANAGEMENT, LLC, | : | |
| FORREST ENERGY, LLC, | : | |
| WARREN DRILLING, LLC, | : | |
| WARRICK DRILLING, LLC | : | |
| PAWNEE IRON WORKS, LLC | : | |
| MID KAN OPERATING, LLC, | : | |
| T&D OIL SERVICE, LLC, | : | |
| CONSUMER INFORMATION NETWORK, INC., | : | |
| SUMMIT LEASING SERVICES CORPORATION, | : | |
| SANTA FE TRAILS LEASING, LLC, | : | |
| WARREN ENERGY, INC. | : | |
| | : | |
| Relief Defendants. | : | |
| | : | |

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1.      This case involves a nationwide securities offering fraud that raised $156 million

from over 1300 investors nationwide and in Canada, through the use of 22 purported oil-and-gas

equipment-leasing and pipeline joint ventures structured to evade the securities laws. In truth,

however, the investments offered were not joint ventures, but investment contracts, which meet

the statutory definition of securities.

2.      Defendants sold these securities by making numerous misrepresentations,

omissions, half-truths and outright falsehoods, concerning, among other things, the purported

success and profitability of the ventures, the background and experience of management, and the

safety and risks of the investment. Defendants lured potential investors with the promise of

annual returns of 25-40% and an even more lucrative initial public offering ("IPO") resulting in

returns as high as 3-8 times their investments.

3.      Contrary to the purported lavish returns, Defendants have returned only $7

million to investors over the four-year period of the scheme. And of that $7 million,

approximately $1 million consisted of funds diverted from later investors to pay earlier ones, *i.e.*,

Ponzi payments. Moreover, almost half of the funds fraudulently raised went to pay sales

commissions to agents who promoted the investments.

4.      The remaining $80 million was supposed to be used to acquire and refurbish

approximately 59 oil-and-gas rigs and related equipment for the ventures, as well as to acquire,

refurbish and outfit an oil-and-gas pipeline system. Currently, however, only eight of the 59

promised rigs are operating. Further, little work has been done on the pipeline, and the pipeline

venture has insufficient cash to do any meaningful work.

5.      Moreover, recent operating results are bleak. For the fourth quarter ending

December 31, 2007, seven of the 22 purported ventures reported losses ranging from $3,537 to

6.    Even so, none of the fourth quarter profits from any of these ventures, which collectively total over $700,000, has been distributed to investors as required.    Instead, Defendants McNaul, Nunns, Krause and Lucas, each of whom invoked the Fifth Amendment privilege in response to the SEC's investigation, appear to have misapplied the investors' profits to pay operating and other expenses of at least one of the entities named herein as a Relief Defendant.

7.    In addition, the promised IPO has never come to fruition.    Indeed, Defendants have never provided investors with promised audited financial statements, a necessity for an IPO.

8.    The Commission, in the interest of protecting the public from such fraudulent activities, brings this civil securities law enforcement action seeking preliminary and permanent injunctions against Defendants, enjoining them from further violations of the antifraud and registration provisions of the federal securities laws and requiring disgorgement of ill-gotten gains, plus prejudgment interest and civil money penalties.    The Commission also seeks an asset freeze, an accounting and other incidental relief, as well as the appointment of a receiver to take possession and control of certain Defendants' and Relief Defendants' assets for the protection of Defendants' victims.    Finally, the Commission also seeks to recover from Relief Defendants all assets transferred to them that are traceable to investor monies raised by Defendants.

## JURISDICTION AND VENUE

9.     The investments offered and sold by Defendants are "securities" under Section

2(1) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77b] and Section 3(a)(10) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78c].

10.     The Commission brings this action under the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act

[15 U.S.C. § 78u(d)] to preliminarily and permanently enjoin Defendants from future violations

of the federal securities laws.

11.     This Court has jurisdiction over this action under Section 22(a) of the Securities

Act [15 U.S.C. §77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa].

12.     Defendants have, directly and indirectly, made use of the means or

instrumentalities of interstate commerce and/or the mails in connection with the transactions

described in this Complaint.

13.     Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C.

§77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa] because certain of

the acts and transactions described herein took place in Wichita, Kansas and elsewhere in this

district and division, and because certain Defendants and Relief Defendants reside in this district

and division.

## DEFENDANTS

14.     **Michael J. McNaul, II** ("McNaul"), 54, is a resident of Hutchinson, Kansas.

McNaul is an undisclosed control person behind the Consolidated, Garner, Golden Belt, and

several of the Alliance ventures described below.  In January 2007, McNaul was enjoined by the

state of Colorado for violating the securities fraud, registration and broker-dealer provisions of the Colorado securities laws in connection with oil-and-gas offerings sponsored by Key Gas Corp. ("Key Gas"), a Kansas company controlled by McNaul. *Fred J. Joseph, Securities Commissioner for the State of Colorado v. Key Resource Group, LLC et al.*, 2005 CV 7455. McNaul is also the subject of a Cease-and-Desist Order in Connecticut for violations of state securities fraud and registration provisions related to his participation in the Key Gas offerings. *In the Matter of Key Resource Group, LLC et al., Docket Nos. CF – 2007-7073-S and CF – 2007-7297-S*. Additionally, McNaul is a signatory on the bank accounts for each of the nine Consolidated ventures. McNaul is also a signatory on the bank accounts of Forrest, Mid Kan, PIW and Warren. McNaul asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

15. **Dale C. Lucas** ("Lucas"), 57, is a resident of Wichita, Kansas. Lucas is a partial owner and a principal of Consolidated, Forrest, Mid-Kan and PIW. In January 2007, Lucas was enjoined by the state of Colorado for violating the securities fraud, registration and broker-dealer provisions of the Colorado securities laws in the Key Gas lawsuit. Lucas was also the subject of the Connecticut Cease-and-Desist Order for violations of state securities fraud and registration provisions related to his participation in the Key Gas offerings. Lucas is an authorized signatory on bank accounts for several of the Consolidated ventures, Forrest, Mid-Kan and PIW. Lucas asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

16. **Russell W. Kilgariff** ("Kilgariff"), 59, is a resident of Preston, Kansas and the current CEO of Golden Belt and Garner. In January 2007, Kilgariff was enjoined by the state of Colorado for securities fraud in the Key Gas lawsuit. Kilgariff was also the subject of the Connecticut Cease-and-Desist Order for violations of state securities fraud and registration

provisions related to his participation in the Key Gas offerings. Kilgariff is an authorized signatory on bank accounts for several of the Consolidated ventures, the Garner and Pawnee Pipeline ventures, and Forrest, Garner and Golden Belt.

17.    **Gregory A. Krause** ("Krause"), 57, is a resident of Hutchinson, Kansas. Krause is a principal of Alliance and the sole signatory on its known bank accounts and the bank accounts for each of the eleven purported joint ventures sponsored and managed by Alliance. Krause asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

18.    **Lloyd F. Nunns** ("Nunns"), 64, is a resident of Hutchinson, Kansas. Nunns, along with others, owns and/or controls Alliance, Forrest, Consolidated, Mid-Kan, PIW and Warren. Before his partnership with McNaul and Lucas, Nunns spent 40 years as a railroad conductor, and had little or no oil-and-gas experience. Nunns is an authorized signatory on bank accounts for several of the Consolidated ventures and for Forrest, Mid-Kan and PIW. Nunns asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

19.    **Steven L. Tallman** ("Tallman"), 54, is a resident of Pretty Prairie, Kansas, and served as the CEO of Garner and Golden Belt until August 2007. Tallman is the signatory on the Garner and Golden Belt bank accounts. Before associating with Garner and Golden Belt, Tallman worked in construction and managing pizza parlors, and had little or no oil-and-gas experience.

20.    **Freddie J. Hembree** ("Hembree"), 53, is a resident of Hutchinson, Kansas. Hembree was formerly the president of Consolidated and the manager of Warren. In July of 2007, Hembree was replaced as manager and "transferred" to the position of asset manager for Consolidated and Alliance.

21.     **Ray L. Leonard, Jr.** ("Leonard"), a/k/a "Jimmy Blake," 48, a resident of Rancho

Santa Margarita, California, controls CIN, which sold investments in the Alliance, Consolidated,

Garner and Golden Belt ventures.  Leonard has never been associated with a registered broker,

dealer or investment advisor.  Leonard pled guilty to two counts of mail fraud in 2004 and was

sentenced to 33 months in federal prison.  *See United States v. Raymond Lee Leonard,* SA CR

03-143 AHS (C.D. Cal. (SD) January 26, 2004).  Leonard is currently on supervised release.

Leonard asserted his Fifth Amendment right against self-incrimination during the SEC's

investigation.

22.     **Mark DuBoise** ("DuBoise"), 47, is a resident of Corona, California.  DuBoise

controls Mid Western, which sold investments in the Consolidated, Alliance, Garner and Golden

Belt ventures.   Mid Western and Mark DuBoise shall be known collectively as the "Mid

Western Defendants."  On sales conference calls for these ventures, DuBoise described himself

as a "senior authorized representative" and "senior analyst" for Consolidated, Alliance, Garner

and Golden Belt.  DuBoise assisted in printing certain of the offering materials for the ventures

discussed herein.  DuBoise has never been associated with a registered broker, dealer or

investment advisor.  DuBoise has an unenviable track record of brushes with state and federal

regulators.  In May 2003 and October 2003, respectively, Kansas and Pennsylvania issued

Cease-and-Desist Orders for acting as an unregistered broker selling unregistered securities.  In

January 2003, and December 2007, respectively, Washington and Connecticut issued Cease-and-

Desist Orders against DuBoise for violations of those states' antifraud, securities registration and

broker-dealer registration provisions.   In addition, in 1997, DuBoise was enjoined and ordered

to pay $130,000 in a consumer fraud action brought by the Federal Trade Commission in

connection with a sweepstakes scam.    In connection with the continuous securities offering described herein, investors were not advised of DuBoise's disciplinary record.

23.    **Mid Western Natural Gas Inc.** ("Mid Western") is a California corporation with offices in Yorba Linda, California. Mid Western is controlled by DuBoise, and offered and sold interests in each of the ventures described herein. Mid Western and DuBoise shall be known collectively as the "Mid Western Defendants."

### RELIEF DEFENDANTS

24.    **Consolidated Management Group, LLC** ("Consolidated") is a Kansas limited liability corporation ("LLC") with its principal place of business in Hutchinson, Kansas. Consolidated is the managing venturer of nine unregistered purported joint ventures formed for the stated purpose of acquiring and leasing refurbished oil-and-gas drilling rigs and related equipment. McNaul, Lucas, Nunns and Kilgariff own and control Consolidated through their respective ownership interests in several Kansas LLC's. In July 2006, the California Department of Corporations entered a Desist-and-Refrain Order against Consolidated and two of its ventures for selling unregistered securities in that state. Following the issuance of the Order (as modified by a July 20, 2006 hearing), the Respondents appealed the Order to the Court of Appeal of California. On April 28, 2008, the appellate court ruled, among other things, the joint venture interests constituted securities under California law. In September 2006, the Alabama Securities Commission entered a Cease-and-Desist Order against Consolidated for similar violations of Alabama's securities laws.

25.    **Alliance Leasing, LLC** ("Alliance") is an Oklahoma LLC based in Hutchinson, Kansas. Alliance, which is owned by Krause, is the managing venturer of eleven unregistered

purported joint ventures formed for the stated purpose of acquiring and leasing refurbished oil-and-gas drilling rigs.

26.     **Golden Belt Transportation, LLC** ("Golden Belt") is an Oklahoma LLC with offices in Hutchinson, Kansas and Oklahoma City, Oklahoma. Golden Belt is the managing venturer of the Pawnee Pipeline Joint Venture, an unregistered purported joint venture whose stated purpose was to purchase and refurbish a gas pipeline located in four Kansas counties. Tallman incorporated Golden Belt in September, 2006. Tallman and Kilgariff currently control Golden Belt.

27.     **Garner Management, LLC** ("Garner") is an Oklahoma LLC with offices in Hutchinson, Kansas and Oklahoma City, Oklahoma. Garner is the managing venturer of the Garner Rig Joint Venture, an unregistered purported joint venture formed for the stated purpose of acquiring and leasing a refurbished oil-and-gas drilling rig. Tallman incorporated Garner in October, 2006. Garner is now controlled by Tallman and Kilgariff.

28.     **Forrest Energy, LLC** ("Forrest") is a Kansas LLC with offices in Hutchinson, Kansas. Forrest is owned by Nunns, Lucas, McNaul, Kilgariff and their affiliated entities. Forrest provided oil-and-gas drilling equipment to certain of the Consolidated purported joint ventures and also leased equipment from such purported ventures.

29.     **Warrick Drilling, LLC** ("Warrick") is an Oklahoma LLC with offices in Pratt, Kansas. Warrick is owned and controlled by McNaul through another LLC he controls. Warren has purported to lease oil-and-gas drilling equipment acquired by certain of the Consolidated and Alliance ventures.

30.     **Warren Drilling, LLC** ("Warren") is a Kansas LLC with offices located in Wichita, Kansas. Warren is owned by Lucas, Nunns and McNaul through their respective

Kansas LLC's. Warren has purported to lease oil-and-gas drilling equipment acquired by certain of the Consolidated and Alliance joint ventures.

31. **Mid-Kan Well Service, LLC** ("Mid-Kan") is a Kansas LLC with offices in Russell and Wichita, Kansas. Mid-Kan is owned and controlled by Lucas, Nunns and McNaul through their respective LLC's. Mid-Kan services and operates drilling-related equipment for certain of the Consolidated and Alliance ventures and is an affiliated entity of Consolidated and Alliance.

32. **T&D Oilfield Services, LLC** ("T&D") is a Kansas LLC with offices in Pratt, Kansas. T&D is controlled by Krause, Lucas, McNaul and their affiliated entities. T&D leases, services and operates drilling-related equipment for certain of the Consolidated joint ventures.

33. **Pawnee Iron Works, LLC** ("PIW") is a Kansas LLC with offices in Hutchinson, Kansas. PIW is owned by Lucas, Nunns and McNaul through their respective LLC's. PIW purportedly acquired and refurbished drilling equipment for the certain of the Consolidated, Alliance and Garner ventures.

34. **Consumer Information Network** ("CIN") is a Nevada corporation with offices in Mission Viejo, California. CIN is controlled by Leonard and offered and sold interests in each of the ventures described herein.

35. Summit Leasing Services Corporation ("Summit") is a Kansas corporation with a registered office and mailing address in Hutchison, Kansas. Summit was incorporated by Tallman and controlled by McNaul. Summit received funds during the relevant time period from several of the relief defendants described herein and at least one other entity controlled by McNaul.

36.    Santa Fe Trails Leasing, LLC ("Santa Fe") is a Kansas corporation with a registered office in Hutchison, Kansas, and a mailing address in Wichita, Kansas. Santa Fe was incorporated by Nunns and is owned by several entities owned and controlled by the defendants described herein. Santa Fe received funds during the relevant time period from at least one relief defendant.

37.    Warren Energy, Inc. ("Warren Energy") is a Kansas corporation with a registered office in Hutchison, Kansas, and a mailing address in Wichita, Kansas in the name defendant Gregg Krauss. Warren Energy has received assets during the relevant time period from at least two other relief defendants.

## FACTS

### Background-The Key Gas Oil and Gas Drilling Ventures

38.    Between March 2001 and December 2004, McNaul, Lucas, Kilgariff, DuBoise and others offered and sold interests in 16 purported joint ventures to acquire and re-work existing oil-and-gas wells in Kansas. The managing venturer for each offering was Key Gas Corp., a Kansas LLC controlled by McNaul. According to Forms D filed with the Commission for each offering, aggregate capitalization for the 16 ventures was approximately $30 million.

39.    Key Gas sold these ventures through a nationwide network of commissioned sales agents (called Independent Sales Offices, or ISOs), including DuBoise and Leonard. None of the ISOs or individual sales agents was registered with the Commission as a broker or dealer. Key Gas also held periodic nationwide conference calls to solicit investors. Leonard led those conference calls. The sales agents received commissions of up to 50% for their sales.

40.    To date, none of the Key Gas investors has received returns equaling their initial investment. Indeed, DuBoise stated that he personally invested and lost more than $100,000 in

the Key Gas offerings. Moreover, Kilgariff testified during the SEC investigation that Key Gas stopped fund-raising activities due to the ventures' lack of success.

41.     DuBoise repeatedly referred to his dismal Key Gas investments in subsequent conference sales calls for the Consolidated and Alliance equipment leasing ventures. Without mentioning the name "Key Gas" or disclosing that the same principals responsible for his worthless oil-and-gas investments also controlled Alliance, Consolidated Garner, and Golden Belt, DuBoise contrasted his prior "high risk" and unprofitable oil-and-gas drilling investments with the "safe" ventures offered by the Defendants, which he said "always make money."

42.     In September 2005, the State of Colorado sued Key Gas, McNaul, Lucas and Kilgariff for fraudulently offering unregistered securities. In January 2007, the same defendants were permanently enjoined by Colorado for state securities fraud and registration violations.

43.     In addition, in December 2007, the Connecticut Department of Securities issued a cease-and-desist order against Key Gas, McNaul, Lucas, Kilgariff and DuBoise for violating the state's securities fraud and registration provisions.

### The Consolidated Management Oil and Gas Equipment Ventures

#### Overview

44.     At various times between March 2004 and March 2006, McNaul, Lucas, Kilgariff, Nunns, Hembree, Leonard (the "Consolidated Defendants") and the Mid Western Defendants offered and sold interests in nine ventures to acquire, refurbish and lease oil-and-gas drilling related equipment. Leonard offered and sold interests in the first Consolidated Joint Venture until April 2004, when he began serving a 33-month federal prison sentence for an unrelated fraud conviction. Consolidated is the managing venturer for each venture.

45.    The Consolidated Ventures, like the Key Gas venture, featured the use of a network of commissioned sales agents and investor conference calls, in which the Consolidated and Mid Western Defendants touted projected annual returns of 20 to 35%.

46.    Beginning in approximately August 2004, the Consolidated and Mid Western Defendants enticed investors with a purported "exit strategy." The "exit strategy" included plans to "roll up" the Consolidated ventures into a single entity that would either (a) be acquired by or merged with a public company, or (b) conduct an initial public offering with an earnings multiple of three to eight times the initial investment.

47.    Defendants emphasized the IPO prospect, with DuBoise stating that "we're not in this for a long time, we're in it for a good time." Nearly four years later, this IPO has not occurred.

48.    The Consolidated Defendants raised approximately $45.5 million through the nine ventures. As of December 31, 2007, they had returned only $6.6 million to Consolidated investors.

### Independent Sales Offices

49.     The Consolidated Defendants utilized more than 20 ISOs coast-to-coast and in Canada as exclusive selling agents for the ventures.  The agreements with the Consolidated ISOs provided for the payment of commissions ranging from 25 to 40%.

50.     Prospective investors initially received "cold calls" from lead lists purchased by the ISOs.  Many of the ISOs employed "fronters," who made the initial call to investors, and "closers" who attempted to close the sale.

51.     During the initial call, the fronters repeated canned sales scripts with statements such as "your investment is 100% secured by the equipment;" "with our venture #1 and #2 from 2004 paying revenues, we are projecting about a 30% annual return;" and "this pays out every quarter.  You should receive a check that equates to 25 to 40% return per year."  Prospective investors were advised that the venture was limited to accredited investors only.

### The Venture Materials

### Confidential Information Memorandum

52.     The Consolidated Defendants provided the sales force and potential investors with offering materials consisting of, among other things, a Confidential Information Memorandum (CIM) and a glossy promotional brochure.  The Consolidated venture materials were prepared, utilized and/or approved by the Consolidated Defendants.  Leonard approved and used the CIM and other offering materials for the first Consolidated Joint Venture.

53.     Each venture was purportedly established to operate as a general partnership and gave investors (aka "partners" or "venturers") control in the management and operation of the venture.  In reality, the purported joint ventures were not true partnerships, but securities

(investment contracts) falsely labeled as joint ventures in an attempt to evade the federal securities laws.

54.    Nunns and Hembree were the only individual defendants identified in the Consolidated offering materials. Nunns was described as "the managing member of Forrest Energy" and as having "decades of management experience in oil and gas, construction and land acquisition." In truth, before joining Forrest and Consolidated, Nunns served as a railroad conductor for 40 years and had no prior management experience in the oil-and-gas industry.

### Promotional Brochure

55.    The principal document used to sell each Consolidated venture was the slick promotional brochure, which made no reference to the risks of the ventures. Leonard helped prepare the brochure. Certain of the brochures contained a letter from Hembree, stating "the equipment to be leased by the joint venture has a history of being extremely profitable" and that the venture's equipment will be managed "by a very experienced management" that has a "proven track record." But no financial information in either the CIMs or promotional brochures supported the statements regarding equipment profitability or the Consolidated Defendants' track record.

56.    The brochures also claimed that Consolidated, the initial managing venturer, would provide audited financials and annual reports. In fact, no audited financials or annual reports have ever been prepared for any of the ventures or provided to any investors or prospective investors.

57.    Each Consolidated promotional brochure also contained projected revenue and expense figures that reflect annual investor returns between 20-35%. After the initial Consolidated venture was formed, however, none of the materials for the subsequent

Consolidated ventures disclosed the operating results of previous ventures, even though

Defendants touted their purported results in conference calls.

**Promotional DVD.**

58.    Leonard oversaw the preparation of the responsible for the promotional DVD that

was sent to prospective investors in the initial packet.  Among other things, the DVD claimed:

- This is a low risk venture with high returns.
- Forrest Energy now has contracts to keep these rigs busy for the next several years.
- Because these assets are in constant use, investors are provided an immediate income stream, paid quarterly.
- Consolidated Leasing Joint Ventures can provide such substantial returns with minimal risk because you are buying hard assets with a proven track record of profitability.

### The Sales Process: Sales Conference Calls

59.    Upon receipt of the offering materials, prospective investors were given a

"conference code" and encouraged to dial into a nationwide conference sales call pertaining to

the venture.  These conference calls were replete with materially misleading misstatements and

omissions concerning each of the Consolidated ventures.

60.    Between August 18, 2004, and March 14, 2006, Consolidated sponsored at least

100 nationwide conference sales calls for the Consolidated venture offerings, all of which were

recorded by the conference call provider.   As many as 100 prospective investors participated in

the calls.

61.    Acting at the behest and with the knowledge and approval of McNaul, Nunns,

Hembree, Kilgariff, and Lucas, DuBoise hosted many of the Consolidated conference calls.  For

hosting the calls, DuBoise received an undisclosed 3% commission "over-ride" on all sales

resulting from the sales call, in addition to the commissions he received from direct sales by his

ISO, Mid Western.

62.    DuBoise hosted the Consolidated sales calls from his office in California. After the State of California issued its Desist-and-Refrain Order against Consolidated, however, DuBoise hosted at least some of the calls from Nevada.

63.    McNaul, Nunns, Hembree, Kilgariff, and Lucas participated and/or listened to the Consolidated sales calls from a conference room in Consolidated's Kansas office. Kilgariff participated in numerous calls between August 18, 2004 and March 24, 2005, when he supposedly left Consolidated to pursue other interests. At the conclusion of most calls, DuBoise, McNaul, Nunns, Kilgariff, Lucas and Hembree discussed among themselves and critiqued the calls.

64.    DuBoise used a scripted sales pitch on the conference calls. He typically introduced himself as "Mark," without mentioning his last name.

65.    DuBoise routinely described himself as a "senior representative" of the corporation and falsely claimed to have "been with these guys for the last decade." In truth, DuBoise met McNaul and Kilgariff by making a telephone pitch to sell them ATM machines in 2000.

66.    On the calls, DuBoise then typically introduced Nunns and Hembree as "industry affiliates" or "experts." DuBoise then discussed, among other things, the uniqueness of the investment opportunity, the expertise and experience of the "proposed" management and affiliates involved, and the projected returns for the joint venture.

67.    DuBoise repeatedly referred to the investment as a "turnkey" deal in which Consolidated and its affiliates (Forrest and, later, PIW) would acquire, refurbish in "like new condition," lease and operate the oil-and-gas drilling rigs on behalf of the venture for the total subscription amount of the venture.

68.    DuBoise also claimed that an investor's risk of loss was limited to the amount of the investment and that there would never be an additional cash call. At the conclusion of the presentation, DuBoise would field questions from potential investors.

69.    At this point, McNaul, who was introduced only as "Mike," and the other participants on the call, including Nunns and Hembree, would answer questions.

70.    In addition, on at least two Consolidated sales calls, McNaul posed as Hembree to answer questions. Use of imposters was not a new tactic for the Consolidated Defendants; according to the complaint filed in the Colorado Key Gas case, a convicted felon sometimes posed as an investor during the Q&A session of the Key Gas conference calls.

### The Consolidated Joint Venture #2.

71.    The first known recorded sales conference calls occurred in connection with the venture referred to as Consolidated Joint Venture #2 ("CJV#2"). The June 10, 2004 CIM for the venture sought to raise a total of a $4,900,000 from investors in order to purchase eight completion—workover drilling rigs from Forrest or another affiliate. This, of course, suggested that Forrest or an affiliate actually had the rigs.

72.    The CIM for CJV#2 also represented that upon the purchase of the rigs from Forrest or an affiliate, the venture would lease the equipment to "oil and gas operators." The CIM added that "Forrest may seek to lease the equipment from the Venture."

73.    Likewise, the glossy promotional brochure for CJV#2 contained pictures of the rigs. In addition, the glossy brochure represented that the rigs were in "excellent" condition and had recently been "refurbished and rebuilt between 2002 and 2004."

74.    At the beginning of the CJV#2 solicitation, however, neither Forrest nor any of the Consolidated Defendants' affiliates had acquired *any* rigs for the venture.

75.     Instead, McNaul, on behalf of Forrest, had merely signed a letter of intent to acquire a privately held Kansas oil company for $2 million, whose assets included the eight rigs slated for CJV#2 and depicted in the glossy brochure. The letter of intent was dated April 8, 2004.

76.     Under the agreement, Forrest would also acquire the Kansas oil company's list of approximately 200 customers for whom it drilled wells. When the agreement was executed, Forrest had approximately 30 customers for which it drilled and/or completed oil and gas wells.

77.     Forrest made a down payment of $100,000, with the $1.9 million balance due on July 6, 2004. Subsequently, Forrest made another $100,000 payment to buy time to complete the acquisition.

78.     But Forrest never made the remaining payments, never acquired any assets from the Kansas company, and never operated or refurbished any of its rigs. In fact, on September 21, 2004, the Kansas company repudiated the contract, advising Forrest in writing that "this agreement is over."

79.     On November 24, 2004, Forrest filed a breach-of-contract lawsuit against the Kansas company. Yet, Forrest sought only return of its down payment; it did not seek specific performance of delivery of the rigs.

80.     Indeed, after the Kansas company repudiated the agreement, Forrest began acquiring *other* rigs on behalf of CJV#2. But Forrest did not acquire a full eight rigs for the venture, even from this new source, until approximately June 2005.

81.     Meanwhile, from the second quarter 2004 to at least the third quarter of 2006, Consolidated made "pro forma" quarterly payments to CJV#2 investors that were not based on actual revenues. In fact, the initial investor distribution for the quarter ended June 30, 2004,

consisted of investor funds misappropriated from the CJV#2 joint venture account, *i.e.*, Ponzi payments.

82.     The amount of the initial "pro forma" checks, which were signed by Lucas, was $2,860.13. This represented an approximate quarterly return of six percent – which, not coincidentally, approximated the quarterly net income projection in the CJV#2 promotional brochure of $2,977.

83.     Further, between August and December 2004, the offering materials mailed to potential CJV#2 investors contained a bogus CJV#2 second quarter P&L statement, claiming to show that existing investors in CJV#2 were already being paid the projected returns.

84.     DuBoise further misled potential investors by repeatedly referring to the CJV#2 second quarter distribution in conference sales calls. DuBoise made these and other false and misleading statements in the presence of, and with the knowledge and approval of McNaul, Kilgariff, Nunns, and Hembree.

85.     For example, during sales calls between August and December 2004, in which McNaul, Kilgariff, Nunns and Hembree participated, DuBoise falsely represented that Forrest had acquired the eight workover—completion rigs for the venture, that the rigs were already leased to Forrest for five years (despite no vote from the venturers approving Forrest as the lessee), that Forrest had contracts from third-party operators for the rigs well into 2005, and that the rigs were operating and returning profits to CJV#2 investors that met the projections in the CJV#2 promotional brochure.

86.     On August 18, 2004, the Consolidated Defendants participated in and/or monitored a nationwide sales conference call for CJV#2 hosted by DuBoise. On the call, DuBoise made the following materially false and misleading statements without being corrected:

- [w]e took over this particular group of rigs in the very latter part of the first quarter from an extremely successful company..... Basically, we not only took over the entire operation, but we got over 200 existing clients that we drill for right now.

- Now, Forrest Energy -- which is also on the phone call tonight, our industry partner -- has already contracted 100 percent of the [CJV#2 rigs] for the next five years with price escalators, as I'll go over with you in a second, and a contractual backlog. These particular eight rigs are already backlogged into the latter part of the third quarter, early fourth quarter of 2005. We're talking literally a year's backlog on projects that are already funded.

- [w]e have all eight of these rigs. They have been up and operational and that's why the customers on -- every one of these rigs is in-house. It's completely, 100-percent refurbished. Every one of those rigs is outside making us money right now, and that's why the customers, in the second quarter [of 2004], even though we weren't working the amount of hours that we're working now, and in fact, the price went from $125 to $155 on these particular rigs, that's why the customers made a return of $2,860.

- Every one of those rigs is outside making us money right now, and that's why the customers, in the second quarter...made a return of $2,860.

- the equipment already is valued at a little over $5 million and the [amount of this offering] is over $4.9 million, so the appreciation of the equipment is literally happening on a daily basis.

87.    None of the Consolidated Defendants corrected these misrepresentations, which DuBoise made at their behest.

88.    On October 6, 2004, the Consolidated Defendants participated in and/or monitored a nationwide sales conference call for CJV#2. On the call, Defendant DuBoise made the following materially false and misleading statements without being corrected:

- [w]e took over this particular group of rigs in the very latter part of the first quarter from an extremely successful company.... Basically, we not only took over the entire operation, but we got over 200 existing clients that we drill for right now.

- If you turn to the second page of the [2nd quarter 2004 CJV#2] Profit and Loss sheet, I want to point out something down at the bottom that you may not have noticed. It says, One Unit Quarterly Disbursement, $2,860.13. Well, as I'm going to go over in a second here, when we get into the first page of the prospectus, literally that was only a hundred dollars short of projections. Our

projections were based on $2,977. Every customer that purchased at least one unit got $2,860.13.

- You know, I've been in many, many operations, I've been selling oil and gas for many years, and it's not very likely that a company hits projections, or 96 percent of projections, quarter after quarter after quarter, and that's the beauty and the safety of this, because this particular rigs, they do not leave the yard until we're paid, and we are paid for travel time as well to and from the projects.

- I'm very proud to say in the third quarter [2004], and very much so in the fourth quarter [2004], this particular group of rigs [CJV#2] is working 60 to 65 hours a week, so once again, when I state the projections are conservative, we feel that they are very achievable and at times we're actually going to be able to exceed those.

89.    On December 16, 2004, the Consolidated and Mid Western Defendants participated in and/or monitored a nationwide sales conference call for CJV#2. This call occurred after Forrest had filed suit against the Kansas company over the repudiated agreement to acquire, among other things, the rigs for CJV#2. On the call, DuBoise, McNaul, and Hembree made the following materially false and misleading statements without being corrected:

- DUBOISE:  Now, Mr. Lloyd Nunn (sic), our industry partner, the contracted proposed leasee (sic) for the next five years, Forrest Energy, has already contracted 100 percent of the equipment with price escalators and a contractual backlog of many, many months on projects that have already been funded.

- DUBOISE:  Well, we're not working 50-hours any more. We have these rigs working approximately, in the fourth quarter, 60 to 65 hours a week.

- DUBOISE:  This is something that's pretty Steady Eddie that you can count on year in and year out. The bottom line is, if you've ever invested in oil and gas wells, once you invest with Consolidated Management and you start seeing the quarterly disbursements that we are talking about, I almost guarantee you will never take the risk of investing in oil and gas wells again.

- DUBOISE:  And we fully expect, as we've already hit and I'll go over the performa (sic) with you in just a second right before we get to the question and answers the second quarter and the third quarter, annualized, along with the fourth quarter, we're going to meet expectations. We're going to be right what it says in regards to the performa (sic). We fully anticipate based on second, third and the work we're doing towards the end of the fourth quarter -- that you're looking at a 25-percent annual return over the year 2004. As we step into 2005 and 2006,

when I go through the prospectus with you, I'll show you how that's going to increase dramatically. And most important, your investment is secured by ownership of 100 percent of the equipment.

- CALLER: I invested in Consolidated Leasing No. 1.
  DUBOISE: Okay.
  CALLER: I'm also in Consolidated Leasing No. 2
  DUBOISE: Very Good.
  CALLER: What happened to No. 1 as compared to No. 2 as far as return is concerned?
  DUBOISE: The difference is—and I'll let Mike [McNaul] jump in here and answer this, too – we've already got all the equipment in Consolidated Leasing No. 2. All eight of the rigs have been out there working the whole time. Mike, would you like to finish that up in regards to Consolidated 1?
  MCNAUL: Yeah. All the equipment has not been acquired yet, and so if you don't have all the equipment in the field, it is a little different than Consolidated No. 2 in that all eight rigs have been out in the field working already.

- DUBOISE: Okay. When Mike said all the equipment hasn't been acquired, he was referring, callers, to Consolidated 1.

- CALLER: Question. So how did you acquire the equipment in Consolidated 2 prior to the closing of the joint venture?

- DUBOISE: We contracted. We contracted for the equipment.

- CALLER: So you're carrying a short-term note or –

- DUBOISE: That is correct. In fact, it will -- it will be paid off probably after tonight's phone call. Like I said, caller, we're down to our last handful of units. I mean, we -- I don't know exactly because I left the office a little early today to do the conference call, but I believe there is only seven or eight units left, and I might be a little high on that one. So the equipment is basically almost all paid for and will be paid for by tomorrow or Monday. You know, and the funny thing about this is, caller, if I can add a little footnote to that. The equipment has actually appreciated in value as we were paying off the equipment.

- CALLER: Did you have to rework the equipment, refurbish the equipment to make it running, or or

- DUBOISE: Well, I wouldn't say to make it running, but that's a good question, caller. Thank you for bringing that up. Mike [McNaul] or Fred [Hembree], either one of you want to jump in there and not only give him the answer, which obviously I know what it is, but tell him what exactly that you do when you talk about a complete refurbishment?

- MCNAUL: Yeah. We have gone through, this equipment that we have had under contract has been totally gone through, everything from -- Fred -- new engines, the derricks have been taken off and been checked out for stress cracks and cleaned up and, of course, put back on. What? New transmissions.

- DUBOISE: What else, Fred?

- HEMBREE: Oh, yeah, they replaced air lines. Some of the trucks we actually even did the cabs.

- MCNAUL: Yeah. New cabs on them and, yeah, frameup restoration kind of deal like you might do on a --on a vintage car, so to speak.

90.    The bogus "pro forma" returns paid to CJV#2 investors became part of DuBoise's standard sales pitch during the sales conference calls for numerous of the defendants' subsequent 20 ventures. The "extremely successful" CJV#2 became the poster child to support the outlandish projections in the subsequent ventures.

### The Remaining Consolidated Joint Venture Offerings

91.    Between approximately December 2004 and March 2006, the Consolidated and Mid Western Defendants and other ISOs – with the exception of Leonard, who had gone to the federal penitentiary – raised approximately $43.3 million through seven additional Consolidated oil-and-gas equipment joint ventures similar to CJV#2. In connection with each venture, the Consolidated and Mid Western Defendants made numerous false and misleading statements during the sales conference calls concerning: the success of prior ventures, including CJV#2; the safety and risks of the investment; the background and qualifications of management and affiliated entities; and the number of oil-and-gas operators for whom Forrest drilled.

92.    As early as August 2004, the Consolidated Defendants, with DuBoise as the primary spokesman, began touting an "exit strategy" for the joint ventures. They told investors and potential investors that the management team was seriously considering a merger,

acquisition, or an initial public offering (IPO) for the ventures. They further stated that investors could quickly reap a large return on investment.

93.     Among other things, the Consolidated defendants said they were working with one of the largest brokerage houses in the world; they had met with one of the "directors" for that firm to discuss an IPO; based on other IPOs in the industry, they expected at least a 3-4x multiple (that is, a 300-400% return on investment); that they were "not in this for a long time;" that the IPO had a 99% chance of happening within the next six to twelve months, if not sooner; and that once the IPO happened, they would return immediately to offering new ventures in order to do another IPO.

94.     The statements concerning the planned IPO were materially false and misleading for several reasons. First, although defendant McNaul engaged a brokerage firm in June 2006, it was to raise private capital for an unaffiliated company – not to raise funds for the ventures.

95.     Second, in approximately September 2006, McNaul actually declined the offer proposed by the brokerage firm.

96.     Third, the "director" of the brokerage firm repeatedly mentioned to investors he was not a director of the firm, and had no role in capital-raising for the firm.

97.     Fourth, the Consolidated Defendants never provided any brokerage firm or investment banking firm with audited financial statements – a prerequisite for engaging in an IPO.

98.     And fifth, a properly performed audit would have likely uncovered, among other things, the bogus pro-forma payments made to CJV#2 investors, thereby dashing any hopes for an IPO.

99.   In October 2005, starting with the conference calls for the seventh Consolidated venture, the Consolidated and Mid Western Defendants began touting the purported involvement of a very experienced and well-respected oil executive (the "executive"), in the operations and management of the ventures and affiliated entities.   According to DuBoise, "one of the most well-respected oil men in the world" had joined the Consolidated management team, along with his son and two associates.

100.   DuBoise and Nunns told prospective investors that these individuals were the "head of" Consolidated's (and later Alliance's) drilling operations.   DuBoise claimed that the executive oversaw the drilling operations in Oklahoma through his company Warrick Drilling, LLC, and that the executive's son oversaw the Defendants' drilling operations in Kansas through his company, Warren Drilling, LLC.

101.   DuBoise, in virtually every sales conference call from October 2005 through at least early 2007, trumpeted the executive's experience and his value to the ventures.   For example, DuBoise repeatedly claimed that because of the executive's reputation and involvement in the Defendants' operations, the timeline for the proposed "IPO [for the ventures] will be a lot shorter."

102.   He also claimed that the executive's company, Warrick Drilling, was the "proposed lessee" on the particular venture being offered, and that it had done a "great job" as the "contractual lessee on all prior ventures." DuBoise mentioned that if prospective investors did not want this executive and defendant Warrick operating their rigs, then maybe they should not invest.   Based on these representations, investors in at least two Consolidated ventures voted to lease the venture's equipment to defendant Warrick Drilling.

103.    In truth, during the relevant period, neither the executive nor Warrick ever operated a single rig or other piece of equipment for any of Defendants' ventures. Indeed, the executive never executed a lease on behalf of Warrick with any venture.

104.    To perpetuate the ruse, McNaul moved the operations of Forrest into the newly formed Warren Drilling – a company purportedly named after the executive's son. But neither the executive nor his son had any ownership or affiliation with Warren Drilling. Undisclosed to investors, McNaul was the majority owner of Warrick and Warren.

105.    Further, in the two Consolidated ventures that voted to execute a lease with the executive and *Warrick Drilling*, McNaul substituted *Warren Drilling* and leased the equipment to that company without consulting the investors. The purported partners in the joint ventures had no say in these decisions.

106.    In connection with Consolidated Joint Ventures #3 through #9, Defendant DuBoise, on various conference sales calls, made the following materially false and misleading statements without being corrected:

- [Caller]: "How close are your projections to and your actual experience? In other words, what is confidence value that I can put in these [projections]?"

- DUBOISE: For -- they've hit, sir. I mean when you talk about [CJV#2], that was -- we didn't actually start -- we had already contractually acquired the equipment in the latter part of the second quarter on that particular equipment or actually a little bit towards the middle of the second quarter. And the distribution checks that went out for Joint Venture No. 2 were, I think the worse case scenario was 95 percent or thereabouts of projections. We projected 2,977 dollars. There's probably several callers on this call tonight that were in a joint venture that got distribution checks for 2,860 the second quarter; 2,800 and change the third quarter. And the fourth quarter, from what I understand, is going to be very similar to the second and the third quarter. So we do have three quarters with the track record on Joint Venture No. 2.

- We fully believe, based on the returns we have seen on [CJV2], that you will receive a 30-35-40-45% and higher annual return in your investment and most

important your investment is secured by ownership of 100% of the equipment, a hard asset that is actually appreciating in value.

- …it's never taken any longer than 30 days to get the equipment in-house…it's always been a relatively short period of time.

- there has not been a venture yet where we didn't get the equipment in a timely fashion

- [caller]: Are there any contingent liabilities to the venturers?

- DUBOISE: No there isn't. Absolutely zero.

- For your own safety as a venturer, we use one of the largest attorney firms in the world . . . . For those of you who are familiar with them, they are a very high price international firm. But they're there to protect us, protect you the venturer from any liability, and that is all inclusive in the $4.5 million raise.

- [We]Really don't have any competition because so much work is out there.

- Oil prices go up or down but that will have no influence on new drilling for gas.

- …there's more work than any of us can handle. We don't have any competition. I know that's a bold statement but there's so much work that even the big boys like Forrest…we've got more work than anybody can handle. This particular equipment has a contractual backlog of up to 15 months…there's no end in site.

- What that means is, by owning the drilling rig, you would be getting involved in the one sector of the oil and gas industry that always gets paid, regardless of whether the wells are wet or dry, produce or not. We always make money. That's the bottom line. It's taking the risk out of the oil and gas industry.

- We are completely booked on this rig throughout 2006.

- The rig [for venture CJV#7] has been in house for 45 days and is being totally refurbished, like new. We have welders working full time. Big advantage to have already acquired the equipment. The rig will get in field in December 2005 to early January 2006. This rig has contractual backlog through 2006, meaning that if this rig is put onto the field in 1-06, it is already booked for a year solid.

- Nunns is the Managing member of Forrest Energy; contracted lessee for the next 5 years on all the prior ventures, which have been extremely successful. Invested in oil and gas drilling projects and he has been in the industry as far as the production assets over 30 years as well. He has extensive experience in drilling rigs, completion rigs, wire line trucks, drill stem testing, casing crews, fracturing and all facets of equipment management.

- Forrest has a client base of over 250 clients that it is currently drilling wells for.

- Bottom line is you're getting an opportunity to get into a company that already has a tremendous leg up, has all the pieces in place, has the acquisition specialist, has the operators to run the equipment, has the client base of over 220 operators that are publicly traded companies and large private companies.

- Forrest Energy has over 220 operators that they drill for.

- When we talk about exit strategy in the back of the [promotional brochure], that's why I wanted you to write down Bronco Drill.com. It's very similar. We've actually modeled ourselves after them with one exception, actually several exceptions. Number one, we believe we have a lot stronger management team with Mr. Fred Hembree, with Mr. Lloyd Nunns and, of course, [the executive]. The bottom line is though, Bronco Drilling went public on August 19th [2005]. They did an IPO. ....Their shares went from $17 to $25 overnight. If you go to Bronco Drill.com, you will see that we are very similar with the exceptions that I have already outlined.

- Well, I've got to tell you, folks, we are not in this for a long time. We are in this for a good time. This [venture] will not be in operation, I believe in five years. In fact, I would be absolutely shocked and surprised if it didn't go IPO within the next year or less.

- We operate the equipment and give great -- 25%, 30%, and 35% -- returns. So an IPO makes sense.

- We are looking right now that we could potentially sell this entire group of ventures inside of the next 6-12 months at 3-4 times what you put into it.

- With men associated with this deal like Fred Hembree and [the executive] -- one of the most respected oil & gas men in the world – I [Mark] believe the exit strategy will be executed in the next 6-12 months if not less.

- If I go over prior IPOs, I believe we have highest quality of management of any of them that has gone public in last year. This project/next project. If these two rigs are not operational until the second quarter. It is very possible that – first distribution in August – high potential that this thing will go public before you see your first distribution check.

### The Alliance Leasing Ventures

107.    Shortly after the California D&R Order was issued against Consolidated in

January 2006, Krause incorporated Alliance in Oklahoma in order to continue the scheme. Then,

at various times, McNaul, Lucas, Krause, Nunns, Hembree, Leonard (collectively the "Alliance

Defendants") and the Mid Western Defendants began offering equipment leasing ventures under

the Alliance name.

108.    During a recorded conference call between DuBoise, McNaul, Krause and various

salespersons on March 21, 2006, DuBoise stated:

- As you know, as a result of the California, Gregg are you on the call?

- Gregg: Yes I am.

- Good, we have Gregg Krause here.  As you know, the last 3 weeks or so, we haven't been able to sell California.  As a result of that, we are not changing company names, we are actually opening a new corporation in the State of Oklahoma.

109.    During the call, DuBoise also instructed all salespersons to delete any reference to

Consolidated in the correspondence to prospective investors.  Although Alliance was purportedly

based in Oklahoma, it operated from the same Kansas offices as Consolidated.

110.    The Alliance and Mid Western Defendants offered the purported ventures in the

same manner as Consolidated.   The materials and purported joint venture documents were

virtually identical to the Consolidated materials.  Prospective Alliance investors also received a

promotional DVD that, among other things, described the ventures as "actually a low risk

venture with high returns," and claimed the equipment had "a proven record of profitability."

111.    The CIMs for the first five Alliance ventures identified Krause as a managing

member of Alliance, but failed to identify or disclose the management role of McNaul.  Missing

from the same five CIMs was any mention of the Consolidated ventures or the California Desist

and Refrain Order entered against the company.  McNaul did not appear in the management

section in the CIMs until the last six Alliance offerings, where he, along with Lucas, were

identified as "consultants."  After the Alabama C&D Order was entered against Consolidated

and one of its ventures on September 21, 2006, none of the Alliance CIMs disclosed the existence of the order.

112.   On certain Alliance conference calls, McNaul was introduced by first name only and described as an "exit strategy specialist" and the "project coordinator" for PIW.

113.   In the CIMs for the first five Alliance ventures, the only affiliate identified was PIW.   In the CIMs for the last six offerings, Warren and Warrick were also identified as affiliates.

114.   Also beginning with the sixth Alliance venture in August 2006, the CIMs disclosed, under the "prior activities" section, the existence of the prior Consolidated ventures, the amounts raised in each venture, and the amounts "distributed" to investors in each venture.

115.   Measured by returns to investors, the Alliance CIMs represented CJV#2 to be the most successful.   The CIMs stated that it was formed in June 2004 and capitalized with approximately $4.9 million.   The CIMs further claimed that as of August 1, 2006, it had returned $1,933,563 to investors.

116.   The "amount returned" figure represented a total return of approximately 40%. The CIMs failed to disclose, however, that the funds paid to CJV#2 investors were not based on actual equipment lease revenues, but were instead "pro forma" returns consisting at least in part of Ponzi payments.

117.   By January 2007, Alliance had formed eleven oil-and-gas equipment leasing joint ventures and raised over $75 million from investors.   As of December 31, 2007, only $445,738 had been returned to Alliance investors.

118.   In connection with the offer and sale of the Alliance ventures, Krause hired DuBoise to conduct dozens of nationwide sales conference calls utilizing the same procedure as

in the Consolidated ventures. Nunns, Hembree, and McNaul participated in the conference calls.

After each call, DuBoise, McNaul, Nunns, and Hembree would discuss and critique them.

119.    The Alliance sales calls contained the same or similar material misrepresentations and omissions as the Consolidated sales calls. For example, DuBoise, on various Alliance conference sales calls, made the following materially false and misleading statements, while Nunns, Hembree, and McNaul sat quietly by and failed to correct the misstatements:

- I've seen tremendous returns of the early venture on the workover rigs. Our early venture with eight completion rigs [CJV#2], it's brought me two years' worth of returns at approximately 50 percent return on investment and the value of those rigs have more than doubled and I've got to enjoy a 100 percent tax break. So I mean I couldn't have made a better more wise investment at the time, and obviously, I have invested in many ventures since. So that kind of gives you an idea of the historical track record on the completion rigs.

- Not only are we joint venture No. 15, and we've had 29 million dollars coming our way as far as the venture capital group and 90 million dollars through a third party institutional, very large brokerage house, third party affiliate, we are very close to executing an exit strategy. So [caller], there is a real good possibility you could only see two checks out of this thing, maybe three at best, if this thing does go acquisition, merge or IPO and the majority votes yes.

- We can prove to you that we have a history of overall tremendous performance.

- On the early venture I got involved in  [CJV#2], I have enjoyed a 25% return in the last two years plus.

- In [CJV2] we projected returns in the mid-20s, but you've gotten over a 45% return on investment, plus the value of equipment has almost doubled.

- You are a general partner with no liability.

- CALLER:  So you cannot forsee any situation where something would happen, somebody dies in the process, where the JV becomes liable beyond its insurance limits?"

- DUBOISE:  Absolutely 100% no.   No possibility that if someone dies in the work-place, that we would be liable.  [A large international law firm] is our attorney firm, they are considered to be one of the top attorney firms in the world. They have a thousand general partners.  They billed $1.2 billion last year.  [A prominent lawyer] is our attorney, one of the top gentlemen in the United States.

He only has six clients, we're one of them. When the Bronco Drilling IPO took place, that I mentioned earlier in the call, that happened last August, he was the attorney and his firm that did the memorandum for that. When we go public, or we get acquired or merged, that's same gentleman that's going to handle, so he's structured this to protect the principals and you and I, the equity-holders, from any and all liabilities.

- These three rigs [for Alliance Sooner Trend JV#2] aren't in the field yet. We have them. We are refurbishing them. But I guarantee you, as soon as they get out there, we will have a backlog of up to two years.

- Lloyd [Nunns] has been in the industry for 30 years with a lot of experience.

- Warrick Drilling is the contracted lessee on prior projects.

- DUBOISE: Fred Hembree-is the acquisition specialist, and when it comes to refurbishing in my mind there is nobody better that does the job than Mr. Fred Hembree, and he has been with us from day one. Fred, if you could, give the folks a little background on how things are going and how things are going in the MidWest as far as our drilling operations.

- HEMBREE: Sure, Mark .....

- There is no exaggeration of the point that [the executive] is the one of the top ten, most respected drilling contractors in the world. And guess what? He was the lessee of choice on our prior ventures and certainly the lessee of choice on this venture.

- I'm very, very proud in the simple fact that we've got [the executive and his associates], a Lloyd Nunns and a Fred Hembree. We- this our management team could be compared to any publicly traded management team in the United States and certainly would be compared to any one of the top few in the world.

- It is a good time to consider using your IRA. The bottom line is, if you put $200,000 in it – and I'm just rounding, it turns into $800,000 at the time of the exit strategy.

- You will only get 1 or 2 distribution checks before it goes IPO by this time next year.

- When you talk about an acquisition or an IPO. They are looking at independently yearly audited profit and loss. They are looking at hard assets and the appreciation of that hard asset. They are looking at your client base, the people we drill for. They are looking at your earnings, and most important, they are looking at your management. And don't fool yourself folks, when you are talking

about this type of management, it's going to equate to 25 or 30 percent of a total acquisition or an IPO.

120.   The statements set forth in paragraph 116 above, were materially false and misleading because, among other reasons:

- By definition, a general partner is exposed to unlimited liability.  Thus, Defendants' representation that the investors were general partners could not be true, since they were purportedly exposed to "no liability" beyond their initial investments.

- The large international law firm did not participate in the legal work for the Bronco Drilling IPO.

- There was no two-year backlog of drilling projects for the Alliance Sooner Trend JV#2. In fact, as of the date of this Complaint, that venture has yet to generate any revenue.

- During the Alliance venture offerings, neither Warrick Drilling nor the executive ever leased or operated a rig on behalf of a venture.

- Hembree had no role in the acquisition or refurbishment of oil and gas drilling equipment.

- None of the joint ventures had been audited as previously represented.

121.   DuBoise, acting on behalf of McNaul, Lucas, Krause, Hembree and Nunns continued to tout the potential for investors to cash out in an expected IPO.  Once again, however, these claims were materially false and misleading.

122.   As previously mentioned in connection with the Consolidated ventures, McNaul engaged a brokerage firm in June 2006 to raise private capital for an unaffiliated company – not to raise funds for the ventures; around September 2006, McNaul actually declined the offer proposed by the brokerage firm; the "director" of the brokerage firm who was repeatedly mentioned to investors was not a director of the firm, and had no role in capital-raising for the firm; the proposed defendants never provided any brokerage firm or investment banking firm with audited financial statements – a prerequisite for engaging in an IPO; and a properly

performed audit would have likely uncovered, among other things, the bogus pro-forma payments made to CJV#2 investors, thereby dashing any hopes for an IPO.

### The Garner Rig Leasing and Pawnee Pipeline Ventures

123.    In January 2007, immediately after McNaul, Kilgariff and Lucas were permanently enjoined by a Colorado court for securities fraud and registration violations, Alliance ceased seeking joint venture investors. Instead, Tallman, a long-time friend of McNaul, nominally set up and oversaw the last two ventures (numbers 21 and 22), even though Tallman had no prior oil-and-gas drilling experience.

124.    Although Tallman, a former pizzeria manager, is identified in all offering materials as the principal of the two purported ventures, McNaul orchestrated and controlled both efforts. For example, McNaul hired employees, directed transfer of venture funds, and received substantial funds from both offerings, either himself or through entities he controls.

125.    Beginning on February 1, 2007, Tallman, McNaul, Nunns, Hembree, Leonard (collectively "the Garner Defendants") and the Mid Western Defendants began offering interests in the $12 million Garner Rig Leasing Joint Venture ("Garner JV"), with Garner Management as the purported managing venturer.

126.    In March 2007, Tallman, McNaul, Kilgariff, Leonard (collectively "the Golden Belt Defendants") and the Mid Western Defendants began offering interests in the $54 million Pawnee Pipeline Joint Venture ("Pawnee Pipeline JV"). The managing venturer for the pipeline offering is Golden Belt, another entity nominally run by Tallman.

### Garner and Pawnee Materials

127.    The Garner CIM, which is nearly identical to the Consolidated and Alliance CIMs, stated that the Garner venture planned to acquire a refurbished drilling rig capable of

drilling to a depth of 15,000 feet, which would then be leased out to "Operators, including [undisclosed] Affiliates of Garner." As of December 31, 2007, at least 75 investors in more than 24 states had invested nearly $11 million in the Garner venture.

128.    The Garner and Golden Belt Defendants provided their sales force and potential investors with materials consisting of a CIM, a promotional brochure, and a promotional DVD. The Golden Belt brochure was prepared by Leonard. The Garner JV CIM described the proposed drilling equipment to be acquired and stated that it would be purchased from Garner or an affiliate of Garner in a "non-arms length" transaction, and that the venture intends to lease the equipment to affiliates of Garner.

129.    Garner's affiliates are not identified in any of the offering documents. The intention from the outset, however, was to purchase the equipment from defendant PIW and lease it to Warren Drilling.

130.    The Pawnee Pipeline CIM claimed plans to acquire and expand three natural gas gathering systems consisting of approximately 95 miles of pipeline located in four contiguous Kansas counties and build a nitrogen reduction plant ("NRU") to remove unwanted nitrogen from the gas before it transported to market. The CIM also contained a breakdown of estimated expenditures, which included $27 million for organizational costs, $10 million to acquire the pipeline in a "non arms length" transaction, $8.5 million to build the NRU, and $2.2 million for "geology costs." None of the Pawnee Pipeline materials disclosed that the pipeline system was going to be purchased from one of McNaul's LLC's.

131.    Tallman and a third-party consultant were the only individuals identified in the Garner and Pawnee venture materials. The materials described Tallman as having the following experience: "manager in various sectors of the energy industry;" "consultant to various oil and

gas companies for the past 10 years;" "operator of oil and natural gas concerns in Kansas for the

past decade;" and as someone having "upper-level management experience in the successful

production of oil & gas." All of these statements were false, as Tallman had done nothing in the

oil-and-gas business apart from a few title searches at a local courthouse.

132.    The Garner and Pawnee promotional brochures projected annual returns between

20-35%. The brochures contain no list or description, however, of the affiliated individuals and

entities, the dismal prior performance of the Alliance or Consolidated ventures, or the prior

disciplinary history of McNaul, Kilgariff, Leonard, DuBoise, and Consolidated.

133.    The Garner DVD is identical to the Alliance DVD, except for the name change

from Alliance to Garner. Moreover, the Garner DVD identifies Hembree as "Pawnee Ironworks

LLC Industry Spokesman." Hembree however, claims he never served in that capacity and that

he was unaware that the Alliance DVD was used to create a Garner DVD.

134.    Both DVDs tout the managing venturer for each offering as having "extensive

experience in the oil and gas industry," without disclosing that Garner and Golden Belt's sole

owner, Tallman, had virtually no oil-and-gas experience, and that two of the undisclosed

principals of the ventures, McNaul and Kilgariff, had been enjoined for fraud in connection with

a previous oil-and-gas offering.

135.    As of December 31, 2007, at least 90 investors in at least 23 states had invested

nearly $22 million in the Pawnee Pipeline JV offering. Neither Garner nor Golden Belt has

made any distributions to investors.

136.    The CIMs and purported joint venture agreements for both ventures also provided

that the managing venturers (Garner and Golden Belt) were required to make a 1% capital

contribution to the respective ventures (Garner - $120,000; Golden Belt - $540,000). The

**Garner and Pawnee ISOs and Sales Calls**

137.   The Garner and Golden Belt Defendants used several of the same ISOs used to

sell the Consolidated and Alliance offerings.   But Leonard's company, CIN, was the principal

ISO.

138.   When pitching investors, Leonard used the alias "Jimmy Blake."   Had he used his

real name, investors could have discovered his criminal history, which he failed to disclose.

139.   The agreements with the ISOs provided for the payment of commissions ranging

from 33 to 48%.   As with the Consolidated and Alliance ventures, prospective accredited

investors initially received "cold calls" from lead lists purchased by the ISOs.

140.   In addition, interests in the ventures were offered to existing clients who had

previously invested in one or more of the Consolidated and Alliance offerings.   The Pawnee

Pipeline JV was purportedly initially offered to investors in the Consolidated, Alliance, and

Garner ventures.   But new investors were also solicited, and some invested in the venture.

141.   In preparation for the Pawnee investor calls, the proposed defendants conducted at

least two "training calls" for the ISOs.   DuBoise and Leonard led the "mock" conference calls,

and individual sales agents could either listen to the calls live, or access recordings of the calls

later.

142.   Between February 28, 2007 and May 9, 2007, there were approximately 20

recorded nationwide conference calls for the Garner JV venture and eight recorded calls for the

Pawnee Pipeline JV venture.    DuBoise hosted all of the pipeline calls and one of the Garner calls. The remaining Garner JV calls were hosted by a California salesman recruited by McNaul, and DuBoise.

143.    DuBoise monitored several of the Garner calls and occasionally answered investor questions as a "senior analyst" of Garner.    McNaul (and others) also monitored each Garner call.    At the conclusion of each call they all critiqued the California salesman.

144.    On the Garner JV calls, Nunns and Hembree were introduced as "experts" or "absolute specialists" in the oil-and-gas industry who were "integral" to the Garner venture.    In one Garner call, DuBoise described PIW as probably the most "integral part" of the venture.

145.    In each call, Nunns described the role of PIW in the rig refurbishment process and Hembree described the role of Warren Drilling in leasing the venture's rig to drill gas wells for various third parties.

146.    Tallman was also introduced on several of the Garner and on all of the pipeline calls as very experienced in the oil and gas industry.    Kilgariff participated on each pipeline call, as head of Exploration and Production for Golden Belt Transportation.

147.    DuBoise, Nunns, and Hembree answered investor questions on various Garner calls, and DuBoise, Tallman and Kilgariff answered questions on the Pawnee Pipeline calls.

148.    As with the Consolidated and Alliance calls, DuBoise received an undisclosed 3% commission on all sales resulting from a sales call, in addition to the large commissions he received from direct sales by his ISO, Mid Western.

### Fraudulent Statements and Omissions

149.    The Garner JV and Pawnee Pipeline JV ventures, which DuBoise repeatedly referred to on the sales calls as "our 21st and 22nd ventures," rested on a foundation of fraudulent

statements and omissions concerning the success of previous joint ventures, the background and

experience of management, the financial condition of the Managing Venturer and its affiliates,

the risks involved, the status of the venture's operations, and the likelihood that the venture

would be part of an initial public offering.

150.    In early April, 2007, Leonard, DuBoise, McNaul, Tallman, and Kilgariff

participated in a telephone conference call with several salesmen for the Pawnee Pipeline JV

venture. Leonard made the following statements, among others, regarding the venture:

- So we have four points of entry into the pipeline. We've got an existing NRU
  that we don't own that we're processing our gas in right now, and we are in the
  process of building an NRU up there at that, where that flag is [in the promotional
  brochure]. That's going to take us about nine months to build that plant. That
  starts (sic) about two months ago.

- we're going to tie [the pipeline] in at Pawnee County. It's done.

- we're going to tie [the pipeline] into Edwards [county]. That's done.

- Our managing member, GLM, is headed by Steve Tallman.  He is very
  experienced at managing income and expense, risk mitigation and insurance and
  things of that nature. ...he has a background in managing large projects, he's got a
  background in managing gas and oil developmental projects....

151.    The statements set forth in paragraph 147 above, are materially false and

misleading because, among other reasons, the Golden Belt Defendants failed to disclose that:

- Construction had not begun on the NRU plant and the pipeline had not been tied in at
  either Pawnee or Edwards counties.

- Steve Tallman had no background in managing large oil-and-gas development projects.

152.    On April 19, 2007, the individual Golden Belt Defendants participated in a

telephone sales conference call in which defendant DuBoise made the following statements

without correction:

- And by the way, if you're wondering how long it's going to take to get the NRU
  in place, we're about two months in on the NRU, so we're looking at about seven

months to build the nitrogen rejection unit, which, like I said, we're two months in..

- ...Golden Belt Transportation, LLC, which is the managing venturer, have (sic) already contributed one percent of the purchase in the Pawnee Pipeline Joint Venture...

- Keep in mind folks, that this has been 10 years in the making. We thought of everything in regards to this. I, like I said, along with Russ on the call today, have been involved in almost 60 wells of our own back in the latter 90's in the early part of the century in the Pawnee fields. I am very, very familiar. This thing is my baby. I mean, it's kinda like, probably not a good analogy, but it's my super model. This is something – as exciting as it's been to be involved in the drilling rigs and completion rigs, there is absolutely no comparison, in my opinion, to anything else out there.

- We also have Russ [on the call], who is head of E&P, Exploration and Production/Development for Golden Belt Transportation, Russ Kilgariff. By the way, Russ didn't honk his own horn, but he's pretty, pretty nice when it comes to this. He's got vast experience, his entire life in the oil and gas. In fact, him (sic) and all of his brothers have worked for numerous years in Saudi Arabia and all over the field. An absolute specialist in the oil business. I couldn't work with a better gentleman than Russ Kilgariff in regards to this.

- You know, the thing that I'm the proudest of, [caller] and I believe that you're in some of the early ventures, as I am, and I got involved in the first six ventures that we did – and the thing I'm the proudest of is we hit projections or exceeded them in all the ventures that are out there operating with rigs, so I would go with the numbers [in the Pawnee Pipeline brochure], you can live with those numbers, you'll be very, very, happy and very pleased for many years to come. ....we're just trying to come at this kind of a pessimistic way, and if we do like we did with a lot of the drilling rig ventures, instead of getting a $3,000 [quarterly] distribution, people were getting $5,000 distributions on a quarterly basis, you're just going to be that much happier you invested.

- Like I said in the early part of the call, callers, we're already halfway committed to the verbally and contractually with monies in the door. For those of you that have a high degree of interest in this lower risk income program, the time is now to express that interest to your authorized representative.

153.    The statements set forth in paragraph 149 above, are materially false and misleading because, among other reasons:

- Construction on the venture's proposed NRU plant had not begun.

- Defendant Golden Belt had not made its required managing venturer's one percent ($540,000) contribution and did not have the funds to do so.

- The 60 wells in the Pawnee field that Kilgariff was previously involved with were drilled by Key Gas Corp, which, along with McNaul and Kilgariff, was permanently enjoined for fraudulently offering oil-and-gas securities by the State of Colorado.

- DuBoise invested in only three of the first six Consolidated ventures, and none of these, or any of the remaining 14 Consolidated and Alliance ventures, ever met annual revenue or net income projections.

- The only Consolidated or Alliance venture that projected quarterly distributions in approximate amount of $3,000, was CJV#2, and the only quarterly distributions in that venture that approximated $3,000 were not based on actual revenue, but were funded with other investor funds.

- As of April 19, 2007, the Pawnee Pipeline Joint Venture had received only $1,794,500, of the proposed $54 million offering.

154.    On April 24, 2007, the individual Golden Belt and Mid Western Defendants participated in a telephone sales conference call in which Defendant DuBoise made the following statements without correction:

- Now, if you go to the top right-hand side of page 39 [in the Pawnee Pipeline Promotional Brochure], it says Pawnee Pipeline Gas-Gathering System Expansion Project. ... [t]he next one, it says Q107, begin tie-in at Pawnee County. Done, as I mentioned. Q107, begun (sic) tie-in at Edwards County. It's done. And 2007, it says Q207, begin second NRU construction project. In process. In fact, I believe we're a couple of months in the process of doing that now.

- The first kind of shaded red box there, Golden Belt Transportation, LLC, managing member. The managing member, Steve Tallman, has already contributed one percent to the Pawnee Pipeline Joint Venture as well.

- [CALLER]: When you -- are there -- who would be a competitor to -- to, you know --
  DUBOISE: To us? We have the only pipeline in the AMI. We don't have any competition.

155.    The statements set forth in paragraph 151, above, are materially false and misleading because, among other reasons:

- As of the date of the call, the pipeline system had not been tied in at Pawnee and Edwards counties.

- Likewise, construction on the NRU had not begun.

- Tallman had not contributed his required one percent managing venturer contribution ($540,000) to the Pawnee Pipeline venture and did not have the funds to do so.

- According to the Pawnee Pipeline JV CIM, "the venture will experience competition with many companies that have greater financial and technical resources and access to larger natural gas supplies than those available to the venture."

156.    The Golden Belt Defendants participated in yet another recorded conference sales

call in April 2007 in which the following statements were made without correction:

- DUBOISE: Now, right out the gate, I would like to introduce a couple of different gentlemen.  Mr. Steve Tallman.  He is the managing member of Golden Belt Transportation, and Steve has been with us for quite a long time.  I know he's been in the oil and gas business for the better part of his life.  If you could, Steve, just say hello to the folks and anything else you might want to add to that.

- TALLMAN:  (No response.)

- DUBOISE:  Steve, are you with us?  Press star six on your phone to unmute yourself. Okay.  Well, we might be having a little technical difficulty.

- TALLMAN:  No, we got it now, Mark.  I would like to take this opportunity to thank everyone today for being on this call, and also for their time.

- DUBOISE:  Very good.  All right, Steve.  Is Russ with you, too?

- TALLMAN:  Yes, he is.

157.    The statements set forth in paragraph 153, above, are materially false and

misleading because, among other reasons, Tallman had only been involved with the Pawnee

Pipeline venture for a few months and had hardly been in the oil-and-gas business for the better

part of his life, but instead, had been managing pizzerias.

158.    The individual Garner Defendants participated in a recorded conference sales call

on May 8, 2007, in which the following statements were made without correction:

- DUBOISE:  So once again, on behalf of Garner Management, let me assure you that each of us is honored to have the opportunity to be of service. Now before we get started, I would like to introduce a couple of the intrical (sic) gentlemen with this company.  As a matter of fact right out the gate I would like to introduce Mr. Lloyd Nunns.  Lloyd Nunns has been in the industry for well over 30 years in all facets of the oil and gas industry.   His job, which is probably one of the most important jobs, is the manager of Pawnee Iron Works, an all inclusive refurbishment center.  Now Pawnee Iron Works, just to give you a little background, we are working on rigs in the 50 total right now, over 50 rigs total, that Pawnee Iron Works is actively refurbishing or already put out in the field.

- DUBOISE: Lloyd has done an absolutely phenomenal job.

- DUBOISE: Well, Pawnee Iron Works is probably the most intrical (sic) part of this, especially to get the rigs out in like-new condition.

- DUBOISE: Lloyd, you run other 300 employees, 10 different refurbishment facilities.  Like I said, you are working on or finished over 50 rigs all inclusive. It's a pleasure to have you on the call tonight.  And if you could, say hello to the folks and just let them know what is going on with Paw -- maybe you might want to touch on what a like-new refurbishment is, is what I wanted to ask you.

- NUNNS:  Okay.  Thanks, Mark.  I would like to welcome everybody to the call and thank them for their participation this afternoon.  At Pawnee, we've geared up to meet the needs of the oil and gas industry over the last couple of years.  And I think biggest one around.  And when we get done with them we -- you can sit it next to a brand new rig and couldn't tell the difference.  And it will get the same rates in the field that a brand new rig would demand.  So they are just the same as a brand new rig, except about half.  And it's -- so far we've been able to meet the needs of the joint ventures and get this equipment moving.

- DUBOISE: The next person I would like to introduce is Mr. Fred Hembre.  Mr. Hembre, I've known for many, many years just like I've known Lloyd.  He's an absolute specialist in the drilling sector.  In fact he's a third generation oil man. Fred, if you could, being a representative of  Warren Drilling, you know, the marketing guys and gals have brought 21 ventures to date, over 50 rigs all inclusive, not including all the support equipment, the allied equipment, the drill stem testing, the casing  crews, all the other stuff that we put to date out there in the fields.  With you being the lessee of choice, contractually for the next five years, if you could say, hello to the callers and let them know how busy you are at Warren Drilling?

- HEMBREE:  Sure, Mark, thank you for that. You know, out here at Warren Drilling we are definitely staying hooked up, tell you what.  We have a really very long client list that -- that's just waiting to have wells drilled.  So I stay busy on

the telephone every day and keeping up with all of the coordination of drilling the wells.

- DUBOISE; [W]e will have this rig out and operating within 60 days from now. And that's the key to this, getting it out there very, very quickly because there's already work lined up to operate this rig. .....This rig, because it's 90 percent complete, we are only looking at two months before it's out in the field.

- DUBOISE: That's why if I go back to all the early ventures, the ventures we worked on three years ago, two years ago, two and a half years ago, our ventures are all paid anywhere from 20 to 35 percent return on investment over the last two, three years.

- DUBOISE: Really and truly if you look at it for what it is, there really is no competition for the simple fact that we've all got more work that any of us can handle. And that is the -- there is no end in sight on that.

- DUBOISE: But that leads me right back to a potential exit strategy. The irony here is, is this particular venture, because of the size of the rig, because of the components, because of the horizontal abilities, because of everything else that could quite possibly go in an exit strategy to be done later this year, early part of next year. We -- the whole intent when we originally got into this from venture No. 1, all the way to venture 21 is to build a strong team. Remember you are looking at independently, yearly audited profit and loss statements. You are looking at cost and appreciation of the equipment. You are looking at a client base with the drilling company of over 150 up -- up, and E and P companies that they drill and complete wells for. So when you have all these components together, you make for a very attractive merge, acquisition or IPO target. And folks, that was the intent going in, and absolutely has nothing changed in any way, shape or form. This rig is in, my opinion, because it's one of the biggest, will be one of the most valuable rigs in any proposed exit strategy.

- DUBOISE: Folks, I invest in these too. I'm invested in, this will be my 11th investment of 21 ventures the marketing team has brought to the table. I would have never invested in the first one if it wasn't for two things. Number one, the liability is severed for you and I.

- DUBOISE: If this rig is added to the exit strategy and you agree to do so, Janet, it could happen as early as the fourth quarter of this year.

- [CALLER] I see.

- DUBOISE: Now what does that mean? That means, depending on the offers, you could get a three, four, maybe a five-time multiple of your original investment.

- [CALLER]: Wow. So that's going to happen?

- DUBOISE: There's no guarantees, Janet, but we have been working on this for two years.

- DUBOISE: Furthermore, we are working with one of the largest brokerage houses worldwide. In fact, I've met with, myself personally, Janet, spoke to one of the board of directors, sat down with dinner with him, of one of the top brokerage houses in the world, is very excited to underwrite this whether it's an acquisition, merge or what I believe is going to happen is probably an IPO, so absolutely.

- DUBOISE: Okay. Let me -- let me take it a step further if you don't mind. Can I just talk about risk, period?

- [CALLER] Yes.

- DUBOISE: Okay. Because there's a little more than just the price. When I first got into this and bought into my first couple of ventures, and by the way, my father is 73, he is retired now. And has no more expendable income and he's barely accredited, you know, he's a little bit over a million dollars in net worth. My father had his monies tied up in savings accounts. And I said, dad, and then when Y2K came around, he bought 200,000 dollars worth of gold Kreugerands because he thought armageddon was here. And when I found about that, I just about flipped. I decided it's time for me to start looking for investments for my dad and take over a little bit of his portfolio. I have him invested in this as well.

- My recommendation is, this may be the last 15,000-foot rig we do. For those of you that have a degree of interest in what I consider a lower risk mitigation program, the time is now to express that interest to your authorized representative. Every single venture that the marketing guys and gals do, we always end up over selling and sending contracts and checks back.

159.    The statements set forth in paragraph 155, above, are materially false and misleading for the following reasons:

- Nunns did not have 30 years experience in the oil and gas industry. In fact, his career in the oil business began in late 2003 when he went to work for Defendant Forrest Energy, and in a sworn deposition on June 9, 2005, Nunns admitted he had little oil and gas experience and that "I don't know anything about going out and buying rigs."

- None of the previous ventures had paid investors "anywhere from 20 to 35 percent return on investment over the last two, three years."

- Defendants failed to disclose that they had raised $6.2 million from investors beginning in October 2005 for the seventh Consolidated venture, and after approximately 19 months, Defendant PIW had still not delivered a deep well drilling rig similar to the proposed Garner rig to the Consolidated venture

- Defendants failed to disclose that between April 6, 2006 and April 30, 2007, Defendant PIW had received approximately $40 million of investor funds from Alliance ventures for the purchase of approximately 25 refurbished drilling and/or completion rigs. However, according to quarterly progress reports sent to Alliance investors, as of the end of the first quarter of 2007, PIW had delivered only 13 drilling and/or completion rigs to the ventures.

- Defendants failed to disclose that during the first quarter 2007, Defendant Warren had leased approximately five drilling rigs from four Consolidated ventures and one rig from one Alliance venture, and for the quarter, each of the four Consolidated ventures operated at a loss, while the one Alliance venture returned only 2.3% to investors, which was less than half of the projected amount for the quarter.

- Defendants failed to disclose that as of May 08, 2007, neither Warren nor Hembree had ever drilled a well in Oklahoma, where the Garner rig was scheduled to be leased.

- As of May 08, 2007, the Garner rig was not 90% complete. In fact, as of the date of this complaint, Defendant PIW has not delivered the rig to the Garner venture.

- Neither DuBoise nor his father invested in the Garner offering, DuBoise had invested in only eight Consolidated or Alliance ventures, and his father's only venture investment was given to him by Defendant McNaul in exchange for a previous worthless Key Gas venture investment.

### The Purported Joint Ventures are Securities

160.　　The purported joint ventures constitute "investment contracts" within the meaning of the federal securities laws because the investors entered into (1) a contract, transaction or scheme in which a person invests money, (2) in a common enterprise, (3) having been led to expect that profits would be derived from the managerial or entrepreneurial efforts of others.

### The Investors' Illusory Managerial Powers

161.   Defendants tried to create the appearance of true joint ventures in which the venturers would participate actively in managing the venture.  But in reality, the victims were passive investors in "turnkey" investment contracts and had only illusory managerial powers.

162.   In the offering materials and on sales calls, investors were told they would have "extensive and significant management powers," which they would exercise by voting on all venture decisions.  And in each of the 22 ventures, certain ballots were sent to investors asking their approval of such things as appointing the managing venturer, whether to buy or sell specific pieces of equipment, and whether to elect straight-line or accelerated depreciation.

163.   Yet, the operation of the balloting process reveals that from the very beginning investors lacked the power to manage their respective joint ventures.  In essence, the balloting process is a sham, and Consolidated, Alliance, Garner and Golden Belt ran the joint ventures like limited partnerships, not general partnerships.  Defendants controlled the flow of information, and systematically withhold relevant information from investors.

164.   Even when investors were supplied with some information and a ballot, their vote was meaningless because in many instances the managing venturers had taken action well in advance of tallying the partners' votes.  Thus, investors were doing nothing more than voting on matters that had already occurred and decisions that had already been made, based on misleading and incomplete information.

165.   In addition, investors are dependent on some unique managerial ability and therefore have no realistic alternative to the manager.  The promotional brochures and conference calls are replete with references to the peerless skill levels of the management team

and affiliated entities that are involved in the Consolidated, Alliance, Garner and Golden Belt enterprises.

166. Investors are told that the relevant management team consists of consummate veterans in the oil and gas industry that are currently operating or managing companies at the height of their field. From the refurbishment facilities to the equipment operators, the assembled infrastructure is represented to be as good as it gets.

167. Defendants claim to have intimate knowledge of nearly every aspect of the oil-and-gas industry, including knowledge of the drilling fields in Kansas and Oklahoma, the equipment needed to drill wells, the materials and efforts required to locate, purchase, and refurbish drilling rigs, the quality of the oil-and-gas being extracted, the steps necessary to distribute, market, and sell the end product, and the components necessary to make a profit for investors.

168. Thus, in reality investors had no meaningful voice in the management of the ventures. In voting on a particular proposal, investors were denied material information, provided materially misleading information, or asked to vote on something that had already taken place.

169. To begin with, the managing venturers each sent ballots to their partners, with Consolidated, Alliance, Garner or Golden Belt, respectively, listed as the sole option for managing venturer in the partnership. The ballots contained no information about the respective nominees and provided no alternative nominee for the investors' consideration.

170. Further, as the injunctions and other regulatory actions mounted, the ballots omitted these material facts. For example, all ballots after January 2007 failed to disclose the Colorado fraud injunction against McNaul, Lucas and Kilgariff.

171.    To compound matters, the Consolidated, Alliance, Garner and Pawnee Pipeline offering materials and sales conference calls, which were the only sources of information about the proposed managing entities, provided false and misleading information to investors about the identity, background, experience and success of the actual and purported principals of the proposed managing ventures and their affiliated entities.  For instance, in the Consolidated and Alliance offerings, investors were provided false information about Nunns' oil-and-gas experience and were falsely told that a very experienced and respected oil-and-gas executive had managed and would continue to manage the drilling rigs for the ventures.

172.    Likewise, investors in the Garner Rig and Pawnee Pipeline ventures were fed admittedly false information about Tallman, the sole officer of the proposed managing venturer. The Garner and Pawnee Pipeline offerings materials, both written and in sales calls, also failed to disclose that McNaul and Kilgariff, two enjoined oil-and-gas fraudsters, were the true principals behind the managing venturer.  Moreover, starting with CJV#2, investors were provided false information about the actual success of the ventures' management and their affiliated companies in operating the ventures.

173.    Similar to the "yes-or-no" vote on the managing venturer, the ballots sent to select the lessee of the venture's oil-and-gas equipment offered only one choice: the proposed defendants' affiliated entity.

174.    Furthermore, in at least two of the Consolidated ventures, investors were misled to approve Warrick Drilling as the equipment lessee.  Even worse, McNaul, without notifying investors, substituted Warren Drilling as the lessee.   Thus, investors had no say in Warren Drilling becoming the lessee.

175.    On or about April 30, 2007 Garner Rig JV investors received ballots to approve the acquisition of the rig for the venture.  But investors were given inaccurate, incomplete and misleading information.

176.    For example, investors were not told that Tallman had *already* executed a contract to purchase the rig for $6.2 million, transferred approximately $1.25 million of investor funds to PIW (a McNaul LLC) towards the purchase of the rig, and that PIW had nine months within which to deliver the rig to the venture (even though the rig was supposedly 90% complete at the time of the offering).

177.    Even more egregious was that the pipeline venture "vote" to purchase the pipeline and NRU was tabulated when less than 40% of the venture had been sold.  Worse still, the "vote" was approved with less than half of the ballots returned.  These facts made it mathematically impossible for the vote to have been approved by a majority of the venturers.

178.    In August 2007, investors in the seventh Consolidated venture received a ballot requesting approval to lease the venture's rig to Trace Drilling Co., an unaffiliated oil-and-gas company.  In October 2007, CJV #7 investors were advised "that it appears" the new lease with Trace "is being accepted" with 47% of the venturers returning ballots.

179.    Contrary to the statements made to investors, CJV#7 does not have a lease with Trace, and never did.  Instead, the lease is between Trace and PIW, which, according to the lease, has "exclusive" title to the rig.

180.    Further, the lease was executed in May 2007, two months before ballots were apparently sent to CJV#7 investors seeking their approval.  Worse yet, as discussed below, PIW has misappropriated net revenue from the Trace lease that rightfully belongs to CJV#7 investors.

181.   The investors themselves had little or no background or experience in the oil-and-gas industry. Before investing, investors were not even asked if they had prior oil-and-gas experience, much less experience with drilling rigs or oil-and-gas pipelines and gathering systems. The investors, many of whom are senior citizens who invested retirement funds, are members of the general public that are relying solely on Consolidated, Alliance, Garner and Golden Belt to operate the business.

182.   Investors had no prior relationships with other investors and did not receive all the names and addresses of the other investors until long after making their investments. Indeed, the investors, who are scattered across the country, had no knowledge of reasonable alternatives to Consolidated, Alliance, Garner or Golden Belt (even if they had been provided with any meaningful choice), and no understanding of how to purchase alternative oil-and-gas equipment or enter into alternative lease agreements with other drilling companies.

183.   The investors were pitched these investments by unregistered salesmen and during conference calls where they heard a one-sided story about the capabilities of the managing venturer. Then, they invested their money with the expectation that the management and operation of the business would be handled by others.

184.   Defendants made the day-to-day decisions regarding the operations of the ventures. The investors did not receive a financial statement from Defendants as to the exact amount of money received from investors and how it was spent. No one associated with Defendants disclosed any information as to the exact amount of their compensation. Investors simply sent their money to Defendants and passively expected to earn a return on their investments.

185.    Even though investors were afforded the "right" to vote, Consolidated, Alliance, Garner and Golden Belt started functioning as managing venturers before investors even received their initial ballots. And, as the acting managing venturers, Consolidated, Alliance, Garner and Golden Belt had already entered into material agreements with, and transferred millions of dollars to, entities owned and/or controlled by the proposed defendants – *before* investors had a chance to vote on these managerial decisions.

186.    In certain instances, investors subsequently received ballots to "vote" on whether to enter into these agreements and transfer those funds. When asked what would happen if a majority of investors voted against the agreements, Tallman testified that he would ask for the money back.

187.    In other instances, no subsequent vote was taken. Even assuming that the investors had the power to vote on, or change the outcome of, these managerial decisions, they were not provided with sufficient information to make any *informed* managerial decisions.

188.    For example, one Garner ballot asked whether the venture should enter into a 75% net revenue equipment lease with an affiliated drilling company. Yet, no copy of the lease was attached to the ballot. And the ballot identified none of the terms of the lease, such as price or term, or any information about the proposed lessee.

189.    In the nationwide conference calls, prospective investors repeatedly heard that the equipment for their joint venture was "already booked" for a term of years with the "proposed" lessee.

190.    More recently, investors in the seventh Consolidated venture received ballots asking to approve Trace Drilling, a third-party oil company, as the lessee of the equipment. In fact, a month before the ballots were sent out, McNaul, on behalf of PIW (*not* the Consolidated

venture), had *already* executed a lease with Trace. Further, PIW continued to lease the venture's rig to Trace even though the required 50% approval of partners had not been obtained as of October 22, 2007.

191.   The large number of investors in each venture residing all over the United States, except Kansas where the rigs are located, confirms that the investors' purported managerial powers are illusory.

192.   As disclosed in the CIMs, the joint ventures were purchasing equipment that was identified by the managing venturer or an affiliate, at a price determined by the managing venturer, and then leased by the managing venturer, usually to another affiliate. As a result, the success of the joint ventures was uniquely dependent on the efforts of the managing venturer, upon which investors would rely in making their investments.

### Misuse of Proceeds

193.   Between March 2004 and December 2007, Defendants directly and indirectly raised approximately $156 million from over 1,300 investors.

194.   Consistent with the disclosure in the CIMs, approximately $72 million, or 46% of the funds, has been expended on "organizational costs," the vast majority of which went toward commissions paid to the approximately 28 ISOs. Approximately $79 million was initially paid to Defendants' affiliated entities (including Relief Defendants Forrest, Mid-Kan, T&D, Warren and PIW), ostensibly for, among other things, the purchase and refurbishment of 59 drilling rigs and the pipeline. Twelve of the 59 rigs have not been delivered at all, including the rig for the Garner Rig venture, the 21st venture. Moreover, the Pawnee venture (22nd venture) has not acquired or begun construction of the nitrogen rejection unit, which is integral to the operation

and success of the venture. Because of the incomplete document production during the investigation, approximately $5 million of the $79 million remains unaccounted for.

195.    As of December 31, 2007, Defendants had distributed approximately $7 million to investors: $6.6 million to investors in eight Consolidated ventures, and $400,000 to investors in six Alliance ventures. Investors in the remaining six Consolidated and Alliance ventures and the Garner and Pawnee investors have received no returns.

196.    In addition, bank records reveal that not all of the $7 million paid to investors derived from actual equipment leasing revenues. With respect to the "pro forma" earnings payments that went to CJV#2 investors, bank records reflect that approximately $112,000 came directly from investor funds deposited into the CJV#2 account, and approximately $900,000 came from other Consolidated ventures (i.e., Ponzi payments).

197.    Recently, McNaul and others have misapplied earnings belonging to CJV #7 and possibly other ventures. Unknown to CJV#7 investors, McNaul, on behalf of PIW, agreed to lease a rig belonging to CJV#7 to Trace Drilling. McNaul caused PIW to enter into the lease with Trace a month before the ballots to approve a lease between CJV #7 and Trace were even sent out.

198.    Since then, Trace has paid PIW approximately $962,000 in net earnings from the operation of the CJV#7 rig, all of which should have been paid to CJV#7 investors. Yet, only $433,522 of the earnings have been distributed to CJV#7 investors. The remaining approximate $528,000 has improperly been used to cover, among other things, legal fees, child support payments, and operating and payroll expenses of relief defendants PIW, Mid-Kan, T&D and Warren.

SEC v. Michael J. McNaul, II, et al.
First Amended Complaint

55

199.    Further, approximately $13.6 million from the Garner and Pawnee ventures ended up in PIW accounts.  PIW bank records seem to indicate that an undisclosed purpose of the Garner and Pawnee ventures was to raise funds for PIW in order to acquire and refurbish rigs for the Consolidated and Alliance ventures – rigs that should have been paid for with Consolidated and Alliance investors' funds.

200.    At the beginning of the Garner offering, PIW had approximately $2.2 million in its accounts and had yet to either acquire and/or complete refurbishment of approximately 17 rigs to the Consolidated and Alliance ventures.  Since then, the majority of new deposits in the PIW accounts came from the Garner and Pawnee ventures.  But those funds did not remain in PIW accounts.  As of April 11, 2008, the collective balances in the PIW accounts had dwindled to approximately $32,000.  During this same period, PIW had apparently acquired and/or completed refurbishment on an additional 12 rigs for various Consolidated and Alliance ventures.  Thus, these rigs were acquired or refurbished with funds fraudulently obtained from the Garner and Pawnee Pipeline investors.

201.    Finally, the individual defendants have received the following amounts:

- McNaul – at least $5.1 million paid to McNaul, his family and entities he controls

- Lucas – at least $1.4 through entities he controls

- Nunns – at least $422,000 personally and through an entity he controls

- Krause – at least $414,000 personally and through entities he controls

- Kilgariff – at least $510,000 personally and through entities he controls

- Hembree – at least $224,000 personally and through entities he controls

- Tallman – at least $110,000 personally

- Leonard – at least $5.4 million through an entity he controls

- DuBoise – at least $4.6 million personally and through defendant Mid-Western

**Recent Developments**

202.    In late April 2008, investors in CJV#7 received, among other things, an unsigned letter from Consolidated. The letter falsely stated that the delay of their approximate $388,000 distribution for the fourth quarter 2007 (already two months overdue at the time) was the lessee's [Trace Drilling] financial problems caused by "its inability to reach well locations during the first, second, and third quarters of 2007..." The letter also stated the investors would receive their check "once the lease payment is received from [Trace]." These were lies.

203.    As previously noted, PIW, not CJV#7, has the lease with Trace. Further, Trace has timely paid all of the lease payments to PIW since the inception of the lease on May 31, 2007. And PIW has misapplied at least $528,000 belonging to CJV#7 investors. On May 12, 2008, Trace received notice that the lease was being assigned to CJV#7, but it received no notice as to where to send the current $60,000 lease payment.

204.    Beginning in late April and continuing into May 2008, investors in the 20 Consolidated and Alliance ventures also received two ballots from the "Advisory Committee, LLC" ("Committee"). The Committee consists of six investors who have invested a combined total of $3.2 million in a total of 16 ventures. The Committee, which was formed in August 2007, has spent considerable time at its own expense to investigate the status of the investments. For example, the Committee learned that as of April 15, 2008, only eight of the approximate 59 drilling and completion rigs for the Consolidated and Alliance ventures were operating.

205.    The two ballots also requested approval of the transfer of Consolidated's and Alliance's respective 1% interest in each of the ventures to the Committee and to approve the

Committee to serve as the managing member of each partnership. As of May 23, 2008, the Committee had received the necessary 50% approval from seven of the 20 Consolidated and Alliance ventures.

206.    On or about May 8, 2008, Consolidated and Alliance sent out ballots seeking their investors' immediate approval to replace the current lessees of the equipment for each Consolidated and Alliance venture (relief defendants Warren, Warrick, T&D or Mid-Kan) with a newly formed Kansas entity, Panther Energy Services, LLC ("Panther"). The ballot also claimed that Panther will be capitalized with an unspecified amount of funds by unidentified "unrelated third parties," and "the current lessee principles (sic) will have no ownership interest in Panther."

207.    The ballot also advised that (a) the new lease with Panther would contain the same terms and conditions of the previous lease, which would entitle Panther to receive 25% of the net income generated by each venture's equipment; and (b) Consolidated and Alliance were assigning "to Panther their respective rights and interests to the net proceeds from the sale or liquidation of the equipment," which, according to the Consolidated and Alliance CIMs, is between 25% and 35%. The current status of this ballot process is unknown to the SEC.

208.    Neither the identity of the "unrelated third parties" behind Panther nor the amount of capital they intend to invest in Panther has been disclosed to Alliance and Consolidated investors. The SEC, however, has spoken with a purported representative of the venture capital firm affiliated with Panther and learned the identities of its principals, whom the representative said would have a "hands-on" role in management.

209.    A cursory Internet search revealed that the venture capital firm's principals were held in contempt of court on April 25, 2008 and ordered to be placed under arrest for misconduct in a civil lawsuit. The principals had defaulted on a $300,000 loan, defaulted on the ensuing lawsuit,

and failed to appear for four scheduled post-judgment depositions. These defaults and non-appearances, which formed the basis of the contempt order, inspire no confidence that the venture capital firm or its principals have either the finances or the fortitude to operate Warren, Warrick, Mid-Kan and T&D, assuming investors approve the measure.

210.    McNaul, Lucas, Krause and Nunns remain in control of the affiliated entities, such as PIW, Mid-Kan, T&D, Warren and Warrick, each of which presently operates equipment leased from the ventures and is presumably receiving revenue from the leases, none of which being distributed to investors.

211.    Further, Kilgariff remains in control of the Garner and Pawnee ventures and recently withdrew $69,000 of investor funds from a Pawnee account contrary to his agreement with the SEC that he would not withdraw additional funds. The SEC has learned that the $69,000 came from a $540,000 investment in the Pawnee venture made by an elderly investor in April 2008.

212.    Because investor funds from each of the 22 ventures have been commingled in the accounts of various affiliated entities, including PIW, an <u>independent</u> receiver should be appointed to protect the interests of <u>all</u> investors, including investors in the Garner and Pawnee ventures.

213.    Moreover, absent a receiver, investors whose funds were used to make Ponzi payments to investors in other ventures will have no redress for those improper payments. In other words, while the SEC does not doubt the Committee's good intentions, it is not clear that the Committee, whose members are themselves investors in various ventures, will be able sort out and protect the claims of <u>all</u> investors.

214.    Finally, the SEC recently learned that PIW, Warren, Warrick, Mid-Kan and T&D have substantial debts in excess of $12 million, including approximately $1.5 million owed to the

IRS for failure to pay payroll taxes. IRS liens have been placed on two of the relief defendants and at least three lawsuits have been filed by third-party creditors against Warren and PIW. It is very likely that additional lawsuits by the creditors of Defendants and Relief Defendants will follow, including lawsuits against the ventures based on unsatisfied claims against the ventures' oil-and-gas drilling rigs. A receivership order, among other things, could stay the filing of such suits.

215.    In addition, several of the defendants and relief defendants identified above have, over the past several months and perhaps as recently as June 2, 2008, transferred funds and other assets, for no apparent consideration, to Relief Defendants Summit, Santa Fe, and Warren Energy.

**FIRST CLAIM
AS TO ALL DEFENDANTS**

**Violation of Section 10(b) of the Exchange Act and Rule 10-5**

216.    Plaintiff Commission repeats and realleges paragraphs 1 through 215 of this Complaint and incorporated herein by reference as if set forth verbatim.

217.    Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

218.    As a part of and in furtherance of their scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

219.  Defendants made the referenced misrepresentations and omissions knowingly or with severe recklessness disregarding the truth.

220.  For these reasons, Defendants have violated and, unless enjoined, will continue to violate the provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
## AS TO ALL DEFENDANTS

### Violations of Section 17(a) of the Securities Act

221.  Plaintiff Commission repeats and realleges paragraphs 1 through 215 of this Complaint and incorporated herein by reference as if set forth verbatim.

222.  Defendants, directly or indirectly, singly, in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have:  (a) employed devices, schemes or artifices to defraud;  (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

223.  As part of and in furtherance of this scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

224.    Defendants made the referenced misrepresentations and omissions knowingly or with severe recklessness disregarding the truth.

225.    For these reasons, Defendants have violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. 77q(a)].

## THIRD CLAIM
## AS TO ALL DEFENDANTS

### Violations of Section 5(a) and 5(c) of the Securities Act

226.    Plaintiff Commission repeats and realleges paragraphs 1 through 215 of this Complaint and incorporated herein by reference as if set forth verbatim.

227.    Defendants, directly or indirectly, singly and in concert with others, have been offering to sell, selling and delivering after sale, certain securities, and have been, directly and indirectly: (a) making use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, through the use of written contracts, offering documents and otherwise; (b) carrying and causing to be carried through the mails and in interstate commerce by the means and instruments of transportation, such securities for the purpose of sale and for delivery after sale; and (c) making use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

228.    Defendants offered and sold the purported Consolidated, Alliance, Garner and Golden Belt joint venture investment programs to the public through a general solicitation of investors. No registration statements have been filed with the Commission or are otherwise in effect with respect to these securities.

For these reasons, Defendants have violated and, unless enjoined, will continue to violate

Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. 77e(a) and 77e(c)].

## FOURTH CLAIM

### AS TO MID WESTERN, DUBOISE, AND LEONARD

### Violations of Section 15(a)(1) Of The Exchange Act

229.   Plaintiff Commission repeats and realleges paragraphs 1 through 215 of this Complaint and incorporated herein by reference as if set forth verbatim.

230.   At the times alleged in this Complaint, Mid Western, DuBoise, and Leonard have been in the business of effecting transactions in securities for the accounts of others.

231.   Mid Western, DuBoise, and Leonard made use of the mails and of the means and instrumentalities of interstate commerce to effect transactions in and to induce or attempt to induce the purchase of securities.

232.   At the times alleged in this Complaint Mid Western, DuBoise, and Leonard were not registered with the Commission as a broker or dealer, as required by Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

233.   By reason of the foregoing, Mid Western, DuBoise, and Leonard have violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

## FIFTH CLAIM

### Claim Against the Relief Defendants
### As Custodians of Investor Funds

235.   Plaintiff Commission repeats and realleges paragraphs 1 through 215 of this Complaint and incorporated herein by reference as if set forth verbatim.

236.   Relief Defendants have received funds and property from one or more Defendants, which are the proceeds, or are traceable to the proceeds, of the unlawful activities of Defendants.

237.    Relief defendants have obtained the funds and property alleged above under circumstances in which it is not just, equitable or conscionable for them to retain the funds and property. As a consequence, Relief Defendants have been unjustly enriched.

## RELIEF REQUEST

Plaintiff respectfully requests that this Court:

### I.

Preliminarily and permanently enjoin (a) all Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5; and (b) Mid Western, Leonard and DuBoise from violating Section 15(a)(1) of the Exchange Act.

### II.

Enter an Order immediately freezing the assets of Defendants McNaul, Lucas, Leonard and Kilgariff and directing that all financial or depository institutions comply with the Court's Order.

### III.

Enter an Order immediately freezing assets received by Relief Defendants, directly or indirectly, from the activities described in the Commission's Complaint, and directing that all financial or depository institutions comply with the Court's Order.

## IV.

Order that Defendants McNaul, Lucas, Krause, Nunns, Kilgariff, Leonard and DuBoise and all Relief Defendants file with the Court and serve upon Plaintiff, within 10 days of the issuance of this order or three days before a hearing on the Commission's motion for a preliminary injunction, whichever comes first, an accounting, under oath, detailing all of their assets and all funds or other assets received from investors and one another.

## V.

Order that Defendants and Relief Defendants be restrained and enjoined from destroying, removing, mutilating, altering, concealing or disposing of, in any manner, any of their books and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of the Court.

## VI.

Appoint a receiver for Defendants McNaul, Lucas, Leonard, Kilgariff and all Relief Defendants, for the benefit of investors, to marshal, conserve, protect and hold funds and assets obtained by Defendants, Relief Defendants and their agents, co-conspirators and others involved in this scheme, wherever such assets may be found

## VII.

Order that the parties may commence discovery immediately, and that notice periods be shortened to permit the parties to require production of documents and the taking of depositions on 72 hours' notice.

## VIII.

Order Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount, and order Relief Defendants to disgorge an amount equal to the illegally obtained investors funds they received from the Defendants.

## IX.

Enter an Order of Final Judgment as to Defendants Hembree and Tallman in the form submitted simultaneously with the filing of the accompanying motion for entry of final judgment.

## X.

Order civil penalties against the Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], for their securities law violations.

## XI.

Order any additional relief that this Court may deem just and proper.

DATED:  June 9, 2008                Respectfully submitted,

                                    ERIC F. MELGREN
                                    United States Attorney
                                    District of Kansas


                          By:    s/ Laurie K. Kahrs_____
                                    LAURIE KAHRS #17249
                                    Assistant United States Attorney
                                    District of Kansas
                                    1200 Epic Center
                                    301 North Main
                                    Wichita, Kansas 67202
                                    Tel:   (316) 269-6481
                                    Attorneys for the United States of America

                                    TOBY M. GALLOWAY
                                    Texas Bar No. 00790733
                                    DAVID B. REECE
                                    Texas Bar No. 24002810
                                    Attorney for Plaintiff
                                    U.S. Securities and Exchange Commission
                                    Burnett Plaza, Suite 1900
                                    801 Cherry Street, Unit #18
                                    Fort Worth, TX  76102-6882
                                    (817) 978-6447
                                    (817) 978-4927 (fax)

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**WICHITA DIVISION**

'08  JUN -9  A8 :49

SECURITIES AND EXCHANGE COMMISSION     )

           Plaintiff     )

           vs.     )

MICHAEL J. McNAUL, II, *et al.*     )

           Defendants     )

           and     )

CONSOLIDATED MANAGEMENT GROUP, LLC, *et al* )

           Relief Defendants     )

CLERK, U.S. DISTRICT COURT
BY: _____ DEPUTY CLERK
AT WICHITA. KS

Civil Action No.
08-1159 JTM

**SECOND AGREED ORDER APPOINTING RECEIVER *NUNC PRO TUNC* AND**
**EXTENDING RECEIVERSHIP TO SANTA FE TRAILS LEASING, LLC**

This matter comes on for hearing on Tuesday, the 3rd day of June, 2008, concerning the

request for the second amended order appointing receiver *nunc pro tunc* to include additional parties

under the scope of the receivership order to provide clarification of the prior scope of the duties of

the receiver. The plaintiff, Securities and Exchange Commission appears by and through its counsels

of record, Toby M. Galloway and David B. Reece. The defendants, Michael J. McNaul, II and Dale

C. Lucas, and relief defendants, Alliance Leasing, LLC, Consolidated Management Group, LLC,

Forrest Energy, LLC, Warren Drilling, LLC, Warrick Drilling, LLC, Pawnee Iron Works, LLC, Mid

Kan Operating, LLC, T&D Oil Service, LLC, Warren Energy, Inc. and/or Warren Energy, LLC

appear by and through their counsel, Mark Ayesh. Mr. Ayesh additionally entered his appearance

orally on behalf of Santa Fe Trails Leasing, LLC, the additional party subject to this receivership.

-1-

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 152720    — TC
* * C O P Y * *
July 08. 2008
13:42:33**

**Misc. Case**
USAO #.: 08MC0371
Amount.:                    $39.00 CK
Check#.: BC15907

**Total—>  $39.00**

FROM: MISC CASE FILING

AO 30 (Rev. 8/98) Certified Copy

# UNITED STATES DISTRICT COURT

DISTRICT OF _____ KANSAS

## CERTIFIED COPY

I, _____ Timothy M. O'Brien _____ , Clerk of the United States District Court, certify
that the attached is a true and full copy of the original

Securities and Exchange Commission v. Michael J. McNaul, II, et al.
Case No.  08-1159-JTM-DWB
Docket Nos: 1, 15, 16, 36, 40, 50

'08 MC 0 3 7 1

*Nothing further*

now existing among the records of this Court.

In testimony whereof I sign my name, and affix the seal of this Court at

Wichita _____ , in this State, on _____ July 3, 2008

City                                                                    Date

Timothy M. O'Brien

Clerk

(By) Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action No. 08-1159-JTM-DWB |
| | : | |
| MICHAEL J. MCNAUL, II, DALE C. LUCAS, | : | **COMPLAINT** |
| GREGG KRAUSE, LLOYD F. NUNNS, | : | |
| RUSSELL W. KILGARIFF, STEVEN L. TALLMAN, | : | |
| FREDDIE J. HEMBREE, | : | |
| RAYMOND L. LEONARD, JR., MID WESTERN | : | |
| NATURAL GAS, INC., and MARK DuBOISE | : | |
| | : | |
| Defendants, | : | |
| | : | |
| And | : | |
| | : | |
| ALLIANCE LEASING, LLC, | : | |
| CONSOLIDATED MANAGEMENT GROUP, LLC, | : | |
| GOLDEN BELT TRANSPORTATION, LLC, | : | |
| GARNER MANAGEMENT, LLC, | : | |
| FORREST ENERGY, LLC, | : | |
| WARREN DRILLING, LLC, | : | |
| WARRICK DRILLING, LLC | : | |
| PAWNEE IRON WORKS, LLC | : | |
| MID KAN OPERATING, LLC, | : | |
| T&D OIL SERVICE, LLC, | : | |
| CONSUMER INFORMATION NETWORK, INC., | : | |
| | : | |
| Relief Defendants. | : | |
| | : | |

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1.    This case involves a nationwide securities offering fraud that raised $156 million

from over 1300 investors nationwide and in Canada, through the use of 22 purported oil-and-gas

equipment-leasing and pipeline joint ventures structured to evade the securities laws. In truth, however, the investments offered were not joint ventures, but investment contracts, which meet the statutory definition of securities.

2.     Defendants sold these securities by making numerous misrepresentations, omissions, half-truths and outright falsehoods, concerning, among other things, the purported success and profitability of the ventures, the background and experience of management, and the safety and risks of the investment. Defendants lured potential investors with the promise of annual returns of 25-40% and an even more lucrative initial public offering ("IPO") resulting in returns as high as 3-8 times their investments.

3.     Contrary to the purported lavish returns, Defendants have returned only $7 million to investors over the four-year period of the scheme. And of that $7 million, approximately $1 million consisted of funds diverted from later investors to pay earlier ones, *i.e.,* Ponzi payments. Moreover, almost half of the funds fraudulently raised went to pay sales commissions to agents who promoted the investments.

4.     The remaining $80 million was supposed to be used to acquire and refurbish approximately 59 oil-and-gas rigs and related equipment for the ventures, as well as to acquire, refurbish and outfit an oil-and-gas pipeline system. Currently, however, only eight of the 59 promised rigs are operating. Further, little work has been done on the pipeline, and the pipeline venture has insufficient cash to do any meaningful work.

5.     Moreover, recent operating results are bleak. For the fourth quarter ending December 31, 2007, seven of the 22 purported ventures reported losses ranging from $3,537 to $97,109. Another four of the ventures were not even operational. The remaining 11 ventures

reported a profit, but the profit was *de minimis* for nine of those, ranging from .05% to .7%. The

other two ventures for the fourth quarter reported quarterly profits to investors of 4.8% and 6.2%.

6.      Even so, none of the fourth quarter profits from any of these ventures, which

collectively total over $700,000, has been distributed to investors as required.     Instead,

Defendants McNaul, Nunns, Krause and Lucas, each of whom invoked the Fifth Amendment

privilege in response to the SEC's investigation, appear to have misapplied the investors' profits

to pay operating and other expenses of at least one of the entities named herein as a Relief

Defendant.

7.      In addition, the promised IPO has never come to fruition. Indeed, Defendants

have never provided investors with promised audited financial statements, a necessity for an

IPO.

8.      The Commission, in the interest of protecting the public from such fraudulent

activities, brings this civil securities law enforcement action seeking preliminary and permanent

injunctions against Defendants, enjoining them from further violations of the antifraud and

registration provisions of the federal securities laws and requiring disgorgement of ill-gotten

gains, plus prejudgment interest and civil money penalties. The Commission also seeks an asset

freeze, an accounting and other incidental relief, as well as the appointment of a receiver to take

possession and control of certain Defendants' and Relief Defendants' assets for the protection of

Defendants' victims. Finally, the Commission also seeks to recover from Relief Defendants all

assets transferred to them that are traceable to investor monies raised by Defendants.

## JURISDICTION AND VENUE

9.      The investments offered and sold by Defendants are "securities" under Section

2(1) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77b] and Section 3(a)(10) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78c].

10.      The Commission brings this action under the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act

[15 U.S.C. § 78u(d)] to preliminarily and permanently enjoin Defendants from future violations

of the federal securities laws.

11.      This Court has jurisdiction over this action under Section 22(a) of the Securities

Act [15 U.S.C. §77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa].

12.      Defendants have, directly and indirectly, made use of the means or

instrumentalities of interstate commerce and/or the mails in connection with the transactions

described in this Complaint.

13.      Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C.

§77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa] because certain of

the acts and transactions described herein took place in Wichita, Kansas and elsewhere in this

district and division, and because certain Defendants and Relief Defendants reside in this district

and division.

## DEFENDANTS

14.      **Michael J. McNaul, II** ("McNaul"), 54, is a resident of Hutchinson, Kansas.

McNaul is an undisclosed control person behind the Consolidated, Garner, Golden Belt, and

several of the Alliance ventures described below.  In January 2007, McNaul was enjoined by the

state of Colorado for violating the securities fraud, registration and broker-dealer provisions of the Colorado securities laws in connection with oil-and-gas offerings sponsored by Key Gas Corp. ("Key Gas"), a Kansas company controlled by McNaul.     *Fred J. Joseph, Securities Commissioner for the State of Colorado v. Key Resource Group, LLC et al.*, 2005 CV 7455. McNaul is also the subject of a Cease-and-Desist Order in Connecticut for violations of state securities fraud and registration provisions related to his participation in the Key Gas offerings. *In the Matter of Key Resource Group, LLC et al., Docket Nos. CF – 2007-7073-S and CF – 2007-7297-S.* Additionally, McNaul is a signatory on the bank accounts for each of the nine Consolidated ventures. McNaul is also a signatory on the bank accounts of Forrest, Mid Kan, PIW and Warren. McNaul asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

15.     **Dale C. Lucas** ("Lucas"), 57, is a resident of Wichita, Kansas. Lucas is a partial owner and a principal of Consolidated, Forrest, Mid-Kan and PIW. In January 2007, Lucas was enjoined by the state of Colorado for violating the securities fraud, registration and broker-dealer provisions of the Colorado securities laws in the Key Gas lawsuit. Lucas was also the subject of the Connecticut Cease-and-Desist Order for violations of state securities fraud and registration provisions related to his participation in the Key Gas offerings. Lucas is an authorized signatory on bank accounts for several of the Consolidated ventures, Forrest, Mid-Kan and PIW. Lucas asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

16.     **Russell W. Kilgariff** ("Kilgariff"), 59, is a resident of Preston, Kansas and the current CEO of Golden Belt and Garner. In January 2007, Kilgariff was enjoined by the state of Colorado for securities fraud in the Key Gas lawsuit. Kilgariff was also the subject of the Connecticut Cease-and-Desist Order for violations of state securities fraud and registration

provisions related to his participation in the Key Gas offerings. Kilgariff is an authorized signatory on bank accounts for several of the Consolidated ventures, the Garner and Pawnee Pipeline ventures, and Forrest, Garner and Golden Belt.

17.     **Gregory A. Krause** ("Krause"), 57, is a resident of Hutchinson, Kansas. Krause is a principal of Alliance and the sole signatory on its known bank accounts and the bank accounts for each of the eleven purported joint ventures sponsored and managed by Alliance. Krause asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

18.     **Lloyd F. Nunns** ("Nunns"), 64, is a resident of Hutchinson, Kansas. Nunns, along with others, owns and/or controls Alliance, Forrest, Consolidated, Mid-Kan, PIW and Warren. Before his partnership with McNaul and Lucas, Nunns spent 40 years as a railroad conductor, and had little or no oil-and-gas experience. Nunns is an authorized signatory on bank accounts for several of the Consolidated ventures and for Forrest, Mid-Kan and PIW. Nunns asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

19.     **Steven L. Tallman** ("Tallman"), 54, is a resident of Pretty Prairie, Kansas, and served as the CEO of Garner and Golden Belt until August 2007. Tallman is the signatory on the Garner and Golden Belt bank accounts. Before associating with Garner and Golden Belt, Tallman worked in construction and managing pizza parlors, and had little or no oil-and-gas experience.

20.     **Freddie J. Hembree** ("Hembree"), 53, is a resident of Hutchinson, Kansas. Hembree was formerly the president of Consolidated and the manager of Warren. In July of 2007, Hembree was replaced as manager and "transferred" to the position of asset manager for Consolidated and Alliance.

21.    **Ray L. Leonard, Jr.** ("Leonard"), a/k/a "Jimmy Blake," 48, a resident of Rancho Santa Margarita, California, controls CIN, which sold investments in the Alliance, Consolidated, Garner and Golden Belt ventures.  Leonard has never been associated with a registered broker, dealer or investment advisor.  Leonard pled guilty to two counts of mail fraud in 2004 and was sentenced to 33 months in federal prison.  *See United States v. Raymond Lee Leonard,* SA CR 03-143 AHS (C.D. Cal. (SD) January 26, 2004).  Leonard is currently on supervised release.  Leonard asserted his Fifth Amendment right against self-incrimination during the SEC's investigation.

22.    **Mark DuBoise** ("DuBoise"), 47, is a resident of Corona, California.  DuBoise controls Mid Western, which sold investments in the Consolidated, Alliance, Garner and Golden Belt ventures.    Mid Western and Mark DuBoise shall be known collectively as the "Mid Western Defendants."  On sales conference calls for these ventures, DuBoise described himself as a "senior authorized representative" and "senior analyst" for Consolidated, Alliance, Garner and Golden Belt.  DuBoise assisted in printing certain of the offering materials for the ventures discussed herein.  DuBoise has never been associated with a registered broker, dealer or investment advisor.  DuBoise has an unenviable track record of brushes with state and federal regulators.  In May 2003 and October 2003, respectively, Kansas and Pennsylvania issued Cease-and-Desist Orders for acting as an unregistered broker selling unregistered securities.  In January 2003, and December 2007, respectively, Washington and Connecticut issued Cease-and-Desist Orders against DuBoise for violations of those states' antifraud, securities registration and broker-dealer registration provisions.  In addition, in 1997, DuBoise was enjoined and ordered to pay $130,000 in a consumer fraud action brought by the Federal Trade Commission in

connection with a sweepstakes scam.   In connection with the continuous securities offering described herein, investors were not advised of DuBoise's disciplinary record.

23.     **Mid Western Natural Gas Inc.** ("Mid Western") is a California corporation with offices in Yorba Linda, California. Mid Western is controlled by DuBoise, and offered and sold interests in each of the ventures described herein. Mid Western and DuBoise shall be known collectively as the "Mid Western Defendants."

**RELIEF DEFENDANTS**

24.     **Consolidated Management Group, LLC** ("Consolidated") is a Kansas limited liability corporation ("LLC") with its principal place of business in Hutchinson, Kansas. Consolidated is the managing venturer of nine unregistered purported joint ventures formed for the stated purpose of acquiring and leasing refurbished oil-and-gas drilling rigs and related equipment.   McNaul, Lucas, Nunns and Kilgariff own and control Consolidated through their respective ownership interests in several Kansas LLC's.   In July 2006, the California Department of Corporations entered a Desist-and-Refrain Order against Consolidated and two of its ventures for selling unregistered securities in that state.   Following the issuance of the Order (as modified by a July 20, 2006 hearing), the Respondents appealed the Order to the Court of Appeal of California.   On April 28, 2008, the appellate court ruled, among other things, the joint venture interests constituted securities under California law.   In September 2006, the Alabama Securities Commission entered a Cease-and-Desist Order against Consolidated for similar violations of Alabama's securities laws.

25.     **Alliance Leasing, LLC** ("Alliance") is an Oklahoma LLC based in Hutchinson, Kansas. Alliance, which is owned by Krause, is the managing venturer of eleven unregistered

purported joint ventures formed for the stated purpose of acquiring and leasing refurbished oil-and-gas drilling rigs.

26.     **Golden Belt Transportation, LLC** ("Golden Belt") is an Oklahoma LLC with offices in Hutchinson, Kansas and Oklahoma City, Oklahoma. Golden Belt is the managing venturer of the Pawnee Pipeline Joint Venture, an unregistered purported joint venture whose stated purpose was to purchase and refurbish a gas pipeline located in four Kansas counties. Tallman incorporated Golden Belt in September, 2006. Tallman and Kilgariff currently control Golden Belt.

27.     **Garner Management, LLC** ("Garner") is an Oklahoma LLC with offices in Hutchinson, Kansas and Oklahoma City, Oklahoma. Garner is the managing venturer of the Garner Rig Joint Venture, an unregistered purported joint venture formed for the stated purpose of acquiring and leasing a refurbished oil-and-gas drilling rig. Tallman incorporated Garner in October, 2006. Garner is now controlled by Tallman and Kilgariff.

28.     **Forrest Energy, LLC** ("Forrest") is a Kansas LLC with offices in Hutchinson, Kansas. Forrest is owned by Nunns, Lucas, McNaul, Kilgariff and their affiliated entities. Forrest provided oil-and-gas drilling equipment to certain of the Consolidated purported joint ventures and also leased equipment from such purported ventures.

29.     **Warrick Drilling, LLC** ("Warrick") is an Oklahoma LLC with offices in Pratt, Kansas. Warrick is owned and controlled by McNaul through another LLC he controls. Warren has purported to lease oil-and-gas drilling equipment acquired by certain of the Consolidated and Alliance ventures.

30.     **Warren Drilling, LLC** ("Warren") is a Kansas LLC with offices located in Wichita, Kansas. Warren is owned by Lucas, Nunns and McNaul through their respective

Kansas LLC's. Warren has purported to lease oil-and-gas drilling equipment acquired by certain of the Consolidated and Alliance joint ventures.

31. **Mid-Kan Well Service, LLC** ("Mid-Kan") is a Kansas LLC with offices in Russell and Wichita, Kansas. Mid-Kan is owned and controlled by Lucas, Nunns and McNaul through their respective LLC's. Mid-Kan services and operates drilling-related equipment for certain of the Consolidated and Alliance ventures and is an affiliated entity of Consolidated and Alliance.

32. **T&D Oilfield Services, LLC** ("T&D") is a Kansas LLC with offices in Pratt, Kansas. T&D is controlled by Krause, Lucas, McNaul and their affiliated entities. T&D leases, services and operates drilling-related equipment for certain of the Consolidated joint ventures.

33. **Pawnee Iron Works, LLC** ("PIW") is a Kansas LLC with offices in Hutchinson, Kansas. PIW is owned by Lucas, Nunns and McNaul through their respective LLC's. PIW purportedly acquired and refurbished drilling equipment for the certain of the Consolidated, Alliance and Garner ventures.

34. **Consumer Information Network** ("CIN") is a Nevada corporation with offices in Mission Viejo, California. CIN is controlled by Leonard and offered and sold interests in each of the ventures described herein.

## FACTS

### Background-The Key Gas Oil and Gas Drilling Ventures

35. Between March 2001 and December 2004, McNaul, Lucas, Kilgariff, DuBoise and others offered and sold interests in 16 purported joint ventures to acquire and re-work existing oil-and-gas wells in Kansas. The managing venturer for each offering was Key Gas

Corp., a Kansas LLC controlled by McNaul. According to Forms D filed with the Commission for each offering, aggregate capitalization for the 16 ventures was approximately $30 million.

36.    Key Gas sold these ventures through a nationwide network of commissioned sales agents (called Independent Sales Offices, or ISOs), including DuBoise and Leonard. None of the ISOs or individual sales agents was registered with the Commission as a broker or dealer. Key Gas also held periodic nationwide conference calls to solicit investors. Leonard led those conference calls. The sales agents received commissions of up to 50% for their sales.

37.    To date, none of the Key Gas investors has received returns equaling their initial investment. Indeed, DuBoise stated that he personally invested and lost more than $100,000 in the Key Gas offerings. Moreover, Kilgariff testified during the SEC investigation that Key Gas stopped fund-raising activities due to the ventures' lack of success.

38.    DuBoise repeatedly referred to his dismal Key Gas investments in subsequent conference sales calls for the Consolidated and Alliance equipment leasing ventures. Without mentioning the name "Key Gas" or disclosing that the same principals responsible for his worthless oil-and-gas investments also controlled Alliance, Consolidated Garner, and Golden Belt, DuBoise contrasted his prior "high risk" and unprofitable oil-and-gas drilling investments with the "safe" ventures offered by the Defendants, which he said "always make money."

39.    In September 2005, the State of Colorado sued Key Gas, McNaul, Lucas and Kilgariff for fraudulently offering unregistered securities. In January 2007, the same defendants were permanently enjoined by Colorado for state securities fraud and registration violations.

40.    In addition, in December 2007, the Connecticut Department of Securities issued a cease-and-desist order against Key Gas, McNaul, Lucas, Kilgariff and DuBoise for violating the state's securities fraud and registration provisions.

## The Consolidated Management Oil and Gas Equipment Ventures

### Overview

41.    At various times between March 2004 and March  2006, McNaul, Lucas, Kilgariff, Nunns, Hembree, Leonard (the "Consolidated Defendants") and the Mid Western Defendants offered and sold interests in nine ventures to acquire, refurbish and lease oil-and-gas drilling related equipment.  Leonard offered and sold interests in the first Consolidated Joint Venture until April 2004, when he began serving a 33-month federal prison sentence for an unrelated fraud conviction.  Consolidated is the managing venturer for each venture.

42.    The Consolidated Ventures, like the Key Gas venture, featured the use of a network of commissioned sales agents and investor conference calls, in which the Consolidated and Mid Western Defendants touted projected annual returns of 20 to 35%.

43.    Beginning in approximately August 2004, the Consolidated and Mid Western Defendants enticed investors with a purported "exit strategy."  The "exit strategy" included plans to "roll up" the Consolidated ventures into a single entity that would either (a) be acquired by or merged with a public company, or (b) conduct an initial public offering with an earnings multiple of three to eight times the initial investment.

44.    Defendants emphasized the IPO prospect, with DuBoise stating that "we're not in this for a long time, we're in it for a good time."  Nearly four years later, this IPO has not occurred.

45.    The Consolidated Defendants raised approximately $45.5 million through the nine ventures.  As of December 31, 2007, they had returned only $6.6 million to Consolidated investors.

### Independent Sales Offices

46.     The Consolidated Defendants utilized more than 20 ISOs coast-to-coast and in Canada as exclusive selling agents for the ventures.  The agreements with the Consolidated ISOs provided for the payment of commissions ranging from 25 to 40%.

47.     Prospective investors initially received "cold calls" from lead lists purchased by the ISOs.  Many of the ISOs employed "fronters," who made the initial call to investors, and "closers" who attempted to close the sale.

48.     During the initial call, the fronters repeated canned sales scripts with statements such as "your investment is 100% secured by the equipment;" "with our venture #1 and #2 from 2004 paying revenues, we are projecting about a 30% annual return;" and "this pays out every quarter.  You should receive a check that equates to 25 to 40% return per year."  Prospective investors were advised that the venture was limited to accredited investors only.

### The Venture Materials

### Confidential Information Memorandum

49.     The Consolidated Defendants provided the sales force and potential investors with offering materials consisting of, among other things, a Confidential Information Memorandum (CIM) and a glossy promotional brochure.  The Consolidated venture materials were prepared, utilized and/or approved by the Consolidated Defendants.  Leonard approved and used the CIM and other offering materials for the first Consolidated Joint Venture.

50.     Each venture was purportedly established to operate as a general partnership and gave investors (aka "partners" or "venturers") control in the management and operation of the venture.  In reality, the purported joint ventures were not true partnerships, but securities

51.    Nunns and Hembree were the only individual defendants identified in the Consolidated offering materials. Nunns was described as "the managing member of Forrest Energy" and as having "decades of management experience in oil and gas, construction and land acquisition." In truth, before joining Forrest and Consolidated, Nunns served as a railroad conductor for 40 years and had no prior management experience in the oil-and-gas industry.

### Promotional Brochure

52.    The principal document used to sell each Consolidated venture was the slick promotional brochure, which made no reference to the risks of the ventures. Leonard helped prepare the brochure. Certain of the brochures contained a letter from Hembree, stating "the equipment to be leased by the joint venture has a history of being extremely profitable" and that the venture's equipment will be managed "by a very experienced management" that has a "proven track record." But no financial information in either the CIMs or promotional brochures supported the statements regarding equipment profitability or the Consolidated Defendants' track record.

53.    The brochures also claimed that Consolidated, the initial managing venturer, would provide audited financials and annual reports. In fact, no audited financials or annual reports have ever been prepared for any of the ventures or provided to any investors or prospective investors.

54.    Each Consolidated promotional brochure also contained projected revenue and expense figures that reflect annual investor returns between 20-35%. After the initial Consolidated venture was formed, however, none of the materials for the subsequent

### Promotional DVD.

55.    Leonard oversaw the preparation of the responsible for the promotional DVD that was sent to prospective investors in the initial packet. Among other things, the DVD claimed:

- This is a low risk venture with high returns.
- Forrest Energy now has contracts to keep these rigs busy for the next several years.
- Because these assets are in constant use, investors are provided an immediate income stream, paid quarterly.
- Consolidated Leasing Joint Ventures can provide such substantial returns with minimal risk because you are buying hard assets with a proven track record of profitability.

### The Sales Process: Sales Conference Calls

56.    Upon receipt of the offering materials, prospective investors were given a "conference code" and encouraged to dial into a nationwide conference sales call pertaining to the venture. These conference calls were replete with materially misleading misstatements and omissions concerning each of the Consolidated ventures.

57.    Between August 18, 2004, and March 14, 2006, Consolidated sponsored at least 100 nationwide conference sales calls for the Consolidated venture offerings, all of which were recorded by the conference call provider. As many as 100 prospective investors participated in the calls.

58.    Acting at the behest and with the knowledge and approval of McNaul, Nunns, Hembree, Kilgariff, and Lucas, DuBoise hosted many of the Consolidated conference calls. For hosting the calls, DuBoise received an undisclosed 3% commission "over-ride" on all sales resulting from the sales call, in addition to the commissions he received from direct sales by his ISO, Mid Western.

59.    DuBoise hosted the Consolidated sales calls from his office in California.  After the State of California issued its Desist-and-Refrain Order against Consolidated, however, DuBoise hosted at least some of the calls from Nevada.

60.    McNaul, Nunns, Hembree, Kilgariff, and Lucas participated and/or listened to the Consolidated sales calls from a conference room in Consolidated's Kansas office.  Kilgariff participated in numerous calls between August 18, 2004 and March 24, 2005, when he supposedly left Consolidated to pursue other interests.    At the conclusion of most calls, DuBoise, McNaul, Nunns, Kilgariff, Lucas and Hembree discussed among themselves and critiqued the calls.

61.    DuBoise used a scripted sales pitch on the conference calls.  He typically introduced himself as "Mark," without mentioning his last name.

62.    DuBoise routinely described himself as a "senior representative" of the corporation and falsely claimed to have "been with these guys for the last decade."  In truth, DuBoise met McNaul and Kilgariff by making a telephone pitch to sell them ATM machines in 2000.

63.    On the calls, DuBoise then typically introduced Nunns and Hembree as "industry affiliates" or "experts."  DuBoise then discussed, among other things, the uniqueness of the investment opportunity, the expertise and experience of the "proposed" management and affiliates involved, and the projected returns for the joint venture.

64.    DuBoise repeatedly referred to the investment as a "turnkey" deal in which Consolidated and its affiliates (Forrest and, later, PIW) would acquire, refurbish in "like new condition," lease and operate the oil-and-gas drilling rigs on behalf of the venture for the total subscription amount of the venture.

65.     DuBoise also claimed that an investor's risk of loss was limited to the amount of
the investment and that there would never be an additional cash call.  At the conclusion of the
presentation, DuBoise would field questions from potential investors.

66.     At this point, McNaul, who was introduced only as "Mike," and the other
participants on the call, including Nunns and Hembree, would answer questions.

67.     In addition, on at least two Consolidated sales calls, McNaul posed as Hembree to
answer questions.   Use of imposters was not a new tactic for the Consolidated Defendants;
according to the complaint filed in the Colorado Key Gas case, a convicted felon sometimes
posed as an investor during the Q&A session of the Key Gas conference calls.

### The Consolidated Joint Venture #2.

68.     The first known recorded sales conference calls occurred in connection with the
venture referred to as Consolidated Joint Venture #2 ("CJV#2").  The June 10, 2004 CIM for the
venture sought to raise a total of a $4,900,000 from investors in order to purchase eight
completion—workover drilling rigs from Forrest or another affiliate.  This, of course, suggested
that Forrest or an affiliate actually had the rigs.

69.     The CIM for CJV#2 also represented that upon the purchase of the rigs from
Forrest or an affiliate, the venture would lease the equipment to "oil and gas operators."  The
CIM added that "Forrest may seek to lease the equipment from the Venture."

70.     Likewise, the glossy promotional brochure for CJV#2 contained pictures of the
rigs.  In addition, the glossy brochure represented that the rigs were in "excellent" condition and
had recently been "refurbished and rebuilt between 2002 and 2004."

71.     At the beginning of the CJV#2 solicitation, however, neither Forrest nor any of
the Consolidated Defendants' affiliates had acquired *any* rigs for the venture.

*SEC v. Michael J. McNaul, II, et al.*                                            17
Complaint

72.     Instead, McNaul, on behalf of Forrest, had merely signed a letter of intent to acquire a privately held Kansas oil company for $2 million, whose assets included the eight rigs slated for CJV#2 and depicted in the glossy brochure. The letter of intent was dated April 8, 2004.

73.     Under the agreement, Forrest would also acquire the Kansas oil company's list of approximately 200 customers for whom it drilled wells. When the agreement was executed, Forrest had approximately 30 customers for which it drilled and/or completed oil and gas wells.

74.     Forrest made a down payment of $100,000, with the $1.9 million balance due on July 6, 2004. Subsequently, Forrest made another $100,000 payment to buy time to complete the acquisition.

75.     But Forrest never made the remaining payments, never acquired any assets from the Kansas company, and never operated or refurbished any of its rigs. In fact, on September 21, 2004, the Kansas company repudiated the contract, advising Forrest in writing that "this agreement is over."

76.     On November 24, 2004, Forrest filed a breach-of-contract lawsuit against the Kansas company. Yet, Forrest sought only return of its down payment; it did not seek specific performance of delivery of the rigs.

77.     Indeed, after the Kansas company repudiated the agreement, Forrest began acquiring *other* rigs on behalf of CJV#2. But Forrest did not acquire a full eight rigs for the venture, even from this new source, until approximately June 2005.

78.     Meanwhile, from the second quarter 2004 to at least the third quarter of 2006, Consolidated made "pro forma" quarterly payments to CJV#2 investors that were not based on actual revenues. In fact, the initial investor distribution for the quarter ended June 30, 2004,

consisted of investor funds misappropriated from the CJV#2 joint venture account, *i.e.*, Ponzi payments.

79.    The amount of the initial "pro forma" checks, which were signed by Lucas, was $2,860.13. This represented an approximate quarterly return of six percent – which, not coincidentally, approximated the quarterly net income projection in the CJV#2 promotional brochure of $2,977.

80.    Further, between August and December 2004, the offering materials mailed to potential CJV#2 investors contained a bogus CJV#2 second quarter P&L statement, claiming to show that existing investors in CJV#2 were already being paid the projected returns.

81.    DuBoise further misled potential investors by repeatedly referring to the CJV#2 second quarter distribution in conference sales calls. DuBoise made these and other false and misleading statements in the presence of, and with the knowledge and approval of McNaul, Kilgariff, Nunns, and Hembree.

82.    For example, during sales calls between August and December 2004, in which McNaul, Kilgariff, Nunns and Hembree participated, DuBoise falsely represented that Forrest had acquired the eight workover—completion rigs for the venture, that the rigs were already leased to Forrest for five years (despite no vote from the venturers approving Forrest as the lessee), that Forrest had contracts from third-party operators for the rigs well into 2005, and that the rigs were operating and returning profits to CJV#2 investors that met the projections in the CJV#2 promotional brochure.

83.    On August 18, 2004, the Consolidated Defendants participated in and/or monitored a nationwide sales conference call for CJV#2 hosted by DuBoise. On the call, DuBoise made the following materially false and misleading statements without being corrected:

- [w]e took over this particular group of rigs in the very latter part of the first quarter from an extremely successful company..... Basically, we not only took over the entire operation, but we got over 200 existing clients that we drill for right now.

- Now, Forrest Energy -- which is also on the phone call tonight, our industry partner -- has already contracted 100 percent of the [CJV#2 rigs] for the next five years with price escalators, as I'll go over with you in a second, and a contractual backlog. These particular eight rigs are already backlogged into the latter part of the third quarter, early fourth quarter of 2005. We're talking literally a year's backlog on projects that are already funded.

- [w]e have all eight of these rigs. They have been up and operational and that's why the customers on -- every one of these rigs is in-house. It's completely, 100-percent refurbished. Every one of those rigs is outside making us money right now, and that's why the customers, in the second quarter [of 2004], even though we weren't working the amount of hours that we're working now, and in fact, the price went from $125 to $155 on these particular rigs, that's why the customers made a return of $2,860.

- Every one of those rigs is outside making us money right now, and that's why the customers, in the second quarter...made a return of $2,860.

- the equipment already is valued at a little over $5 million and the [amount of this offering] is over $4.9 million, so the appreciation of the equipment is literally happening on a daily basis.

84.    None of the Consolidated Defendants corrected these misrepresentations, which

DuBoise made at their behest.

85.    On October 6, 2004, the Consolidated Defendants participated in and/or

monitored a nationwide sales conference call for CJV#2. On the call, Defendant DuBoise made

the following materially false and misleading statements without being corrected:

- [w]e took over this particular group of rigs in the very latter part of the first quarter from an extremely successful company.... Basically, we not only took over the entire operation, but we got over 200 existing clients that we drill for right now.

- If you turn to the second page of the [2nd quarter 2004 CJV#2] Profit and Loss sheet, I want to point out something down at the bottom that you may not have noticed. It says, One Unit Quarterly Disbursement, $2,860.13. Well, as I'm going to go over in a second here, when we get into the first page of the prospectus, literally that was only a hundred dollars short of projections. Our

projections were based on $2,977. Every customer that purchased at least one unit got $2,860.13.

- You know, I've been in many, many operations, I've been selling oil and gas for many years, and it's not very likely that a company hits projections, or 96 percent of projections, quarter after quarter after quarter, and that's the beauty and the safety of this, because this particular rigs, they do not leave the yard until we're paid, and we are paid for travel time as well to and from the projects.

- I'm very proud to say in the third quarter [2004], and very much so in the fourth quarter [2004], this particular group of rigs [CJV#2] is working 60 to 65 hours a week, so once again, when I state the projections are conservative, we feel that they are very achievable and at times we're actually going to be able to exceed those.

86.    On December 16, 2004, the Consolidated and Mid Western Defendants participated in and/or monitored a nationwide sales conference call for CJV#2. This call occurred after Forrest had filed suit against the Kansas company over the repudiated agreement to acquire, among other things, the rigs for CJV#2. On the call, DuBoise, McNaul, and Hembree made the following materially false and misleading statements without being corrected:

- DUBOISE:  Now, Mr. Lloyd Nunn (sic), our industry partner, the contracted proposed leasee (sic) for the next five years, Forrest Energy, has already contracted 100 percent of the equipment with price escalators and a contractual backlog of many, many months on projects that have already been funded.

- DUBOISE:  Well, we're not working 50-hours any more. We have these rigs working approximately, in the fourth quarter, 60 to 65 hours a week.

- DUBOISE: This is something that's pretty Steady Eddie that you can count on year in and year out. The bottom line is, if you've ever invested in oil and gas wells, once you invest with Consolidated Management and you start seeing the quarterly disbursements that we are talking about, I almost guarantee you will never take the risk of investing in oil and gas wells again.

- DUBOISE: And we fully expect, as we've already hit and I'll go over the performa (sic) with you in just a second right before we get to the question and answers the second quarter and the third quarter, annualized, along with the fourth quarter, we're going to meet expectations. We're going to be right what it says in regards to the performa (sic). We fully anticipate based on second, third and the work we're doing towards the end of the fourth quarter -- that you're looking at a 25-percent annual return over the year 2004. As we step into 2005 and 2006,

when I go through the prospectus with you, I'll show you how that's going to increase dramatically. And most important, your investment is secured by ownership of 100 percent of the equipment.

- CALLER: I invested in Consolidated Leasing No. 1.
  DUBOISE: Okay.
  CALLER: I'm also in Consolidated Leasing No. 2
  DUBOISE: Very Good.
  CALLER: What happened to No. 1 as compared to No. 2 as far as return is concerned?
  DUBOISE: The difference is—and I'll let Mike [McNaul] jump in here and answer this, too – we've already got all the equipment in Consolidated Leasing No. 2. All eight of the rigs have been out there working the whole time. Mike, would you like to finish that up in regards to Consolidated 1?
  MCNAUL: Yeah. All the equipment has not been acquired yet, and so if you don't have all the equipment in the field, it is a little different than Consolidated No. 2 in that all eight rigs have been out in the field working already.

- DUBOISE: Okay. When Mike said all the equipment hasn't been acquired, he was referring, callers, to Consolidated 1.

- CALLER: Question. So how did you acquire the equipment in Consolidated 2 prior to the closing of the joint venture?

- DUBOISE: We contracted. We contracted for the equipment.

- CALLER: So you're carrying a short-term note or –

- DUBOISE: That is correct. In fact, it will -- it will be paid off probably after tonight's phone call. Like I said, caller, we're down to our last handful of units. I mean, we -- I don't know exactly because I left the office a little early today to do the conference call, but I believe there is only seven or eight units left, and I might be a little high on that one. So the equipment is basically almost all paid for and will be paid for by tomorrow or Monday. You know, and the funny thing about this is, caller, if I can add a little footnote to that. The equipment has actually appreciated in value as we were paying off the equipment.

- CALLER: Did you have to rework the equipment, refurbish the equipment to make it running, or or

- DUBOISE: Well, I wouldn't say to make it running, but that's a good question, caller. Thank you for bringing that up. Mike [McNaul] or Fred [Hembree], either one of you want to jump in there and not only give him the answer, which obviously I know what it is, but tell him what exactly that you do when you talk about a complete refurbishment?

- MCNAUL: Yeah. We have gone through, this equipment that we have had under contract has been totally gone through, everything from -- Fred -- new engines, the derricks have been taken off and been checked out for stress cracks and cleaned up and, of course, put back on. What? New transmissions.

- DUBOISE: What else, Fred?

- HEMBREE: Oh, yeah, they replaced air lines. Some of the trucks we actually even did the cabs.

- MCNAUL: Yeah. New cabs on them and, yeah, frameup restoration kind of deal like you might do on a --on a vintage car, so to speak.

87.     The bogus "pro forma" returns paid to CJV#2 investors became part of DuBoise's standard sales pitch during the sales conference calls for numerous of the defendants' subsequent 20 ventures. The "extremely successful" CJV#2 became the poster child to support the outlandish projections in the subsequent ventures.

## The Remaining Consolidated Joint Venture Offerings

88.     Between approximately December 2004 and March 2006, the Consolidated and Mid Western Defendants and other ISOs – with the exception of Leonard, who had gone to the federal penitentiary – raised approximately $43.3 million through seven additional Consolidated oil-and-gas equipment joint ventures similar to CJV#2. In connection with each venture, the Consolidated and Mid Western Defendants made numerous false and misleading statements during the sales conference calls concerning: the success of prior ventures, including CJV#2; the safety and risks of the investment; the background and qualifications of management and affiliated entities; and the number of oil-and-gas operators for whom Forrest drilled.

89.     As early as August 2004, the Consolidated Defendants, with DuBoise as the primary spokesman, began touting an "exit strategy" for the joint ventures. They told investors and potential investors that the management team was seriously considering a merger,

acquisition, or an initial public offering (IPO) for the ventures. They further stated that investors could quickly reap a large return on investment.

90.    Among other things, the Consolidated defendants said they were working with one of the largest brokerage houses in the world; they had met with one of the "directors" for that firm to discuss an IPO; based on other IPOs in the industry, they expected at least a 3-4x multiple (that is, a 300-400% return on investment); that they were "not in this for a long time;" that the IPO had a 99% chance of happening within the next six to twelve months, if not sooner; and that once the IPO happened, they would return immediately to offering new ventures in order to do another IPO.

91.    The statements concerning the planned IPO were materially false and misleading for several reasons. First, although defendant McNaul engaged a brokerage firm in June 2006, it was to raise private capital for an unaffiliated company – not to raise funds for the ventures.

92.    Second, in approximately September 2006, McNaul actually declined the offer proposed by the brokerage firm.

93.    Third, the "director" of the brokerage firm repeatedly mentioned to investors he was not a director of the firm, and had no role in capital-raising for the firm.

94.    Fourth, the Consolidated Defendants never provided any brokerage firm or investment banking firm with audited financial statements – a prerequisite for engaging in an IPO.

95.    And fifth, a properly performed audit would have likely uncovered, among other things, the bogus pro-forma payments made to CJV#2 investors, thereby dashing any hopes for an IPO.

96.     In October 2005, starting with the conference calls for the seventh Consolidated venture, the Consolidated and Mid Western Defendants began touting the purported involvement of a very experienced and well-respected oil executive (the "executive"), in the operations and management of the ventures and affiliated entities.   According to DuBoise, "one of the most well-respected oil men in the world" had joined the Consolidated management team, along with his son and two associates.

97.     DuBoise and Nunns told prospective investors that these individuals were the "head of" Consolidated's (and later Alliance's) drilling operations.   DuBoise claimed that the executive oversaw the drilling operations in Oklahoma through his company Warrick Drilling, LLC, and that the executive's son oversaw the Defendants' drilling operations in Kansas through his company, Warren Drilling, LLC.

98.     DuBoise, in virtually every sales conference call from October 2005 through at least early 2007, trumpeted the executive's experience and his value to the ventures.   For example, DuBoise repeatedly claimed that because of the executive's reputation and involvement in the Defendants' operations, the timeline for the proposed "IPO [for the ventures] will be a lot shorter."

99.     He also claimed that the executive's company, Warrick Drilling, was the "proposed lessee" on the particular venture being offered, and that it had done a "great job" as the "contractual lessee on all prior ventures." DuBoise mentioned that if prospective investors did not want this executive and defendant Warrick operating their rigs, then maybe they should not invest.  Based on these representations, investors in at least two Consolidated ventures voted to lease the venture's equipment to defendant Warrick Drilling.

100.    In truth, during the relevant period, neither the executive nor Warrick ever operated a single rig or other piece of equipment for any of Defendants' ventures. Indeed, the executive never executed a lease on behalf of Warrick with any venture.

101.    To perpetuate the ruse, McNaul moved the operations of Forrest into the newly formed Warren Drilling – a company purportedly named after the executive's son. But neither the executive nor his son had any ownership or affiliation with Warren Drilling. Undisclosed to investors, McNaul was the majority owner of Warrick and Warren.

102.    Further, in the two Consolidated ventures that voted to execute a lease with the executive and *Warrick Drilling*, McNaul substituted *Warren Drilling* and leased the equipment to that company without consulting the investors. The purported partners in the joint ventures had no say in these decisions.

103.    In connection with Consolidated Joint Ventures #3 through #9, Defendant DuBoise, on various conference sales calls, made the following materially false and misleading statements without being corrected:

- [Caller]: "How close are your projections to and your actual experience? In other words, what is confidence value that I can put in these [projections]?"

- DUBOISE: For -- they've hit, sir. I mean when you talk about [CJV#2], that was -- we didn't actually start -- we had already contractually acquired the equipment in the latter part of the second quarter on that particular equipment or actually a little bit towards the middle of the second quarter. And the distribution checks that went out for Joint Venture No. 2 were, I think the worse case scenario was 95 percent or thereabouts of projections. We projected 2,977 dollars. There's probably several callers on this call tonight that were in a joint venture that got distribution checks for 2,860 the second quarter; 2,800 and change the third quarter. And the fourth quarter, from what I understand, is going to be very similar to the second and the third quarter. So we do have three quarters with the track record on Joint Venture No. 2.

- We fully believe, based on the returns we have seen on [CJV2], that you will receive a 30-35-40-45% and higher annual return in your investment and most

important your investment is secured by ownership of 100% of the equipment, a hard asset that is actually appreciating in value.

- ...it's never taken any longer than 30 days to get the equipment in-house...it's always been a relatively short period of time.

- there has not been a venture yet where we didn't get the equipment in a timely fashion

- [caller]: Are there any contingent liabilities to the venturers?

- DUBOISE: No there isn't. Absolutely zero.

- For your own safety as a venturer, we use one of the largest attorney firms in the world . . . . For those of you who are familiar with them, they are a very high price international firm. But they're there to protect us, protect you the venturer from any liability, and that is all inclusive in the $4.5 million raise.

- [We]Really don't have any competition because so much work is out there.

- Oil prices go up or down but that will have no influence on new drilling for gas.

- ...there's more work than any of us can handle. We don't have any competition. I know that's a bold statement but there's so much work that even the big boys like Forrest...we've got more work than anybody can handle. This particular equipment has a contractual backlog of up to 15 months...there's no end in site.

- What that means is, by owning the drilling rig, you would be getting involved in the one sector of the oil and gas industry that always gets paid, regardless of whether the wells are wet or dry, produce or not. We always make money. That's the bottom line. It's taking the risk out of the oil and gas industry.

- We are completely booked on this rig throughout 2006.

- The rig [for venture CJV#7] has been in house for 45 days and is being totally refurbished, like new. We have welders working full time. Big advantage to have already acquired the equipment. The rig will get in field in December 2005 to early January 2006. This rig has contractual backlog through 2006, meaning that if this rig is put onto the field in 1-06, it is already booked for a year solid.

- Nunns is the Managing member of Forrest Energy; contracted lessee for the next 5 years on all the prior ventures, which have been extremely successful. Invested in oil and gas drilling projects and he has been in the industry as far as the production assets over 30 years as well. He has extensive experience in drilling rigs, completion rigs, wire line trucks, drill stem testing, casing crews, fracturing and all facets of equipment management.

*SEC v. Michael J. McNaul, II, et al.*
Complaint

27

- Forrest has a client base of over 250 clients that it is currently drilling wells for.

- Bottom line is you're getting an opportunity to get into a company that already has a tremendous leg up, has all the pieces in place, has the acquisition specialist, has the operators to run the equipment, has the client base of over 220 operators that are publicly traded companies and large private companies.

- Forrest Energy has over 220 operators that they drill for.

- When we talk about exit strategy in the back of the [promotional brochure], that's why I wanted you to write down Bronco Drill.com. It's very similar. We've actually modeled ourselves after them with one exception, actually several exceptions. Number one, we believe we have a lot stronger management team with Mr. Fred Hembree, with Mr. Lloyd Nunns and, of course, [the executive]. The bottom line is though, Bronco Drilling went public on August 19th [2005]. They did an IPO. ….Their shares went from $17 to $25 overnight. If you go to Bronco Drill.com, you will see that we are very similar with the exceptions that I have already outlined.

- Well, I've got to tell you, folks, we are not in this for a long time. We are in this for a good time. This [venture] will not be in operation, I believe in five years. In fact, I would be absolutely shocked and surprised if it didn't go IPO within the next year or less.

- We operate the equipment and give great -- 25%, 30%, and 35% -- returns. So an IPO makes sense.

- We are looking right now that we could potentially sell this entire group of ventures inside of the next 6-12 months at 3-4 times what you put into it.

- With men associated with this deal like Fred Hembree and [the executive] -- one of the most respected oil & gas men in the world – I [Mark] believe the exit strategy will be executed in the next 6-12 months if not less.

- If I go over prior IPOs, I believe we have highest quality of management of any of them that has gone public in last year. This project/next project. If these two rigs are not operational until the second quarter. It is very possible that – first distribution in August – high potential that this thing will go public before you see your first distribution check.

### The Alliance Leasing Ventures

104.    Shortly after the California D&R Order was issued against Consolidated in

January 2006, Krause incorporated Alliance in Oklahoma in order to continue the scheme. Then,

at various times, McNaul, Lucas, Krause, Nunns, Hembree, Leonard (collectively the "Alliance Defendants") and the Mid Western Defendants began offering equipment leasing ventures under the Alliance name.

105.    During a recorded conference call between DuBoise, McNaul, Krause and various salespersons on March 21, 2006, DuBoise stated:

- As you know, as a result of the California, Gregg are you on the call?

- Gregg: Yes I am.

- Good, we have Gregg Krause here. As you know, the last 3 weeks or so, we haven't been able to sell California. As a result of that, we are not changing company names, we are actually opening a new corporation in the State of Oklahoma.

106.    During the call, DuBoise also instructed all salespersons to delete any reference to Consolidated in the correspondence to prospective investors. Although Alliance was purportedly based in Oklahoma, it operated from the same Kansas offices as Consolidated.

107.    The Alliance and Mid Western Defendants offered the purported ventures in the same manner as Consolidated. The materials and purported joint venture documents were virtually identical to the Consolidated materials. Prospective Alliance investors also received a promotional DVD that, among other things, described the ventures as "actually a low risk venture with high returns," and claimed the equipment had "a proven record of profitability."

108.    The CIMs for the first five Alliance ventures identified Krause as a managing member of Alliance, but failed to identify or disclose the management role of McNaul. Missing from the same five CIMs was any mention of the Consolidated ventures or the California Desist and Refrain Order entered against the company. McNaul did not appear in the management section in the CIMs until the last six Alliance offerings, where he, along with Lucas, were identified as "consultants." After the Alabama C&D Order was entered against Consolidated

and one of its ventures on September 21, 2006, none of the Alliance CIMs disclosed the existence of the order.

109.    On certain Alliance conference calls, McNaul was introduced by first name only and described as an "exit strategy specialist" and the "project coordinator" for PIW.

110.    In the CIMs for the first five Alliance ventures, the only affiliate identified was PIW. In the CIMs for the last six offerings, Warren and Warrick were also identified as affiliates.

111.    Also beginning with the sixth Alliance venture in August 2006, the CIMs disclosed, under the "prior activities" section, the existence of the prior Consolidated ventures, the amounts raised in each venture, and the amounts "distributed" to investors in each venture.

112.    Measured by returns to investors, the Alliance CIMs represented CJV#2 to be the most successful. The CIMs stated that it was formed in June 2004 and capitalized with approximately $4.9 million. The CIMs further claimed that as of August 1, 2006, it had returned $1,933,563 to investors.

113.    The "amount returned" figure represented a total return of approximately 40%. The CIMs failed to disclose, however, that the funds paid to CJV#2 investors were not based on actual equipment lease revenues, but were instead "pro forma" returns consisting at least in part of Ponzi payments.

114.    By January 2007, Alliance had formed eleven oil-and-gas equipment leasing joint ventures and raised over $75 million from investors. As of December 31, 2007, only $445,738 had been returned to Alliance investors.

115.    In connection with the offer and sale of the Alliance ventures, Krause hired DuBoise to conduct dozens of nationwide sales conference calls utilizing the same procedure as

in the Consolidated ventures. Nunns, Hembree, and McNaul participated in the conference calls.

After each call, DuBoise, McNaul, Nunns, and Hembree would discuss and critique them.

116.   The Alliance sales calls contained the same or similar material misrepresentations

and omissions as the Consolidated sales calls.   For example, DuBoise, on various Alliance

conference sales calls, made the following materially false and misleading statements, while

Nunns, Hembree, and McNaul sat quietly by and failed to correct the misstatements:

- I've seen tremendous returns of the early venture on the workover rigs.   Our early venture with eight completion rigs [CJV#2], it's brought me two years' worth of returns at approximately 50 percent return on investment and the value of those rigs have more than doubled and I've got to enjoy a 100 percent tax break.   So I mean I couldn't have made a better more wise investment at the time, and obviously, I have invested in many ventures since.   So that kind of gives you an idea of the historical track record on the completion rigs.

- Not only are we joint venture No. 15, and we've had 29 million dollars coming our way as far as the venture capital group and 90 million dollars through a third party institutional, very large brokerage house, third party affiliate, we are very close to executing an exit strategy.   So [caller], there is a real good possibility you could only see two checks out of this thing, maybe three at best, if this thing does go acquisition, merge or IPO and the majority votes yes.

- We can prove to you that we have a history of overall tremendous performance.

- On the early venture I got involved in  [CJV#2], I have enjoyed a 25% return in the last two years plus.

- In [CJV2] we projected returns in the mid-20s, but you've gotten over a 45% return on investment, plus the value of equipment has almost doubled.

- You are a general partner with no liability.

- CALLER:  So you cannot forsee any situation where something would happen, somebody dies in the process, where the JV becomes liable beyond its insurance limits?"

- DUBOISE:  Absolutely 100% no.   No possibility that if someone dies in the work-place, that we would be liable.   [A large international law firm] is our attorney firm, they are considered to be one of the top attorney firms in the world. They have a thousand general partners.   They billed $1.2 billion last year.   [A prominent lawyer] is our attorney, one of the top gentlemen in the United States.

He only has six clients, we're one of them. When the Bronco Drilling IPO took place, that I mentioned earlier in the call, that happened last August, he was the attorney and his firm that did the memorandum for that. When we go public, or we get acquired or merged, that's same gentleman that's going to handle, so he's structured this to protect the principals and you and I, the equity-holders, from any and all liabilities.

• These three rigs [for Alliance Sooner Trend JV#2] aren't in the field yet. We have them. We are refurbishing them. But I guarantee you, as soon as they get out there, we will have a backlog of up to two years.

• Lloyd [Nunns] has been in the industry for 30 years with a lot of experience.

• Warrick Drilling is the contracted lessee on prior projects.

• DUBOISE: Fred Hembree-is the acquisition specialist, and when it comes to refurbishing in my mind there is nobody better that does the job than Mr. Fred Hembree, and he has been with us from day one. Fred, if you could, give the folks a little background on how things are going and how things are going in the MidWest as far as our drilling operations.

• HEMBREE: Sure, Mark …..

• There is no exaggeration of the point that [the executive] is the one of the top ten, most respected drilling contractors in the world. And guess what? He was the lessee of choice on our prior ventures and certainly the lessee of choice on this venture.

• I'm very, very proud in the simple fact that we've got [the executive and his associates], a Lloyd Nunns and a Fred Hembree. We- this our management team could be compared to any publicly traded management team in the United States and certainly would be compared to any one of the top few in the world.

• It is a good time to consider using your IRA. The bottom line is, if you put $200,000 in it – and I'm just rounding, it turns into $800,000 at the time of the exit strategy.

• You will only get 1 or 2 distribution checks before it goes IPO by this time next year.

• When you talk about an acquisition or an IPO. They are looking at independently yearly audited profit and loss. They are looking at hard assets and the appreciation of that hard asset. They are looking at your client base, the people we drill for. They are looking at your earnings, and most important, they are looking at your management. And don't fool yourself folks, when you are talking

about this type of management, it's going to equate to 25 or 30 percent of a total acquisition or an IPO.

117.    The statements set forth in paragraph 116 above, were materially false and misleading because, among other reasons:

- By definition, a general partner is exposed to unlimited liability. Thus, Defendants' representation that the investors were general partners could not be true, since they were purportedly exposed to "no liability" beyond their initial investments.

- The large international law firm did not participate in the legal work for the Bronco Drilling IPO.

- There was no two-year backlog of drilling projects for the Alliance Sooner Trend JV#2. In fact, as of the date of this Complaint, that venture has yet to generate any revenue.

- During the Alliance venture offerings, neither Warrick Drilling nor the executive ever leased or operated a rig on behalf of a venture.

- Hembree had no role in the acquisition or refurbishment of oil and gas drilling equipment.

- None of the joint ventures had been audited as previously represented.

118.    DuBoise, acting on behalf of McNaul, Lucas, Krause, Hembree and Nunns continued to tout the potential for investors to cash out in an expected IPO. Once again, however, these claims were materially false and misleading.

119.    As previously mentioned in connection with the Consolidated ventures, McNaul engaged a brokerage firm in June 2006 to raise private capital for an unaffiliated company – not to raise funds for the ventures; around September 2006, McNaul actually declined the offer proposed by the brokerage firm; the "director" of the brokerage firm who was repeatedly mentioned to investors was not a director of the firm, and had no role in capital-raising for the firm; the proposed defendants never provided any brokerage firm or investment banking firm with audited financial statements – a prerequisite for engaging in an IPO; and a properly

performed audit would have likely uncovered, among other things, the bogus pro-forma payments made to CJV#2 investors, thereby dashing any hopes for an IPO.

## The Garner Rig Leasing and Pawnee Pipeline Ventures

120.    In January 2007, immediately after McNaul, Kilgariff and Lucas were permanently enjoined by a Colorado court for securities fraud and registration violations, Alliance ceased seeking joint venture investors. Instead, Tallman, a long-time friend of McNaul, nominally set up and oversaw the last two ventures (numbers 21 and 22), even though Tallman had no prior oil-and-gas drilling experience.

121.    Although Tallman, a former pizzeria manager, is identified in all offering materials as the principal of the two purported ventures, McNaul orchestrated and controlled both efforts. For example, McNaul hired employees, directed transfer of venture funds, and received substantial funds from both offerings, either himself or through entities he controls.

122.    Beginning on February 1, 2007, Tallman, McNaul, Nunns, Hembree, Leonard (collectively "the Garner Defendants") and the Mid Western Defendants began offering interests in the $12 million Garner Rig Leasing Joint Venture ("Garner JV"), with Garner Management as the purported managing venturer.

123.    In March 2007, Tallman, McNaul, Kilgariff, Leonard (collectively "the Golden Belt Defendants") and the Mid Western Defendants began offering interests in the $54 million Pawnee Pipeline Joint Venture ("Pawnee Pipeline JV"). The managing venturer for the pipeline offering is Golden Belt, another entity nominally run by Tallman.

### Garner and Pawnee Materials

124.    The Garner CIM, which is nearly identical to the Consolidated and Alliance CIMs, stated that the Garner venture planned to acquire a refurbished drilling rig capable of

*SEC v. Michael J. McNaul, II, et al.*
Complaint

34

drilling to a depth of 15,000 feet, which would then be leased out to "Operators, including [undisclosed] Affiliates of Garner." As of December 31, 2007, at least 75 investors in more than 24 states had invested nearly $11 million in the Garner venture.

125. The Garner and Golden Belt Defendants provided their sales force and potential investors with materials consisting of a CIM, a promotional brochure, and a promotional DVD. The Golden Belt brochure was prepared by Leonard. The Garner JV CIM described the proposed drilling equipment to be acquired and stated that it would be purchased from Garner or an affiliate of Garner in a "non-arms length" transaction, and that the venture intends to lease the equipment to affiliates of Garner.

126. Garner's affiliates are not identified in any of the offering documents. The intention from the outset, however, was to purchase the equipment from defendant PIW and lease it to Warren Drilling.

127. The Pawnee Pipeline CIM claimed plans to acquire and expand three natural gas gathering systems consisting of approximately 95 miles of pipeline located in four contiguous Kansas counties and build a nitrogen reduction plant ("NRU") to remove unwanted nitrogen from the gas before it transported to market. The CIM also contained a breakdown of estimated expenditures, which included $27 million for organizational costs, $10 million to acquire the pipeline in a "non arms length" transaction, $8.5 million to build the NRU, and $2.2 million for "geology costs." None of the Pawnee Pipeline materials disclosed that the pipeline system was going to be purchased from one of McNaul's LLC's.

128. Tallman and a third-party consultant were the only individuals identified in the Garner and Pawnee venture materials. The materials described Tallman as having the following experience: "manager in various sectors of the energy industry;" "consultant to various oil and

gas companies for the past 10 years;" "operator of oil and natural gas concerns in Kansas for the past decade;" and as someone having "upper-level management experience in the successful production of oil & gas." All of these statements were false, as Tallman had done nothing in the oil-and-gas business apart from a few title searches at a local courthouse.

129. The Garner and Pawnee promotional brochures projected annual returns between 20-35%. The brochures contain no list or description, however, of the affiliated individuals and entities, the dismal prior performance of the Alliance or Consolidated ventures, or the prior disciplinary history of McNaul, Kilgariff, Leonard, DuBoise, and Consolidated.

130. The Garner DVD is identical to the Alliance DVD, except for the name change from Alliance to Garner. Moreover, the Garner DVD identifies Hembree as "Pawnee Ironworks LLC Industry Spokesman." Hembree however, claims he never served in that capacity and that he was unaware that the Alliance DVD was used to create a Garner DVD.

131. Both DVDs tout the managing venturer for each offering as having "extensive experience in the oil and gas industry," without disclosing that Garner and Golden Belt's sole owner, Tallman, had virtually no oil-and-gas experience, and that two of the undisclosed principals of the ventures, McNaul and Kilgariff, had been enjoined for fraud in connection with a previous oil-and-gas offering.

132. As of December 31, 2007, at least 90 investors in at least 23 states had invested nearly $22 million in the Pawnee Pipeline JV offering. Neither Garner nor Golden Belt has made any distributions to investors.

133. The CIMs and purported joint venture agreements for both ventures also provided that the managing venturers (Garner and Golden Belt) were required to make a 1% capital contribution to the respective ventures (Garner - $120,000; Golden Belt - $540,000). The

documents failed to disclose, however, that neither Tallman nor the proposed managing venturer had sufficient funds to make the contribution. Therefore, unbeknown to investors, Tallman intended to make payment from his "management fee," thereby reducing the stated total capitalization for each venture.

### Garner and Pawnee ISOs and Sales Calls

134.    The Garner and Golden Belt Defendants used several of the same ISOs used to sell the Consolidated and Alliance offerings. But Leonard's company, CIN, was the principal ISO.

135.    When pitching investors, Leonard used the alias "Jimmy Blake." Had he used his real name, investors could have discovered his criminal history, which he failed to disclose.

136.    The agreements with the ISOs provided for the payment of commissions ranging from 33 to 48%. As with the Consolidated and Alliance ventures, prospective accredited investors initially received "cold calls" from lead lists purchased by the ISOs.

137.    In addition, interests in the ventures were offered to existing clients who had previously invested in one or more of the Consolidated and Alliance offerings. The Pawnee Pipeline JV was purportedly initially offered to investors in the Consolidated, Alliance, and Garner ventures. But new investors were also solicited, and some invested in the venture.

138.    In preparation for the Pawnee investor calls, the proposed defendants conducted at least two "training calls" for the ISOs. DuBoise and Leonard led the "mock" conference calls, and individual sales agents could either listen to the calls live, or access recordings of the calls later.

139.    Between February 28, 2007 and May 9, 2007, there were approximately 20 recorded nationwide conference calls for the Garner JV venture and eight recorded calls for the

Pawnee Pipeline JV venture.    DuBoise hosted all of the pipeline calls and one of the Garner calls.  The remaining Garner JV calls were hosted by a California salesman recruited by McNaul, and DuBoise.

140.    DuBoise monitored several of the Garner calls and occasionally answered investor questions as a "senior analyst" of Garner.  McNaul (and others) also monitored each Garner call.  At the conclusion of each call they all critiqued the California salesman.

141.    On the Garner JV calls, Nunns and Hembree were introduced as "experts" or "absolute specialists" in the oil-and-gas industry who were "integral" to the Garner venture.  In one Garner call, DuBoise described PIW as probably the most "integral part" of the venture.

142.    In each call, Nunns described the role of PIW in the rig refurbishment process and Hembree described the role of Warren Drilling in leasing the venture's rig to drill gas wells for various third parties.

143.    Tallman was also introduced on several of the Garner and on all of the pipeline calls as very experienced in the oil and gas industry.  Kilgariff participated on each pipeline call, as head of Exploration and Production for Golden Belt Transportation.

144.    DuBoise, Nunns, and Hembree answered investor questions on various Garner calls, and DuBoise, Tallman and Kilgariff answered questions on the Pawnee Pipeline calls.

145.    As with the Consolidated and Alliance calls, DuBoise received an undisclosed 3% commission on all sales resulting from a sales call, in addition to the large commissions he received from direct sales by his ISO, Mid Western.

### Fraudulent Statements and Omissions

146.    The Garner JV and Pawnee Pipeline JV ventures, which DuBoise repeatedly referred to on the sales calls as "our 21st and 22nd ventures," rested on a foundation of fraudulent

statements and omissions concerning the success of previous joint ventures, the background and experience of management, the financial condition of the Managing Venturer and its affiliates, the risks involved, the status of the venture's operations, and the likelihood that the venture would be part of an initial public offering.

147.   In early April, 2007, Leonard, DuBoise, McNaul, Tallman, and Kilgariff participated in a telephone conference call with several salesmen for the Pawnee Pipeline JV venture. Leonard made the following statements, among others, regarding the venture:

- So we have four points of entry into the pipeline. We've got an existing NRU that we don't own that we're processing our gas in right now, and we are in the process of building an NRU up there at that, where that flag is [in the promotional brochure]. That's going to take us about nine months to build that plant. That starts (sic) about two months ago.

- we're going to tie [the pipeline] in at Pawnee County. It's done.

- we're going to tie [the pipeline] into Edwards [county]. That's done.

- Our managing member, GLM, is headed by Steve Tallman. He is very experienced at managing income and expense, risk mitigation and insurance and things of that nature. …he has a background in managing large projects, he's got a background in managing gas and oil developmental projects….

148.   The statements set forth in paragraph 147 above, are materially false and misleading because, among other reasons, the Golden Belt Defendants failed to disclose that:

- Construction had not begun on the NRU plant and the pipeline had not been tied in at either Pawnee or Edwards counties.

- Steve Tallman had no background in managing large oil-and-gas development projects.

149.   On April 19, 2007, the individual Golden Belt Defendants participated in a telephone sales conference call in which defendant DuBoise made the following statements without correction:

- And by the way, if you're wondering how long it's going to take to get the NRU in place, we're about two months in on the NRU, so we're looking at about seven

months to build the nitrogen rejection unit, which, like I said, we're two months in..

- ...Golden Belt Transportation, LLC, which is the managing venturer, have (sic) already contributed one percent of the purchase in the Pawnee Pipeline Joint Venture...

- Keep in mind folks, that this has been 10 years in the making. We thought of everything in regards to this. I, like I said, along with Russ on the call today, have been involved in almost 60 wells of our own back in the latter 90's in the early part of the century in the Pawnee fields. I am very, very familiar. This thing is my baby. I mean, it's kinda like, probably not a good analogy, but it's my super model. This is something – as exciting as it's been to be involved in the drilling rigs and completion rigs, there is absolutely no comparison, in my opinion, to anything else out there.

- We also have Russ [on the call], who is head of E&P, Exploration and Production/Development for Golden Belt Transportation, Russ Kilgariff. By the way, Russ didn't honk his own horn, but he's pretty, pretty nice when it comes to this. He's got vast experience, his entire life in the oil and gas. In fact, him (sic) and all of his brothers have worked for numerous years in Saudi Arabia and all over the field. An absolute specialist in the oil business. I couldn't work with a better gentleman than Russ Kilgariff in regards to this.

- You know, the thing that I'm the proudest of, [caller] and I believe that you're in some of the early ventures, as I am, and I got involved in the first six ventures that we did – and the thing I'm the proudest of is we hit projections or exceeded them in all the ventures that are out there operating with rigs, so I would go with the numbers [in the Pawnee Pipeline brochure], you can live with those numbers, you'll be very, very, happy and very pleased for many years to come. ....we're just trying to come at this kind of a pessimistic way, and if we do like we did with a lot of the drilling rig ventures, instead of getting a $3,000 [quarterly] distribution, people were getting $5,000 distributions on a quarterly basis, you're just going to be that much happier you invested.

- Like I said in the early part of the call, callers, we're already halfway committed to the verbally and contractually with monies in the door. For those of you that have a high degree of interest in this lower risk income program, the time is now to express that interest to your authorized representative.

150.    The statements set forth in paragraph 149 above, are materially false and misleading because, among other reasons:

- Construction on the venture's proposed NRU plant had not begun.

- Defendant Golden Belt had not made its required managing venturer's one percent ($540,000) contribution and did not have the funds to do so.

- The 60 wells in the Pawnee field that Kilgariff was previously involved with were drilled by Key Gas Corp, which, along with McNaul and Kilgariff, was permanently enjoined for fraudulently offering oil-and-gas securities by the State of Colorado.

- DuBoise invested in only three of the first six Consolidated ventures, and none of these, or any of the remaining 14 Consolidated and Alliance ventures, ever met annual revenue or net income projections.

- The only Consolidated or Alliance venture that projected quarterly distributions in approximate amount of $3,000, was CJV#2, and the only quarterly distributions in that venture that approximated $3,000 were not based on actual revenue, but were funded with other investor funds.

- As of April 19, 2007, the Pawnee Pipeline Joint Venture had received only $1,794,500, of the proposed $54 million offering.

151. On April 24, 2007, the individual Golden Belt and Mid Western Defendants participated in a telephone sales conference call in which Defendant DuBoise made the following statements without correction:

- Now, if you go to the top right-hand side of page 39 [in the Pawnee Pipeline Promotional Brochure], it says Pawnee Pipeline Gas-Gathering System Expansion Project. ... [t]he next one, it says Q107, begin tie-in at Pawnee County. Done, as I mentioned. Q107, begun (sic) tie-in at Edwards County. It's done. And 2007, it says Q207, begin second NRU construction project. In process. In fact, I believe we're a couple of months in the process of doing that now.

- The first kind of shaded red box there, Golden Belt Transportation, LLC, managing member. The managing member, Steve Tallman, has already contributed one percent to the Pawnee Pipeline Joint Venture as well.

- [CALLER]: When you -- are there -- who would be a competitor to -- to, you know --
  DUBOISE: To us? We have the only pipeline in the AMI. We don't have any competition.

152. The statements set forth in paragraph 151, above, are materially false and misleading because, among other reasons:

- As of the date of the call, the pipeline system had not been tied in at Pawnee and Edwards counties.

- Likewise, construction on the NRU had not begun.

- Tallman had not contributed his required one percent managing venturer contribution ($540,000) to the Pawnee Pipeline venture and did not have the funds to do so.

- According to the Pawnee Pipeline JV CIM, "the venture will experience competition with many companies that have greater financial and technical resources and access to larger natural gas supplies than those available to the venture."

153.   The Golden Belt Defendants participated in yet another recorded conference sales call in April 2007 in which the following statements were made without correction:

- DUBOISE: Now, right out the gate, I would like to introduce a couple of different gentlemen.   Mr. Steve Tallman.   He is the managing member of Golden Belt Transportation, and Steve has been with us for quite a long time.  I know he's been in the oil and gas business for the better part of his life.  If you could, Steve, just say hello to the folks and anything else you might want to add to that.

- TALLMAN: (No response.)

- DUBOISE: Steve, are you with us?  Press star six on your phone to unmute yourself. Okay.  Well, we might be having a little technical difficulty.

- TALLMAN: No, we got it now, Mark.  I would like to take this opportunity to thank everyone today for being on this call, and also for their time.

- DUBOISE: Very good.  All right, Steve.  Is Russ with you, too?

- TALLMAN: Yes, he is.

154.   The statements set forth in paragraph 153, above, are materially false and misleading because, among other reasons, Tallman had only been involved with the Pawnee Pipeline venture for a few months and had hardly been in the oil-and-gas business for the better part of his life, but instead, had been managing pizzerias.

155.   The individual Garner Defendants participated in a recorded conference sales call on May 8, 2007, in which the following statements were made without correction:

- DUBOISE:   So once again, on behalf of Garner Management, let me assure you that each of us is honored to have the opportunity to be of service. Now before we get started, I would like to introduce a couple of the intrical (sic) gentlemen with this company. As a matter of fact right out the gate I would like to introduce Mr. Lloyd Nunns. Lloyd Nunns has been in the industry for well over 30 years in all facets of the oil and gas industry.   His job, which is probably one of the most important jobs, is the manager of Pawnee Iron Works, an all inclusive refurbishment center. Now Pawnee Iron Works, just to give you a little background, we are working on rigs in the 50 total right now, over 50 rigs total, that Pawnee Iron Works is actively refurbishing or already put out in the field.

- DUBOISE: Lloyd has done an absolutely phenomenal job.

- DUBOISE: Well, Pawnee Iron Works is probably the most intrical (sic) part of this, especially to get the rigs out in like-new condition.

- DUBOISE: Lloyd, you run other 300 employees, 10 different refurbishment facilities.  Like I said, you are working on or finished over 50 rigs all inclusive. It's a pleasure to have you on the call tonight.  And if you could, say hello to the folks and just let them know what is going on with Paw -- maybe you might want to touch on what a like-new refurbishment is, is what I wanted to ask you.

- NUNNS: Okay.  Thanks, Mark.  I would like to welcome everybody to the call and thank them for their participation this afternoon.  At Pawnee, we've geared up to meet the needs of the oil and gas industry over the last couple of years.  And I think biggest one around.  And when we get done with them we -- you can sit it next to a brand new rig and couldn't tell the difference.  And it will get the same rates in the field that a brand new rig would demand.  So they are just the same as a brand new rig, except about half.  And it's -- so far we've been able to meet the needs of the joint ventures and get this equipment moving.

- DUBOISE: The next person I would like to introduce is Mr. Fred Hembre.  Mr. Hembre, I've known for many, many years just like I've known Lloyd.  He's an absolute specialist in the drilling sector.  In fact he's a third generation oil man. Fred, if you could, being a representative of  Warren Drilling, you know, the marketing guys and gals have brought 21 ventures to date, over 50 rigs all inclusive, not including all the support equipment, the allied equipment, the drill stem testing, the casing  crews, all the other stuff that we put to date out there in the fields.  With you being the lessee of choice, contractually for the next five years, if you could say, hello to the callers and let them know how busy you are at Warren Drilling?

- HEMBREE:  Sure, Mark, thank you for that. You know, out here at Warren Drilling we are definitely staying hooked up, tell you what.  We have a really very long client list that -- that's just waiting to have wells drilled.  So I stay busy on

the telephone every day and keeping up with all of the coordination of drilling the wells.

- DUBOISE; [W]e will have this rig out and operating within 60 days from now. And that's the key to this, getting it out there very, very quickly because there's already work lined up to operate this rig. .....This rig, because it's 90 percent complete, we are only looking at two months before it's out in the field.

- DUBOISE: That's why if I go back to all the early ventures, the ventures we worked on three years ago, two years ago, two and a half years ago, our ventures are all paid anywhere from 20 to 35 percent return on investment over the last two, three years.

- DUBOISE: Really and truly if you look at it for what it is, there really is no competition for the simple fact that we've all got more work that any of us can handle. And that is the -- there is no end in sight on that.

- DUBOISE: But that leads me right back to a potential exit strategy. The irony here is, is this particular venture, because of the size of the rig, because of the components, because of the horizontal abilities, because of everything else that could quite possibly go in an exit strategy to be done later this year, early part of next year. We -- the whole intent when we originally got into this from venture No. 1, all the way to venture 21 is to build a strong team. Remember you are looking at independently, yearly audited profit and loss statements. You are looking at cost and appreciation of the equipment. You are looking at a client base with the drilling company of over 150 up -- up, and E and P companies that they drill and complete wells for. So when you have all these components together, you make for a very attractive merge, acquisition or IPO target. And folks, that was the intent going in, and absolutely has nothing changed in any way, shape or form. This rig is, in my opinion, because it's one of the biggest, will be one of the most valuable rigs in any proposed exit strategy.

- DUBOISE: Folks, I invest in these too. I'm invested in, this will be my 11th investment of 21 ventures the marketing team has brought to the table. I would have never invested in the first one if it wasn't for two things. Number one, the liability is severed for you and I.

- DUBOISE: If this rig is added to the exit strategy and you agree to do so, Janet, it could happen as early as the fourth quarter of this year.

- [CALLER] I see.

- DUBOISE: Now what does that mean? That means, depending on the offers, you could get a three, four, maybe a five-time multiple of your original investment.

- [CALLER]: Wow. So that's going to happen?

- DUBOISE: There's no guarantees, Janet, but we have been working on this for two years.

- DUBOISE: Furthermore, we are working with one of the largest brokerage houses worldwide. In fact, I've met with, myself personally, Janet, spoke to one of the board of directors, sat down with dinner with him, of one of the top brokerage houses in the world, is very excited to underwrite this whether it's an acquisition, merge or what I believe is going to happen is probably an IPO, so absolutely.

- DUBOISE: Okay. Let me -- let me take it a step further if you don't mind. Can I just talk about risk, period?

- [CALLER] Yes.

- DUBOISE: Okay. Because there's a little more than just the price. When I first got into this and bought into my first couple of ventures, and by the way, my father is 73, he is retired now. And has no more expendable income and he's barely accredited, you know, he's a little bit over a million dollars in net worth. My father had his monies tied up in savings accounts. And I said, dad, and then when Y2K came around, he bought 200,000 dollars worth of gold Kreugerands because he thought armageddon was here. And when I found about that, I just about flipped. I decided it's time for me to start looking for investments for my dad and take over a little bit of his portfolio. I have him invested in this as well.

- My recommendation is, this may be the last 15,000-foot rig we do. For those of you that have a degree of interest in what I consider a lower risk mitigation program, the time is now to express that interest to your authorized representative. Every single venture that the marketing guys and gals do, we always end up over selling and sending contracts and checks back.

    156.   The statements set forth in paragraph 155, above, are materially false and

misleading for the following reasons:

- Nunns did not have 30 years experience in the oil and gas industry. In fact, his career in the oil business began in late 2003 when he went to work for Defendant Forrest Energy, and in a sworn deposition on June 9, 2005, Nunns admitted he had little oil and gas experience and that "I don't know anything about going out and buying rigs."

- None of the previous ventures had paid investors "anywhere from 20 to 35 percent return on investment over the last two, three years."

- Defendants failed to disclose that they had raised $6.2 million from investors beginning in October 2005 for the seventh Consolidated venture, and after approximately 19 months, Defendant PIW had still not delivered a deep well drilling rig similar to the proposed Garner rig to the Consolidated venture

- Defendants failed to disclose that between April 6, 2006 and April 30, 2007, Defendant PIW had received approximately $40 million of investor funds from Alliance ventures for the purchase of approximately 25 refurbished drilling and/or completion rigs. However, according to quarterly progress reports sent to Alliance investors, as of the end of the first quarter of 2007, PIW had delivered only 13 drilling and/or completion rigs to the ventures.

- Defendants failed to disclose that during the first quarter 2007, Defendant Warren had leased approximately five drilling rigs from four Consolidated ventures and one rig from one Alliance venture, and for the quarter, each of the four Consolidated ventures operated at a loss, while the one Alliance venture returned only 2.3% to investors, which was less than half of the projected amount for the quarter.

- Defendants failed to disclose that as of May 08, 2007, neither Warren nor Hembree had ever drilled a well in Oklahoma, where the Garner rig was scheduled to be leased.

- As of May 08, 2007, the Garner rig was not 90% complete. In fact, as of the date of this complaint, Defendant PIW has not delivered the rig to the Garner venture.

- Neither DuBoise nor his father invested in the Garner offering, DuBoise had invested in only eight Consolidated or Alliance ventures, and his father's only venture investment was given to him by Defendant McNaul in exchange for a previous worthless Key Gas venture investment.

### The Purported Joint Ventures are Securities

157.    The purported joint ventures constitute "investment contracts" within the meaning of the federal securities laws because the investors entered into (1) a contract, transaction or scheme in which a person invests money, (2) in a common enterprise, (3) having been led to expect that profits would be derived from the managerial or entrepreneurial efforts of others.

### The Investors' Illusory Managerial Powers

158.    Defendants tried to create the appearance of true joint ventures in which the venturers would participate actively in managing the venture. But in reality, the victims were passive investors in "turnkey" investment contracts and had only illusory managerial powers.

159.    In the offering materials and on sales calls, investors were told they would have "extensive and significant management powers," which they would exercise by voting on all venture decisions. And in each of the 22 ventures, certain ballots were sent to investors asking their approval of such things as appointing the managing venturer, whether to buy or sell specific pieces of equipment, and whether to elect straight-line or accelerated depreciation.

160.    Yet, the operation of the balloting process reveals that from the very beginning investors lacked the power to manage their respective joint ventures. In essence, the balloting process is a sham, and Consolidated, Alliance, Garner and Golden Belt ran the joint ventures like limited partnerships, not general partnerships. Defendants controlled the flow of information, and systematically withhold relevant information from investors.

161.    Even when investors were supplied with some information and a ballot, their vote was meaningless because in many instances the managing venturers had taken action well in advance of tallying the partners' votes. Thus, investors were doing nothing more than voting on matters that had already occurred and decisions that had already been made, based on misleading and incomplete information.

162.    In addition, investors are dependent on some unique managerial ability and therefore have no realistic alternative to the manager. The promotional brochures and conference calls are replete with references to the peerless skill levels of the management team

and affiliated entities that are involved in the Consolidated, Alliance, Garner and Golden Belt enterprises.

163.    Investors are told that the relevant management team consists of consummate veterans in the oil and gas industry that are currently operating or managing companies at the height of their field.  From the refurbishment facilities to the equipment operators, the assembled infrastructure is represented to be as good as it gets.

164.    Defendants claim to have intimate knowledge of nearly every aspect of the oil-and-gas industry, including knowledge of the drilling fields in Kansas and Oklahoma, the equipment needed to drill wells, the materials and efforts required to locate, purchase, and refurbish drilling rigs, the quality of the oil-and-gas being extracted, the steps necessary to distribute, market, and sell the end product, and the components necessary to make a profit for investors.

165.    Thus, in reality investors had no meaningful voice in the management of the ventures.  In voting on a particular proposal, investors were denied material information, provided materially misleading information, or asked to vote on something that had already taken place.

166.    To begin with, the managing venturers each sent ballots to their partners, with Consolidated, Alliance, Garner or Golden Belt, respectively, listed as the sole option for managing venturer in the partnership.  The ballots contained no information about the respective nominees and provided no alternative nominee for the investors' consideration.

167.    Further, as the injunctions and other regulatory actions mounted, the ballots omitted these material facts.  For example, all ballots after January 2007 failed to disclose the Colorado fraud injunction against McNaul, Lucas and Kilgariff.

168.    To compound matters, the Consolidated, Alliance, Garner and Pawnee Pipeline offering materials and sales conference calls, which were the only sources of information about the proposed managing entities, provided false and misleading information to investors about the identity, background, experience and success of the actual and purported principals of the proposed managing ventures and their affiliated entities. For instance, in the Consolidated and Alliance offerings, investors were provided false information about Nunns' oil-and-gas experience and were falsely told that a very experienced and respected oil-and-gas executive had managed and would continue to manage the drilling rigs for the ventures.

169.    Likewise, investors in the Garner Rig and Pawnee Pipeline ventures were fed admittedly false information about Tallman, the sole officer of the proposed managing venturer. The Garner and Pawnee Pipeline offerings materials, both written and in sales calls, also failed to disclose that McNaul and Kilgariff, two enjoined oil-and-gas fraudsters, were the true principals behind the managing venturer. Moreover, starting with CJV#2, investors were provided false information about the actual success of the ventures' management and their affiliated companies in operating the ventures.

170.    Similar to the "yes-or-no" vote on the managing venturer, the ballots sent to select the lessee of the venture's oil-and-gas equipment offered only one choice: the proposed defendants' affiliated entity.

171.    Furthermore, in at least two of the Consolidated ventures, investors were misled to approve Warrick Drilling as the equipment lessee. Even worse, McNaul, without notifying investors, substituted Warren Drilling as the lessee. Thus, investors had no say in Warren Drilling becoming the lessee.

172.    On or about April 30, 2007 Garner Rig JV investors received ballots to approve the acquisition of the rig for the venture. But investors were given inaccurate, incomplete and misleading information.

173.    For example, investors were not told that Tallman had *already* executed a contract to purchase the rig for $6.2 million, transferred approximately $1.25 million of investor funds to PIW (a McNaul LLC) towards the purchase of the rig, and that PIW had nine months within which to deliver the rig to the venture (even though the rig was supposedly 90% complete at the time of the offering).

174.    Even more egregious was that the pipeline venture "vote" to purchase the pipeline and NRU was tabulated when less than 40% of the venture had been sold. Worse still, the "vote" was approved with less than half of the ballots returned. These facts made it mathematically impossible for the vote to have been approved by a majority of the venturers.

175.    In August 2007, investors in the seventh Consolidated venture received a ballot requesting approval to lease the venture's rig to Trace Drilling Co., an unaffiliated oil-and-gas company. In October 2007, CJV #7 investors were advised "that it appears" the new lease with Trace "is being accepted" with 47% of the venturers returning ballots.

176.    Contrary to the statements made to investors, CJV#7 does not have a lease with Trace, and never did. Instead, the lease is between Trace and PIW, which, according to the lease, has "exclusive" title to the rig.

177.    Further, the lease was executed in May 2007, two months <u>before</u> ballots were apparently sent to CJV#7 investors seeking their approval. Worse yet, as discussed below, PIW has misappropriated net revenue from the Trace lease that rightfully belongs to CJV#7 investors.

178.   The investors themselves had little or no background or experience in the oil-and-gas industry.   Before investing, investors were not even asked if they had prior oil-and-gas experience, much less experience with drilling rigs or oil-and-gas pipelines and gathering systems.   The investors, many of whom are senior citizens who invested retirement funds, are members of the general public that are relying solely on Consolidated, Alliance, Garner and Golden Belt to operate the business.

179.   Investors had no prior relationships with other investors and did not receive all the names and addresses of the other investors until long after making their investments.   Indeed, the investors, who are scattered across the country, had no knowledge of reasonable alternatives to Consolidated, Alliance, Garner or Golden Belt (even if they had been provided with any meaningful choice), and no understanding of how to purchase alternative oil-and-gas equipment or enter into alternative lease agreements with other drilling companies.

180.   The investors were pitched these investments by unregistered salesmen and during conference calls where they heard a one-sided story about the capabilities of the managing venturer.   Then, they invested their money with the expectation that the management and operation of the business would be handled by others.

181.   Defendants made the day-to-day decisions regarding the operations of the ventures.   The investors did not receive a financial statement from Defendants as to the exact amount of money received from investors and how it was spent.   No one associated with Defendants disclosed any information as to the exact amount of their compensation.   Investors simply sent their money to Defendants and passively expected to earn a return on their investments.

182.    Even though investors were afforded the "right" to vote, Consolidated, Alliance, Garner and Golden Belt started functioning as managing venturers before investors even received their initial ballots. And, as the acting managing venturers, Consolidated, Alliance, Garner and Golden Belt had already entered into material agreements with, and transferred millions of dollars to, entities owned and/or controlled by the proposed defendants – *before* investors had a chance to vote on these managerial decisions.

183.    In certain instances, investors subsequently received ballots to "vote" on whether to enter into these agreements and transfer those funds. When asked what would happen if a majority of investors voted against the agreements, Tallman testified that he would ask for the money back.

184.    In other instances, no subsequent vote was taken. Even assuming that the investors had the power to vote on, or change the outcome of, these managerial decisions, they were not provided with sufficient information to make any *informed* managerial decisions.

185.    For example, one Garner ballot asked whether the venture should enter into a 75% net revenue equipment lease with an affiliated drilling company. Yet, no copy of the lease was attached to the ballot. And the ballot identified none of the terms of the lease, such as price or term, or any information about the proposed lessee.

186.    In the nationwide conference calls, prospective investors repeatedly heard that the equipment for their joint venture was "already booked" for a term of years with the "proposed" lessee.

187.    More recently, investors in the seventh Consolidated venture received ballots asking to approve Trace Drilling, a third-party oil company, as the lessee of the equipment. In fact, a month before the ballots were sent out, McNaul, on behalf of PIW (*not* the Consolidated

venture), had *already* executed a lease with Trace. Further, PIW continued to lease the venture's

rig to Trace even though the required 50% approval of partners had not been obtained as of

October 22, 2007.

188.   The large number of investors in each venture residing all over the United States,

except Kansas where the rigs are located, confirms that the investors' purported managerial

powers are illusory.

189.   As disclosed in the CIMs, the joint ventures were purchasing equipment that was

identified by the managing venturer or an affiliate, at a price determined by the managing

venturer, and then leased by the managing venturer, usually to another affiliate. As a result, the

success of the joint ventures was uniquely dependent on the efforts of the managing venturer,

upon which investors would rely in making their investments.

### Misuse of Proceeds

190.   Between March 2004 and December 2007, Defendants directly and indirectly

raised approximately $156 million from over 1,300 investors.

191.   Consistent with the disclosure in the CIMs, approximately $72 million, or 46% of

the funds, has been expended on "organizational costs," the vast majority of which went toward

commissions paid to the approximately 28 ISOs. Approximately $79 million was initially paid

to Defendants' affiliated entities (including Relief Defendants Forrest, Mid-Kan, T&D, Warren

and PIW), ostensibly for, among other things, the purchase and refurbishment of 59 drilling rigs

and the pipeline. Twelve of the 59 rigs have not been delivered at all, including the rig for the

Garner Rig venture, the 21st venture. Moreover, the Pawnee venture (22nd venture) has not

acquired or begun construction of the nitrogen rejection unit, which is integral to the operation

and success of the venture. Because of the incomplete document production during the investigation, approximately $5 million of the $79 million remains unaccounted for.

192.    As of December 31, 2007, Defendants had distributed approximately $7 million to investors: $6.6 million to investors in eight Consolidated ventures, and $400,000 to investors in six Alliance ventures. Investors in the remaining six Consolidated and Alliance ventures and the Garner and Pawnee investors have received no returns.

193.    In addition, bank records reveal that not all of the $7 million paid to investors derived from actual equipment leasing revenues. With respect to the "pro forma" earnings payments that went to CJV#2 investors, bank records reflect that approximately $112,000 came directly from investor funds deposited into the CJV#2 account, and approximately $900,000 came from other Consolidated ventures (i.e., Ponzi payments).

194.    Recently, McNaul and others have misapplied earnings belonging to CJV #7 and possibly other ventures. Unknown to CJV#7 investors, McNaul, on behalf of PIW, agreed to lease a rig belonging to CJV#7 to Trace Drilling. McNaul caused PIW to enter into the lease with Trace a month before the ballots to approve a lease between CJV #7 and Trace were even sent out.

195.    Since then, Trace has paid PIW approximately $962,000 in net earnings from the operation of the CJV#7 rig, all of which should have been paid to CJV#7 investors. Yet, only $433,522 of the earnings have been distributed to CJV#7 investors. The remaining approximate $528,000 has improperly been used to cover, among other things, legal fees, child support payments, and operating and payroll expenses of relief defendants PIW, Mid-Kan, T&D and Warren.

196.   Further, approximately $13.6 million from the Garner and Pawnee ventures ended up in PIW accounts. PIW bank records seem to indicate that an undisclosed purpose of the Garner and Pawnee ventures was to raise funds for PIW in order to acquire and refurbish rigs for the Consolidated and Alliance ventures – rigs that should have been paid for with Consolidated and Alliance investors' funds.

197.   At the beginning of the Garner offering, PIW had approximately $2.2 million in its accounts and had yet to either acquire and/or complete refurbishment of approximately 17 rigs to the Consolidated and Alliance ventures. Since then, the majority of new deposits in the PIW accounts came from the Garner and Pawnee ventures. But those funds did not remain in PIW accounts. As of April 11, 2008, the collective balances in the PIW accounts had dwindled to approximately $32,000. During this same period, PIW had apparently acquired and/or completed refurbishment on an additional 12 rigs for various Consolidated and Alliance ventures. Thus, these rigs were acquired or refurbished with funds fraudulently obtained from the Garner and Pawnee Pipeline investors.

198.   Finally, the individual defendants have received the following amounts:

- McNaul – at least $5.1 million paid to McNaul, his family and entities he controls

- Lucas – at least $1.4 through entities he controls

- Nunns – at least $422,000 personally and through an entity he controls

- Krause – at least $414,000 personally and through entities he controls

- Kilgariff – at least $510,000 personally and through entities he controls

- Hembree – at least $224,000 personally and through entities he controls

- Tallman – at least $110,000 personally

- Leonard – at least $5.4 million through an entity he controls

- DuBoise – at least $4.6 million personally and through defendant Mid-Western

## Recent Developments

199.   In late April 2008, investors in CJV#7 received, among other things, an unsigned letter from Consolidated.  The letter falsely stated that the delay of their approximate $388,000 distribution for the fourth quarter 2007 (already two months overdue at the time) was the lessee's [Trace Drilling] financial problems caused by "its inability to reach well locations during the first, second, and third quarters of 2007..."   The letter also stated the investors would receive their check "once the lease payment is received from [Trace]."   These were lies.

200.   As previously noted, PIW, not CJV#7, has the lease with Trace.  Further, Trace has timely paid all of the lease payments to PIW since the inception of the lease on May 31, 2007.  And PIW has misapplied at least $528,000 belonging to CJV#7 investors.  On May 12, 2008, Trace received notice that the lease was being assigned to CJV#7, but it received no notice as to where to send the current $60,000 lease payment.

201.   Beginning in late April and continuing into May 2008, investors in the 20 Consolidated and Alliance ventures also received two ballots from the "Advisory Committee, LLC" ("Committee").  The Committee consists of six investors who have invested a combined total of $3.2 million in a total of 16 ventures.  The Committee, which was formed in August 2007, has spent considerable time at its own expense to investigate the status of the investments.  For example, the Committee learned that as of April 15, 2008, only eight of the approximate 59 drilling and completion rigs for the Consolidated and Alliance ventures were operating.

202.   The two ballots also requested approval of the transfer of Consolidated's and Alliance's respective 1% interest in each of the ventures to the Committee and to approve the

Committee to serve as the managing member of each partnership. As of May 23, 2008, the Committee had received the necessary 50% approval from seven of the 20 Consolidated and Alliance ventures.

203.   On or about May 8, 2008, Consolidated and Alliance sent out ballots seeking their investors' immediate approval to replace the current lessees of the equipment for each Consolidated and Alliance venture (relief defendants Warren, Warrick, T&D or Mid-Kan) with a newly formed Kansas entity, Panther Energy Services, LLC ("Panther"). The ballot also claimed that Panther will be capitalized with an unspecified amount of funds by unidentified "unrelated third parties," and "the current lessee principles (sic) will have no ownership interest in Panther."

204.   The ballot also advised that (a) the new lease with Panther would contain the same terms and conditions of the previous lease, which would entitle Panther to receive 25% of the net income generated by each venture's equipment; and (b) Consolidated and Alliance were assigning "to Panther their respective rights and interests to the net proceeds from the sale or liquidation of the equipment," which, according to the Consolidated and Alliance CIMs, is between 25% and 35%. The current status of this ballot process is unknown to the SEC.

205.   Neither the identity of the "unrelated third parties" behind Panther nor the amount of capital they intend to invest in Panther has been disclosed to Alliance and Consolidated investors. The SEC, however, has spoken with a purported representative of the venture capital firm affiliated with Panther and learned the identities of its principals, whom the representative said would have a "hands-on" role in management.

206.   A cursory Internet search revealed that the venture capital firm's principals were held in contempt of court on April 25, 2008 and ordered to be placed under arrest for misconduct in a civil lawsuit. The principals had defaulted on a $300,000 loan, defaulted on the ensuing lawsuit,

and failed to appear for four scheduled post-judgment depositions. These defaults and non-appearances, which formed the basis of the contempt order, inspire no confidence that the venture capital firm or its principals have either the finances or the fortitude to operate Warren, Warrick, Mid-Kan and T&D, assuming investors approve the measure.

207.    McNaul, Lucas, Krause and Nunns remain in control of the affiliated entities, such as PIW, Mid-Kan, T&D, Warren and Warrick, each of which presently operates equipment leased from the ventures and is presumably receiving revenue from the leases, none of which being distributed to investors.

208.    Further, Kilgariff remains in control of the Garner and Pawnee ventures and recently withdrew $69,000 of investor funds from a Pawnee account contrary to his agreement with the SEC that he would not withdraw additional funds. The SEC has learned that the $69,000 came from a $540,000 investment in the Pawnee venture made by an elderly investor in April 2008.

209.    Because investor funds from each of the 22 ventures have been commingled in the accounts of various affiliated entities, including PIW, an independent receiver should be appointed to protect the interests of all investors, including investors in the Garner and Pawnee ventures.

210.    Moreover, absent a receiver, investors whose funds were used to make Ponzi payments to investors in other ventures will have no redress for those improper payments. In other words, while the SEC does not doubt the Committee's good intentions, it is not clear that the Committee, whose members are themselves investors in various ventures, will be able sort out and protect the claims of all investors.

211.    Finally, the SEC recently learned that PIW, Warren, Warrick, Mid-Kan and T&D have substantial debts in excess of $12 million, including approximately $1.5 million owed to the

IRS for failure to pay payroll taxes. IRS liens have been placed on two of the relief defendants and at least three lawsuits have been filed by third-party creditors against Warren and PIW. It is very likely that additional lawsuits by the creditors of Defendants and Relief Defendants will follow, including lawsuits against the ventures based on unsatisfied claims against the ventures' oil-and-gas drilling rigs. A receivership order, among other things, could stay the filing of such suits.

### FIRST CLAIM
### AS TO ALL DEFENDANTS

### Violation of Section 10(b) of the Exchange Act and Rule 10-5

212.   Plaintiff Commission repeats and realleges paragraphs 1 through 211 of this Complaint and incorporated herein by reference as if set forth verbatim.

213.   Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

214.   As a part of and in furtherance of their scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

215.   Defendants made the referenced misrepresentations and omissions knowingly or with severe recklessness disregarding the truth.

216.   For these reasons, Defendants have violated and, unless enjoined, will continue to violate the provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
## AS TO ALL DEFENDANTS

### Violations of Section 17(a) of the Securities Act

217.   Plaintiff Commission repeats and realleges paragraphs 1 through 211 of this Complaint and incorporated herein by reference as if set forth verbatim.

218.   Defendants, directly or indirectly, singly, in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have:  (a) employed devices, schemes or artifices to defraud;  (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

219.   As part of and in furtherance of this scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

220.   Defendants made the referenced misrepresentations and omissions knowingly or with severe recklessness disregarding the truth.

221.   For these reasons, Defendants have violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. 77q(a)].

### THIRD CLAIM
### AS TO ALL DEFENDANTS

### Violations of Section 5(a) and 5(c) of the Securities Act

222.   Plaintiff Commission repeats and realleges paragraphs 1 through 211 of this Complaint and incorporated herein by reference as if set forth verbatim.

223.   Defendants, directly or indirectly, singly and in concert with others, have been offering to sell, selling and delivering after sale, certain securities, and have been, directly and indirectly: (a) making use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, through the use of written contracts, offering documents and otherwise; (b) carrying and causing to be carried through the mails and in interstate commerce by the means and instruments of transportation, such securities for the purpose of sale and for delivery after sale; and (c) making use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

224.   Defendants offered and sold the purported Consolidated, Alliance, Garner and Golden Belt joint venture investment programs to the public through a general solicitation of investors. No registration statements have been filed with the Commission or are otherwise in effect with respect to these securities.

225.   For these reasons, Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. 77e(a) and 77e(c)].

### FOURTH CLAIM
### AS TO MID WESTERN, DUBOISE, AND LEONARD

#### Violations of Section 15(a)(1) Of The Exchange Act

226.    Plaintiff Commission repeats and realleges paragraphs 1 through 211 of this Complaint and incorporated herein by reference as if set forth verbatim.

227.    At the times alleged in this Complaint, Mid Western, DuBoise, and Leonard have been in the business of effecting transactions in securities for the accounts of others.

228.    Mid Western, DuBoise, and Leonard made use of the mails and of the means and instrumentalities of interstate commerce to effect transactions in and to induce or attempt to induce the purchase of securities.

229.    At the times alleged in this Complaint Mid Western, DuBoise, and Leonard were not registered with the Commission as a broker or dealer, as required by Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

230.    By reason of the foregoing, Mid Western, DuBoise, and Leonard have violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

### FIFTH CLAIM

#### Claim Against the Relief Defendants
#### As Custodians of Investor Funds

231.    Plaintiff Commission repeats and realleges paragraphs 1 through 211 of this Complaint and incorporated herein by reference as if set forth verbatim.

232. Relief Defendants have received funds and property from one or more Defendants, which are the proceeds, or are traceable to the proceeds, of the unlawful activities of Defendants.

233. Relief defendants have obtained the funds and property alleged above under circumstances in which it is not just, equitable or conscionable for them to retain the funds and property. As a consequence, Relief Defendants have been unjustly enriched.

## RELIEF REQUEST

Plaintiff respectfully requests that this Court:

### I.

Preliminarily and permanently enjoin (a) all Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5; and (b) Mid Western, Leonard and DuBoise from violating Section 15(a)(1) of the Exchange Act.

### II.

Enter an Order immediately freezing the assets of Defendants McNaul, Lucas, Leonard and Kilgariff and directing that all financial or depository institutions comply with the Court's Order.

### III.

Enter an Order immediately freezing assets received by Relief Defendants, directly or indirectly, from the activities described in the Commission's Complaint, and directing that all financial or depository institutions comply with the Court's Order.

## IV.

Order that Defendants McNaul, Lucas, Krause, Nunns, Kilgariff, Leonard and DuBoise and all Relief Defendants file with the Court and serve upon Plaintiff, within 10 days of the issuance of this order or three days before a hearing on the Commission's motion for a preliminary injunction, whichever comes first, an accounting, under oath, detailing all of their assets and all funds or other assets received from investors and one another.

## V.

Order that Defendants and Relief Defendants be restrained and enjoined from destroying, removing, mutilating, altering, concealing or disposing of, in any manner, any of their books and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of the Court.

## VI.

Appoint a receiver for Defendants McNaul, Lucas, Leonard, Kilgariff and all Relief Defendants, for the benefit of investors, to marshal, conserve, protect and hold funds and assets obtained by Defendants, Relief Defendants and their agents, co-conspirators and others involved in this scheme, wherever such assets may be found

## VII.

Order that the parties may commence discovery immediately, and that notice periods be shortened to permit the parties to require production of documents and the taking of depositions on 72 hours' notice.

## VIII.

Order Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount, and order Relief Defendants to disgorge an amount equal to the illegally obtained investors funds they received from the Defendants.

## IX.

Enter an Order of Final Judgment as to Defendants Hembree and Tallman in the form submitted simultaneously with the filing of the accompanying motion for entry of final judgment.

## X.

Order civil penalties against the Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], for their securities law violations.

## XI.

Order any additional relief that this Court may deem just and proper.

DATED:  May 28, 2008            Respectfully submitted,

ERIC F. MELGREN
United States Attorney
District of Kansas


By:     s/ Laurie K. Kahrs                   
LAURIE KAHRS #17249
Assistant United States Attorney
District of Kansas
1200 Epic Center
301 North Main
Wichita, Kansas 67202
Tel:  (316) 269-6481
Attorneys for the United States of America

TOBY M. GALLOWAY
Texas Bar No. 00790733
DAVID B. REECE
Texas Bar No. 24002810
Attorney for Plaintiff
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-6447
(817) 978-4927 (fax)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

'08   MAY 29   P 2 :05

CLERK, U.S. DISTRICT COURT

SECURITIES AND EXCHANGE COMMISSION,        :

          Plaintiff,        :

    vs.        :        Civil Action No.

MICHAEL J. MCNAUL, II,        :        08- 1159 - JTM
ET AL,        :

          Defendants,        :

    And        :

CONSOLIDATED MANAGEMENT GROUP, LLC,        :
ET AL,        :

          Relief Defendants.        :

                            :

---

**AGREED ORDER APPOINTING RECEIVER**

    This matter came on before me, the undersigned United States District Judge, this

29th day of May 2008, on the motion of Plaintiff Securities and Exchange Commission

("Commission") for the appointment of a Receiver in the above-referenced matter.  It

appears that this *Order Appointing Receiver ("Order")* is both necessary and appropriate in

order to prevent waste and dissipation of assets to the detriment of investors in the securities

offered and sold by Defendants.

**I.**

**IT IS THEREFORE ORDERED:**

    1.    This Court hereby takes exclusive jurisdiction and possession of the

assets, monies, securities, properties, real and personal, tangible and intangible, of

whatever kind and description, wherever situated, of Defendants Michael J. McNaul, II,

Dale C. Lucas, and Russell W. Kilgariff,. ("Defendants") and of Relief Defendants

Alliance Leasing, LLC, Consolidated Management Group, LLC, Golden Belt

Transportation, LLC, Garner Management, LLC, Forrest Energy, LLC, Warren Drilling,

LLC, Warrick Drilling, LLC, Pawnee Iron Works, LLC, Mid Kan Operating, LLC, and

T&D Oil Service, LLC, ("Relief Defendants"), including all such assets of purported

ventures and partnerships identified in Plaintiff's Complaint (including any amendments

thereto) ("Ventures") for which Defendants or Relief Defendants purport or have

purported to serve as general partners or managing venturers (references to the

Defendants and Relief Defendants collectively will be "The Receivership Parties" or to a

"Receivership Party"), any investor funds raised in connection with such purported

Ventures and any assets acquired with or attributable to such investor funds, **including**

**the assets of Warren Energy, LLC** (collectively, these assets may be referred to herein

as "Receivership Assets" or a "Receivership Asset"); and the books and records of any

Receivership Party or the books and records under the actual or beneficial control of any

Receivership Party or any persons acting in concert with or under the direction of any

Receivership Party.

2.      Edward Nazar, located at Redmond & Nazar, L.L.P., 245 North Waco, Suite

402, Wichita, Kansas 67202-1117 with the phone number of (316) 262-8361, facsimile

number (316) 263-0610, is appointed Receiver for each Receivership Party identified

above, as well as of any investor funds raised in connection with the Ventures and any

assets acquired with or attributable to such investor funds; and the books and records of

any Receivership Party or the books and records under the actual or beneficial control of

any Receivership Party or any persons acting in concert with or under the direction of any Receivership Party ("the Receivership Estate"). The Receiver shall file with the Clerk of this Court a bond in the sum of $10,000, without need for sureties approved by the Court, to assure his conscientious performance of the duties and responsibilities imposed by this *Order*.

3.     All persons, including but not limited to the Receivership Parties and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of this *Order* by personal service or otherwise, are enjoined from in any way interfering with the operation of the Receivership or in any way disturbing the Receivership Assets and from filing or prosecuting any actions or proceedings which involve the Receiver or which affect the Receivership Assets, specifically including any proceeding initiated pursuant to the United States Bankruptcy Code, except with the prior permission of this Court. Any actions so authorized to determine disputes relating to Receivership Assets shall be filed in this Court. No person holding or claiming any position of any sort with the Receivership Estate shall possess any authority to act by or on behalf of any of the Receivership Estate, except as authorized by the Receiver.

4.     The Receiver shall have and possess all powers and rights to administer and manage the Receivership Estate, including, but not limited to the power and authority to:

     (a)     to take custody, control and possession of all records, assets, funds, property premises and other materials of any kind in the possession of or

under the direct or indirect control of the Receivership Estate and, until further order of this Court;

(b)    to manage, control, operate and maintain the Receivership Estate, to use income, earnings, rents and profits of the Receivership Estate, with full power to sue for, collect, recover, receive and take into possession all goods, chattels, rights, credits, monies, effects, lands, books and records of accounts and other documents, data and materials;

(c)    to conduct the business operations of the Receivership Parties named in the first paragraph of this *Order*, above, and the entities they control, including the collection of rents or continuation and termination or any employment arrangement and all other aspects of any active business operation;

(d)    to make such ordinary and necessary payments, distributions, and disbursements as he deems advisable or proper for the marshaling, maintenance or preservation of the Receivership Assets;

(e)    to sell, rent, lease or otherwise hypothecate or dispose of the assets of the Receivership Estate;

(f)    to contact and negotiate with any creditors of the named Defendants for the purpose of compromising or settling any claim, including the surrender of assets to secured creditors;

(g)    to receive and collect any and all sums of money due or owing to the Receivership Parties whether the same are now due or shall hereafter become due and payable, and is authorized to incur such expenses and make such

disbursements as are necessary and proper for the collection, preservation, maintenance, administration and operation of the Receivership Estate;

(h)    to renew, cancel, terminate, or otherwise adjust any pending lease agreements to which any of the Receivership Parties is a party;

(i)    to institute, defend, compromise or adjust such actions or proceedings in state or federal courts now pending and hereafter instituted, as may in his discretion be advisable or proper for the protection of the Receivership Estate or proceeds there from, and to institute, prosecute, compromise or adjust such actions or proceedings in state or federal court as may in his judgment be necessary or proper for the administration, preservation and maintenance of the Receivership Estate;

(j)    to institute such actions or proceedings to impose a constructive trust, obtain possession and/or recover judgment with respect to persons or entities who received assets or funds traceable to investor monies, with all such actions filed in this Court;

(k)    to open bank accounts or other depository accounts, in the name of the Receiver on behalf of the Receivership Estate;

(l)    to prepare any and all tax returns and related documents regarding the assets and operation of the Receivership Estate;

(m)    to take any action which could be taken by the officers, directors, managers, members, partners, trustees or other principals of the Receivership Estate;

(n)    to take such other action as may be approved by this Court.

5.      Notwithstanding the powers and rights set forth above in Paragraph 4, the Receiver, prior to recommending any disposition of Receivership Asset to the Court, shall use reasonable efforts to evaluate the viability of a proposed capital infusion by the firm East West Energy, Inc. ("East West"), referenced generally in paragraphs 58-62 of the Declaration of Steve Webster, filed with the Court as part of Plaintiff's Appendix in Support of its Motion for Emergency Relief.

6.      The Receiver shall perform an accounting of the offering and sale of securities that is outlined in the Commission's Complaint including, but not limited to, the named Defendants' and the Relief Defendants' solicitation, receipt, disposition and use of the proceeds from such offering.

7.      The Receiver shall be empowered, but is not required, to file a voluntary petition for relief under Title 11 of the United States Code (the Bankruptcy Code) for the Receivership Estate or any portion thereof. If a bankruptcy petition is filed, the Receiver shall become, and shall be empowered to operate the Receivership Estate as a debtor in possession, with all powers and duties provided to a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Without leave or further order of this Court, no person other than the Receiver is authorized to seek relief for any person or entity included within the Receivership Estate.

8.      In the event an asset freeze order is issued, the Receiver shall be authorized, but not required, to administer, manage, and direct the marshaling, disbursement an/or transfer of monies or other assets held by third parties that are subject to the freeze. The Receiver may, in the reasonable exercise of his discretion, authorize the release, use or segregation of proceeds held by third parties.

9.     The Receivership Parties and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive actual notice of this *Order,* shall cooperate with the Receiver and the other professionals working with him in the administration of the Receivership Estate, including, but not limited to, the immediate delivery to the Receiver of the following:

(a)     all assets and other materials of the Receivership Estate in the possession or under their control, as well as the name and contact information of any person who has knowledge of the nature or location of assets or other materials belonging to the Receivership Estate;

(b)     business records of any kind, whether in hard copy or electronic format, including e-mail files and accounts, customer files, accounting and financial records, bank records and brokerage or other depository records;

(c)     insurance policies regarding any assets or persons that are in any way affiliated with the Receivership Estate, along as other information regarding insurance coverage or the absence thereof;

(d)     computers and computer files, including e-mail files, along with all passwords for such files, that belong to or are under the control of any of the Receivership Parties or that in any way relate to the assets or the operation of the Receivership Estate;

(e)     passwords and other identifying information regarding all computer or on-line files, banking or brokerage accounts and/or any other assets of any of the Receivership Parties or under their direct or indirect control,

specifically including but not limited to, passwords for internet or electronic access banking, brokerage and other on-line accounts;

(f)     keys, security cards, parking cards and other access codes for premises, vehicles, safety deposit boxes or accounts or assets under the direct or indirect control of any of the Receivership Parties; and,

(g)     such other information related to the Receivership Estate as the Receiver and those working with him reasonably request.

10.     Any bank, brokerage firm, mutual fund or other financial institution or any other person, partnership, corporation or other entity maintaining of having custody or control of: any brokerage or depository accounts or other assets of the Receivership Estate; or, accounts into which proceeds of the subject investment offering(s) have been deposited; or, accounts or assets under the direct or indirect control of the Receivership Parties who receives actual notice of this *Order*, shall:

(a)     freeze such accounts, funds or assets;

(b)     within five (5) business days of receipt of such notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other assets, the balance in the account or the description of the assets as of the close of business on the date of the receipt of the notice;

(b)     promptly cooperate with the Receiver to determine whether and to what extent any accounts, funds or other assets are actually assets or proceeds of assets of the Receivership Estate;

(c)    provide to the Receiver records of such funds, accounts and assets

and tender said funds and/or the assets to the Receiver.

To the extent that there are assets about which a determination of ownership cannot be

made, they shall be turned over to the Receiver to be held in escrow pending a

determination of the ownership of such assets.

11.    The Receiver is authorized to provide notice of the entry of this *Order* to

any governmental agency, person or other entity he deems appropriate.  Actual notice

may be accomplished by delivery of a copy of this *Order* by hand, U.S. mail, courier

service, facsimile, by e-mail or by any other reasonable means of delivery.

12.    The Receiver is hereby authorized to make appropriate notification to the

United States Postal Service to forward delivery of any mail addressed to any of the

Receivership Parties named in the first paragraph of this *Order*, above, or any company

or entity under the direction or control of the Receivership Parties, to any Post Office box

or other mail depository, to himself.  Further, the Receiver is hereby authorized to open

and inspect all such mail, to determine the location or identity of assets or the existence

and amount of claims.

13.    The Receiver may investigate any matters he deems appropriate in

connection with discovering additional information as it relates to the activities of the

Receivership Estate.    In connection with any such investigation, the Receiver is

authorized to:

(a)    compel, including by subpoena, the appearance and testimony of all

persons, including the Receivership Parties (prior to and/or after the filing of

responsive pleadings in this  action) and the production of the originals of any

records and materials, of any sort whatsoever, within the possession, custody or control of any person, though the Receiver's authority under this paragraph shall not be construed to require the waiver by any person of any validly asserted privilege; and,

(b)    order consumer and credit reports that the he deems necessary and appropriate as a part of his investigation.

14.    The Receiver is hereby directed to file with this Court and serve upon the parties, within 45 days after entry of this *Order*, a preliminary report setting out the identity, location and value of the Receivership Assets, and any liabilities pertaining thereto.

15.    Absent express permission and leave by this Court, all creditors and other persons seeking money damages or other relief from the Receivership Estate and all others acting on behalf of any such creditors and other persons, including sheriffs, marshals, and all officers and deputies, and their respective attorneys, servants, agents and employees, are, until further order of this Court, hereby stayed. Further, all persons having notice of this Order, including creditors and others seeking money damages or other relief from the Receivership Estate, and all others acting on behalf of any such creditors and other persons, including sheriffs, marshals, and all officers and deputies, and their respective attorneys, servants, agents and employees, are restrained from doing anything to interfere with the Receiver performance of his duties and the administration of the Receivership Estate.

16.    The Receiver is authorized to communicate with all such persons as he deems appropriate to inform them of the status of this matter and the financial condition of the Receivership Estate.

17.    The Receiver is hereby authorized to employ such employees, accountants, consultants, attorneys and other professionals, including employees of his own professional firm, as are necessary and proper for the administration of the Receivership Estate and the performance of his duties as set forth herein.  The Receiver shall seek and obtain the approval of this Court prior to disbursement of professional fees and expenses to himself, his firm or his counsel, by presentation of a written application therefore, and after consultation with the Commission.  All costs incurred by the Receiver shall be paid from the Receivership Assets.  Upon notice to all parties in this case, the Receiver may submit a proposed order regarding an administrative process for the approval and payment of professional fees and expenses consistent with this provision.

18.    Upon the request of the Receiver, the United States Marshal's Office, in any judicial district, or any other law enforcement agency is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody or control of, or identify the location of, any Receivership Assets or Receivership Records.  The Receiver is authorized to remove any person from any premises or real estate that is owned or controlled by any of the Receivership Parties, or that is otherwise part of the Receivership Estate.  The Receiver is further authorized to enter any premises, safety deposit boxes, vehicles or other property of the Receivership Parties, and to change any locks or other security mechanisms, and to recover and assets and records located thereon or therein,

and, in cases of doubt, to secure assets and, in the case of any contest, to seek a judicial determination by this Court with respect to ownership.

19.     The Receiver shall keep the Commission and the Court apprised at reasonable intervals of developments concerning the operation of the receivership, and shall provide to the Commission upon request any documents under the control of the Receiver. The Receiver shall promptly notify the Court and counsel for the Commission of any failure or apparent failure of any of the Receivership Parties to comply in any way with the terms of this Order.

20.     Except for an act of gross negligence or intentional misconduct, the Receiver and all persons engaged or employed by him shall not be liable for any loss or damage incurred by any person or entity by reason of any act performed or omitted to be performed by the Receiver or those engaged or employed by him in connection with the discharge of their duties and responsibilities in connection with the receivership.

## II.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this action for all purposes. The Receiver is hereby authorized, empowered and directed to apply to this Court, with notice to the Commission and the Receivership Parties named in the first paragraph of this *Order*, above, for issuance of such other orders as may be necessary and appropriate in order to carry out the mandate of this Court.

## III.

**IT IS FURTHER ORDERED** that this *Order* will remain in effect until modified by further order of this Court.

UNITED STATES DISTRICT JUDGE

AGREED TO BY:

\# 12296

Mark Ayesh
Ray Simmons
Ayesh Law Offices
Building 2300, Suite 2
8100 East 22nd Street
Wichita, KS  67226
 Attorney for Defendants McNaul, and Lucas,
and  Relief Defendants Alliance, Consolidated, Forrest, Warren, Warrick, PIW, Mid Kan T&D,
and Warren Energy, LLC.


Robert Arnett
 Munck Carter P.C.
12770 Coit Road, Suite 600
Dallas, Texas 75251
(972) 628-3600
(972) 628-3616
Attorney for Defendant  Kilgariff and Relief Defendants
Garner Management, LLC.and Goldent Belt
Transportation, LLC.

By: /s/ Laurie K. Kahrs
LAURIE KAHRS #17249
Assistant United States Attorney
District of Kansas
1200 Epic Center
301 North Main
Wichita, Kansas 67202
Tel: (316) 269-6481
Attorneys for the United States of
        America

TOBY M. GALLOWAY
Texas Bar No. 00790733
DAVID B. REECE
Texas Bar No. 24002810
SECURITIES AND EXCHANGE
        COMMISSION
Fort Worth Regional Office
801 Cherry Street, 19th Floor
Fort Worth, Texas 76102
(817) 978-6447
(817) 978-4927 (fax)
gallowayt@sec.gov

EXHIBIT TO AGREED ORDER APPOINTING RECEIVER

SEC v. McNaul, II, et al.
District of Kansas
Civil Action No. 08-1159-JTM-DWB

## "Joint Ventures"

| | |
|---|---|
| Joint Venture #1 | Consolidated #1 |
| Joint Venture #2 | Consolidated #2 |
| Joint Venture #3 | Consolidated #3 |
| Joint Venture #4 | Consolidated #4 |
| Joint Venture #5 | Consolidated Hugoton |
| Joint Venture #6 | Consolidated Hugoton #2 |
| Joint Venture #7 | Anadarko #1 |
| Joint Venture #8 | Anadarko #2A |
| Joint Venture #9 | Anadarko #2B |
| Joint Venture #10 | Alliance #1 |
| Joint Venture #11 | Alliance #2 |
| Joint Venture #12 | Alliance #3 |
| Joint Venture #13 | Alliance #4 |
| Joint Venture #14 | Alliance Sooner Trend #1 |
| Joint Venture #15 | Alliance Sooner Trend #2 |
| Joint Venture #16 | Alliance Sooner Trend #3 |
| Joint Venture #17 | Alliance Sooner Trend #4 |
| Joint Venture #18 | Alliance Sooner Trend #5 |
| Joint Venture #19 | Alliance Sooner Trend #6 |
| Joint Venture #20 | Alliance Sooner Trend #7 |
| Joint Venture #21 | Garner |
| Joint Venture #22 | Golden Belt |